```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                       MARSHALL DIVISION

 3   VERSATA SOFTWARE           *    Civil Docket No.
                                *    2:08-CV-313
 4   VS.                        *    Marshall, Texas
                                *
 5                              *    June  11, 2012
     INTERNET BRANDS, ET AL     *    11:30 A.M.
 6
                        TRANSCRIPT OF JURY TRIAL
 7          BEFORE THE HONORABLE JUDGE WILLIAM BRYSON
                UNITED STATES FEDERAL CIRCUIT JUDGE
 8

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:   MR. SAM BAXTER
                           McKool Smith
11                         104 East Houston, Suite 300
                           Marshall, TX   75670
12
                           MR. SCOTT COLE
13                         MR. JOHN M. SHUMAKER
                           MR. KEVIN M. KNEUPPER
14                         MS. LEAH B. BURATTI
                           MS. KRISTINA S. BAEHR
15                         McKool Smith
                           300 West 6th Street
16                         Suite 1700
                           Austin, TX    78701
17

18   APPEARANCES CONTINUED ON NEXT PAGE:

19

20   COURT REPORTERS:      MS. SHELLY HOLMES, CSR
                           MS. SUSAN SIMMONS, CSR
21                         Official Court Reporter
                           100 East Houston, Suite 125
22                         Marshall, TX   75670
                           903/935-3868
23

24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1  APPEARANCES CONTINUED:

 2  FOR THE PLAINTIFFS:    MR. DEMETRIOS ANIAPAKOS
                          MR. KINAN H. ROMMAN
 3                        Ahmad, Zavitsanos, Anaipakos,
                              Alavi & Mensing
 4                        1221 McKinney, Suite 3460
                          Houston, TX   77010
 5
 6  FOR THE DEFENDANTS:    MR. MICHAEL P. ADAMS
                          MR. JAMES G. RUIZ
 7                        MR. ANDREW J. SCHUMACHER
                          Winstead
 8                        401 Congress Avenue
                          Austin, TX   78701
 9
                          MS. MELISSA SMITH
10                        Gillam & Smith
                          303 South Washington Avenue
11                        Marshall, TX   75670

12              * * * * * * * * * * * * * * * * * * * * * * * * * *

13                    P R O C E E D I N G S

14              (Jury in.)

15              THE COURT:  Now, the first order of

16  business is to swear the jury.  And Ms. Martin will give

17  you the juror's oath.

18              (Jurors sworn.)

19              THE COURT:  Now, before we turn -- you

20  can -- you can be seated.  Thank you.

21              Before we turn to the counsel's opening

22  statements, I'll give you a very brief overview, and

23  some of you have sat on juries.  A lot of what I was

24  going to say, frankly, is not going to be necessary,

25  given your experience and so forth, so I'm going to
```

1    short-circuit some of this.

2                But let me just tell you for those of you

3    who may not have sat on a jury before, the first thing

4    that's going to happen is the lawyers are going to make

5    an opening statement, basically giving you an outline of

6    where this trial is going to go.

7                Then they will start right in on the

8    evidence.  I suspect what we do is have opening

9    statements before lunch and then evidence starting right

10   after lunch.  We will then go through the evidence,

11   which will be typically in the form of live witnesses,

12   with cross-examination, and some, I expect, deposition

13   evidence as well.  A deposition is basically a

14   videotaped testimony from a witness who wasn't able to

15   be at trial or was, for some reason, far away and so

16   forth.  But that evidence is just as important as live

17   evidence that you'll hear.

18               At the end of the case, I will give you a

19   legal instruction, which will be in this case, I

20   suspect, fairly lengthy.  And you will have to attend to

21   the legal instruction fairly carefully, because it's --

22   it's the law that you are going to apply.  But I will

23   give you a copy of my instructions, so you're not going

24   to have to memorize everything I'm saying.

25               Then the lawyers will come back, and they

1  will make closing arguments to you, after which you will

2  go into deliberations.

3               Now, the notebooks, which have just been

4  given to you, you may use and feel free to take notes on

5  anything that occurs, but I would just caution you --

6  and some people find taking notes is a great way to

7  remember things.  Some people find taking notes gets in

8  the way.

9               I actually fall in the second category.

10 I find it gets in the way of my really listening.  And I

11 remember in school, I would go through a whole hour and

12 copy down what I thought I was hearing, and then realize

13 at the end of the hour, I didn't really remember

14 anything that was said.  All I had were these notes.

15 So if you're like that, I would caution you don't try to

16 take down everything.  There's going to be a lot of

17 testimony, so if you need something to remind you, notes

18 are great.  But if you don't and -- or if you really

19 feel comfortable just listening and occasionally jotting

20 something down, that -- that works, too.

21              Now, you've already heard some talk about

22 some of the legal terms that we're going to get into,

23 and, again, I'm going to short-circuit this, because I

24 think you already know both from the discussions earlier

25 and from your prior experience what most of these terms

1  mean.  But sometimes lawyers do tend to use technical

2  terms, so I'll try to make it a little -- give you a

3  little quick course in some of the terminology.

4              The first is, when one refers to a party,

5  that's just either the Plaintiff, which is the party --

6  the person or the company or whatever that brought the

7  suit, or the Defendant, which is the party that was

8  sued.

9              Now, in this case -- normally, the

10  plaintiff has a claim against the defendant, and yet

11  frequently, not all the time, but frequently, the

12  defendant also has a claim against the plaintiff,

13  referred to sometimes as a counterclaim.

14              That has happened in this case, so both

15  parties have claims against one another.

16              All right.  Now, let me briefly

17  describe -- I think you-all know what breach of contract

18  really means.  I mean, breach is not a word you use in

19  ordinary, daily life, but all it means is breaking your

20  binding contractual obligations and harming somebody by

21  doing so.  That's -- that's pretty straightforward.

22              There is another term or actually a

23  couple of terms that you may hear that you will have to

24  be -- this is going to sound a little strange to you,

25  and I'll just tell you what the terms are, because it

1    will inoculate you, maybe, to the later terms.

2              So the first term is tortious

3    interference with contract, and there's a related term

4    called tortious interference with prospective contract

5    or prospective business relationships.  Now, that's a

6    mouthful.

7              But what it means essentially is that,

8    for example, if you and I have a contract and -- or

9    we're about to form a contract, and Mr. Helman over here

10   should do something unlawful to interfere with our

11   contract and deprive you of the benefit of the contract

12   you had with me, or the benefit of the contract you

13   expected legitimately to have with me, you could sue

14   Mr. Helman for tortious interference with contract.

15             Tort is basically a legal word for a

16   civil wrong; something that is done that's wrong that

17   isn't a crime.  You will hear those terms, but that's

18   basically all it is.

19             You've also heard the term patent

20   infringement, and I think you saw the video earlier

21   about the -- how the patent system works.  Very briefly,

22   again, a patent gives an inventor, a person who goes to

23   the Patent Office, and says I've invented something?

24   If the Patent Office gives that person a patent on that

25   invention, that means that that person, for 20 years,

1 can keep others from using, making, or selling that item

2 that's covered by the patent.

3           Now, that doesn't mean that that person

4 that has the patent can sue the universe for patent

5 infringement.  It just means that something that falls

6 within the scope of the patent is something that's

7 protected by the patent.

8           So if, for example, the patent owner sues

9 somebody and says you've infringed my patent, the

10 patent -- the defendant in that case can say:  No, what

11 I've done is quite different from what's covered by your

12 patent.  And that will be an issue that will be decided

13 in a case exactly like this one.

14           The other thing that frequently happens

15 is that the person who's being sued by the patentee will

16 say, well, that patent is invalid.  Patents to be valid

17 have to be something new.  They also have to be not

18 obvious, but -- and we'll discuss these -- these terms

19 later.

20           The parties will -- will spend some time

21 on these terms.  But if the party who is being sued can

22 prove by clear and convincing evidence that the patent

23 is invalid, then the patentee does not have a lawsuit,

24 all right?

25           I think we discussed during the jury

1  colloquy the discussions with you, the burdens of proof,

2  but let me just reiterate one more time.  The normal

3  burden of proof in a civil case, which this is, is the

4  preponderance of the evidence; that is, if it's a little

5  more on one side than the other, you go with the side

6  that's got a little more force to it, a little more

7  persuasive.

8            We use the word burden, because that

9  means that the party that has the burden is the party

10  that must persuade you, even if only by a little, but

11  that's the party that must persuade you.

12            If, at end of the day, you say I don't

13  know which way I'm persuaded, then the party that had

14  the burden loses, okay?

15            The other standard is clear and

16  convincing evidence.  And the -- that standard applies,

17  for example, to the question of patent validity.  And in

18  clear and convincing evidence, it means pretty much what

19  it sounds like; that in order for you to be satisfied

20  that something has been proven by clear and convincing

21  evidence, you must be left with a clear conviction that

22  the fact in question has been proved.

23            Now, I'll talk more at the very end of

24  the case about burdens of proof and the legal standard

25  and so forth, but these are things that I want you to

 1  have in the back of your mind as -- as you start to hear

 2  the evidence.

 3           Now, I mentioned evidence.  What is

 4  evidence?

 5           Well, evidence is what you're going to

 6  hear in court, but there are certain things that aren't

 7  included in evidence.  The arguments and statements of

 8  lawyers, that's not evidence.  So when the lawyers make

 9  their opening statement to you and when they make their

10  closing statement to you, that's not evidence.  That is

11  designed to help you interpret and understand the

12  evidence.

13           So, you know, if a lawyer says something,

14  that something had better be backed up by something in

15  the evidence in order for you to credit it.  You don't

16  simply take the lawyer's word at face value.

17           Also, there will be objections in my -- I

18  will predict from time to time to some of the evidence,

19  and there will be exchanges between the lawyers and

20  myself over objections.  Objections are not evidence,

21  and the discussions between me and the lawyers are not

22  evidence.  These are just things which you should

23  disregard in terms of deciding what you make of the

24  evidence.

25           That's something which is just between

1 the lawyers and me.  It's not something that should bear

2 on your decision.

3             I may at some point tell you to disregard

4 particular testimony because it's -- for whatever

5 reason, for legal reasons, you are to do that.  You are

6 to disregard as best you can the testimony when I

7 instruct you to disregard testimony.

8             Now, that leads me to my final point, and

9 then I will allow the lawyers to begin with their

10 opening statements, after which we'll break for lunch.

11             The final point is, during the trial, you

12 may find that people will want to talk to you about the

13 case.  It's very natural.  You go home, somebody wants

14 to know what's the case all about and so forth.  You

15 need to tell them that you can't discuss the case.  Now,

16 you can tell them, yes, I've been selected for a jury,

17 and, yes, it's a civil jury, but you really should stop

18 there.

19             And the reason is, because once you start

20 down the path of talking about the case, then somebody

21 might say, oh, yeah, I sat on a case like that.  Boy,

22 you know, that -- in my case, the Plaintiff had no case

23 at all, blah, blah, blah.  You see where that leads.

24             You really want to be focused entirely on

25 the evidence in this case, so if anybody does talk to

1  you about the case or start to you about the case, just

2  tell them I really can't talk about it until it's over.

3  Once it's over, you can talk to anybody you want.

4  You're free to.  You cannot talk to anybody you want, as

5  you like, but not until.

6            Now, the same goes for not sharing any of

7  your views about the case or any thoughts or whatever on

8  any social network, Facebook, Twitter, or any of that.

9  And also, while we're talking about the Internet, don't

10  do any research, independent research on the Internet

11  about the companies or the lawyers or any of that.

12            Sometimes -- I'm pretty confident it's

13  not going to happen with this jury, but every now and

14  then, a juror will decide to get very enterprising and

15  go out and do research on something and say look what I

16  found; these guys did X, Y, Z 10 years ago.

17            Well, that's -- that is absolutely --

18  can't -- no can do, all right?  That's something you

19  should just not pursue.

20            All right.  You may happen to run across

21  the lawyers -- this is a small courthouse.  You may

22  happen to run across the lawyers in the halls or walking

23  to lunch or what-not.  They will not speak with you.

24  They may nod to you, but they won't speak with you.

25  Now, that's not because they're not friendly.  They are.

1  But it's because they know they're not supposed to have

2  any contact with you.  So don't go up to them and chat

3  with them.  And if you should have -- happen to say

4  hello and they sort of give you a nod, and they don't

5  reciprocate, that's why.

6            You have the notebooks, and you will, as

7  I say, be able to take notes there.

8            And at this point, I think we're ready

9  for opening statements.

10           Yes?

11           MR. ADAMS:  Your Honor, one procedural

12  matter.  Because of the jury selection process, we were

13  not allowed to be in the courtroom to set up our

14  technical presentation equipment.  May we have 10 or 15

15  minutes or so?

16           THE COURT:  Are you going to do that --

17  are you going to need that for your opening statement?

18           MR. ADAMS:  Yes, Your Honor.

19           THE COURT:  Mr. Cole?

20           MR. COLE:  How far out are we just to

21  make sure --

22           THE TECHNICIAN:  I think we just need one

23  quick test and we'll be ready.

24           MR. COLE:  I don't if you guys can work

25  while I'm --

1              THE COURT:  Can you work while the

2 opening statement, Mr. Cole's opening statement is going

3 on?

4              MR. ADAMS:  As long as it's not

5 disturbing to him, Mr. Cole.

6              MR. COLE:  I'll be oblivious.

7              THE COURT:  I would like to get going so

8 that we can get lunch at a reasonable hour.

9 Very well.  Who will be giving the opening statement for

10 the Plaintiff?

11              MR. COLE:  I will, Your Honor.

12              THE COURT:  Mr. Cole.

13              MR. COLE:  Your Honor, do we want to pass

14 out the juror notebooks at this point or wait until

15 after opening statements?

16              THE COURT:  I'm assuming that opening

17 statements will be general enough that the juror

18 notebooks would not be all that helpful at this point.

19              If you intend to call their attention to

20 particular pieces of data or documents, then that could

21 be.

22              When we say juror notebooks, by the way,

23 you're going to get another notebook in addition to the

24 one you have now, which will contain some of the

25 documents that are at issue in the case.  And that will

1    be helpful to you, because you can actually look at what

2    the lawyers are talking about.

3              But what -- we're not going to give you

4    those, I think, right now, because they're not going to

5    get into the real nitty-gritty of the case, I think,

6    until the evidence starts coming in.

7              So, Mr. Cole.

8              MR. COLE:  Thank you, Your Honor.  May it

9    please the Court.

10             This is a case about unfair competition.

11   We filed this lawsuit because the Defendant, AutoData,

12   competed against us and took away one of our customers

13   by wrongly claiming to have broad rights to use our

14   ideas, our innovation, and our patented technology.

15             But in reality, they had only a small

16   fraction of the rights that they claimed, and they did

17   all of this because they wanted to win a

18   once-in-a-lifetime contract, a multimillion-dollar deal

19   with Chrysler to replace the technology we were

20   providing at a discount price.

21             And their tactics paid off, because they

22   won the Chrysler deal.  And after they won the contract,

23   they went to work actually implementing or building the

24   software that Chrysler wanted.  And when they did that,

25   they infringed one of our patents.

1                     But the law protects the investments we

2     have made in our technology, and that's why we're

3     bringing this lawsuit, to protect the investment.

4                     My name is Scott Cole, and I'm one of the

5     lawyers here for Versata.

6                     Mr. Randy Jacops is here with us at

7     counsel table.  Mr. Jacops was the CEO of Versata during

8     the whole time period we're going to be talking about.

9                     I think you met Mr. Baxter this morning.

10    Demetrios Anaipakos and Kevin Kneupper -- and John

11    Shumaker is around here somewhere.  We kind of have a

12    team approach, so you'll see a lot of us shuffling in

13    and out, but it helps us to move fast.

14                    Now, let me tell you a little bit about

15    Versata.  Versata is a software company.  It was started

16    in the late 1980s by four Stanford University students

17    in California.

18                    Now, back then when they were formed, the

19    company was called Trilogy Software.  That was the

20    original name.  And in the intervening years, they

21    decided to change the name to Versata.  So it's

22    confusing to all of us, but just try to keep in mind

23    that Trilogy and Versata are the same company.  It's

24    just a new name.  So you'll probably see both names a

25    lot.  I know it's a little confusing.

1                    But in any event, Versata moved to Austin

2    in the early 1990s and then grew to be a very successful

3    company in the area called enterprise software.

4    Now, enterprise software is software that's built and

5    designed for big businesses to use rather than software

6    for individuals like you and me.  Like we might use

7    Microsoft Word or QuickBooks or something like that, but

8    enterprise software is designed to be sold to big

9    companies, and they run large applications for their

10   business purposes.

11                   Now, let me give you just a couple of

12   example of what enterprise software is.  So one kind of

13   enterprise software that Versata made and sold was

14   called configuration software, and what that did is it

15   allowed you to take really complicated products, like

16   computers or airplanes, or as you can see here, cars

17   that have lots and lots of parts that fit together.

18                   And configuration software can take all

19   of those parts and put them together virtually inside

20   the computer to figure out which of the billions and

21   billions of possible ways you can construct this car,

22   which ones will actually work, which ones the company

23   might want to sell or not sell.

24                   Another type of software that Versata

25   built and sold in the enterprise software field was

1   pricing software, and it allowed companies -- large

2   companies that would have maybe thousands of products

3   they're selling; they might have thousands of customers.

4   And it would allow them to manage this huge maze of

5   pricing information and put that on a laptop computer,

6   and put it in their sales force so they can go out and

7   close deals right out there in the field.

8                    So those are a couple of examples of what

9   enterprise software is about.

10                    Now, Versata grew and was a very

11  successful company in this area.  And we have a number

12  of customers in various industries, including several in

13  the automotive industry that we're going to be talking

14  about in this case.

15                    For example, we do work for Ford and

16  Jaguar and Land Rover, to name a few.  So that's --

17  that's Versata.  That's our client.

18                    Now, the Defendant, AutoData, is a -- is

19  an automotive data company, as can you probably guess

20  from their name, and that's a little bit different.

21  What they specialize in is gathering information from

22  all the various car manufacturers about what kinds of

23  models they have, what options are available on those

24  models, and how you can -- how the companies actually

25  sell their products.

1                    And they collect that data and package it
2    up in ways that make it useful for software companies
3    like us to use.  So, for example, Versata might buy data
4    from AutoData to feed into our software.  But AutoData
5    wanted to move beyond being just a data company, and
6    they wanted to move more into the area that we were in.
7    And so in early 2008, they were looking to win some
8    business from Chrysler.  The business actually at the
9    time we had.  And since -- in fact, since 2004 -- for
10   about four years, since 2004, we had been doing work for
11   Chrysler under a very substantial contract that paid us
12   about 5 to $6 million a year.  So that was 2004.

13                   Now, in 2007 -- before this particular
14   bid went out, in 2007, Chrysler was bought by a Wall
15   Street private equity firm called Cerberus Capital,
16   okay?  And when Cerberus Capital bought Chrysler, they
17   installed a set of new executives to run things.  And
18   the new management at Chrysler had some different
19   priorities and different ideas.

20                   But first and foremost, what they wanted
21   to do, when they took over, was to cut costs.  And one
22   of the areas they looked at cutting costs in was the
23   money that they were paying to us under our contract.

24                   So pursuant to that, or basically in
25   accordance with the Chrysler -- new Chrysler

1  management's goals, they sent out an invitation to

2  companies in the industry to come in and bid on the

3  business that we have.

4            So if we could look at Plaintiff's

5  Exhibit 367.

6            Now, this is one of the exhibits that

7  you'll see in this case, and this is a set of notes from

8  some AutoData salespeople, when they were meeting with

9  Chrysler early on.  You can see here the date is

10 February 2008, and the subject of the notes here is

11 Chrysler U.S. - Build and Price.

12            So that's -- build and price was the core

13 of the software that we were -- that we had provided to

14 Chrysler.  It allowed you to build a car to configure

15 all those parts together, and then to price it.

16            And they're talking about -- the

17 important thing here is that they're talking about why

18 this bid is going out.  Their motivation -- Chrysler's

19 motivation is to save a lot of money by the end of the

20 year.  And the reason that's important here is their

21 motive is not that they wanted some fundamentally new

22 technology.  They didn't look at what we were doing and

23 say we don't like that.

24            What they were saying is, we want the

25 same thing; we just want it cheaper; and we want that

1   savings to kick in right away.

2              Now, Chrysler's goal -- in other words,

3   the reason that they sent out this request for a new --

4   a new bid, their goal is important here, because since

5   their focus was not on being dissatisfied with our

6   functionality.  Because they wanted to save money, it

7   was important that there not be any legal concerns.

8              Now, let's take a look at another

9   document.  This is Plaintiff's Exhibit 352.  This is on

10  the same subject.  Again, this is February 2008.  This

11  is an internal AutoData e-mail that's copying Chrysler,

12  okay?

13             And they're talking about, again, what

14  Chrysler's motive is in sending out this bid for

15  replacement.  And they say as a first phrase, this would

16  enable Chrysler to replace the current underlying

17  software, while maintaining the existing functionality.

18  They want to maintain the same functionality that we

19  provided and also the same look and feel.

20             They wanted AutoData, new vendor, to do

21  what we did, the same functionality, and even make it

22  look and feel the same way.  They just wanted to do that

23  for less.

24             Now, let me be clear right off the bat.

25  We don't blame Chrysler for wanting to save money at

1  all.  Nobody is saying that there was anything wrong

2  with Chrysler wanting to pay less.  But their goal in

3  wanting the same thing for less meant that a new vendor

4  had to have the legal right -- they had to be able to do

5  everything that we were doing.

6           And we have patents that cover our

7  technology.  And one other thing that's important is

8  Chrysler's goal meant that AutoData knew they had an

9  incentive to tell Chrysler whatever it took to convince

10  them that they could do everything we could do.

11           And, in fact, that's just what -- what

12  AutoData told Chrysler.  You'll hear evidence that

13  AutoData promised Chrysler that they had the rights to

14  do anything and everything we could.  The only problem

15  with that is it's not true.

16           And you'll see evidence that these broad

17  assurances that Chrysler (sic) made, that they could do

18  everything we could do, is just an overstatement.  It's

19  not the case.  In fact, AutoData had a license to one

20  small group of patents covering a portion of one area of

21  our software.

22           And let me tell you briefly how that came

23  about.  Judge Bryson, I think, mentioned to you briefly

24  that there was a prior lawsuit between these parties,

25  and it started back in the late 1990s, and unlike this

1   time, the parties were able to actually settle that

2   dispute before coming to trial.  So in other words, they

3   entered an agreement that basically got rid of all the

4   lawsuits.

5                   And the agreement -- scratch that -- in

6   the agreement, AutoData paid us.  In exchange for that,

7   they got a license to a portion of our -- excuse me -- a

8   portion of our patents.

9                   Now, that was in 2001.  There was an

10  agreement they had a license to a small group of our

11  patents, and that's the only license that they have.

12                  Now, you fast-forward back to 2008.

13  Again, this is back when the Chrysler bid was going out,

14  and when Chrysler tell -- excuse me -- when AutoData

15  tells Chrysler that they have the broad rights to do

16  anything we can.  In reality, they just have the one

17  license.

18                  Now, not only did AutoData overstate or

19  oversell; the problem was with AutoData even having this

20  discussion with Chrysler at all.  And the problem is

21  that in that settlement agreement that we entered in

22  2001 -- this is a section of it; this is the agreement

23  between us and AutoData settling that litigation.

24                  In that agreement, AutoData promised that

25  they wouldn't do that; that they would not disclose,

1  confirm, or otherwise discuss this agreement -- that's

2  the one that gave them the license -- or its terms and

3  conditions or any confidential information.  Except, and

4  there's some exceptions there, but none of those are at

5  issue in this case.

6           The important thing is, they promised not

7  to discuss the terms of this license.  And even if

8  AutoData comes in here in this case and says:  Listen,

9  we showed them a copy of the license.  We were perfectly

10  clear about the rights that we did and did not have.

11  Even if that's their position, and I don't think it's

12  going to be, they still broke their promise not to

13  broach that subject, certainly not in competition with

14  us.

15           And it makes sense that this is -- that

16  this issue -- in other words, the legal rights here was

17  an important one to Chrysler, because if your goal is to

18  save money, the last thing in the world you need is a

19  lawsuit where you're going to have to pay lawyers and go

20  to all that distraction.

21           If you're looking to save money by

22  year-end, getting involved in a lawsuit is the last

23  thing that you want.

24           Now, how do I know it's -- this was an

25  important issue to Chrysler?

1          Now, this is an e-mail in 2008, July of

2   2008, that's from Mr. Perrier, who, I believe, is the

3   CEO of AutoData to another AutoData person.  And the

4   subject here is that something came up in a meeting with

5   Chuck.  And Chuck is Chuck Sullivan, and he was the most

6   senior Chrysler executive in charge of this project; in

7   other words, he was the Chrysler executive in charge of

8   the bid to replace us.

9          Now, Chuck mentioned something about a

10  perpetual license that AutoData has with Trilogy on

11  config and wanted to understand more on certain vehicle

12  processes, et cetera.  That shows Mr. Sullivan's

13  sensitivity to that issue.  And he -- Mr. Perrier says:

14  They are obviously prepping and are super-sensitive to

15  Trilogy patents.

16          And we agree; Chrysler was

17  super-sensitive to our patents, because they knew they

18  wanted a replacement for us, and they knew that we had

19  patents that covered our technology.

20          Now, let me make a couple of final

21  points on -- this is our breach of contract claim.

22  We're not saying that there's anything wrong with

23  competition.  The fact that Chrysler bid this out, the

24  fact that AutoData competed against us, the fact that

25  they won, all of that is not in dispute.  That is

1 perfect -- that's perfectly legitimate.  It happens

2 every day.  We don't have a problem with it.

3            There's nothing wrong with Chrysler

4 wanting to save money, but breaking legal agreements and

5 misrepresenting facts are wrong, and that's the basis of

6 our suit.  We're not complaining about the competition

7 itself.  We're complaining about the broken agreements

8 and the misrepresentations.

9            Okay.  Now, we're going to move to our

10 second claim, which is the patent claim.  And so not

11 only did they overpromise in order to get the deal, but

12 once they won the contract, AutoData then did the very

13 thing that Chrysler was concerned about on the front

14 end.  They infringed one of our patents in their

15 software that they put into place for Chrysler.

16            Now, the patent you're going to hear

17 about was invented primarily by two Versata engineers

18 named Jeff Van Dyke and Josh Walsky, and they'll both be

19 here to testify for you.  They'll be our second and

20 third witnesses.

21            And the technology that the patents cover

22 involves allowing people to automatically comparably

23 equip cars.  And what that means is, with this

24 invention, you can take a car that you might be

25 interested in and fill out various options and features

1  that you like, and it will automatically figure out some

2  models that compete with that and fill those models out

3  in a way that is most similar to give you a true

4  apples-to-apples comparison.

5               In other words, rather than having to

6  rely a salesperson to tell you that this other car over

7  here is the competitor and why it's terrible, it will

8  allow you, by using our configuration technology, to

9  construct a car that really does match up to the one

10 you're looking at.  And it gives you a lot of power in

11 the buying process.

12              Now, the reason they came up with this

13 invention is that they were looking for ways to use our

14 configuration technology, the technology that allows you

15 to put these cars and planes and computers together, and

16 they were looking for ways to -- to really put that to

17 new use.

18              And at the time, in the late 1990s,

19 websites and the Internet was not nearly as interactive

20 as it is now.  Now, you sort of get used to going in

21 there and clicking on things and allowing the website to

22 do a lot of things for you.

23              But actually, back in the late '90s,

24 things were much more static, which means you could go

25 get information, but it was hard to sort of go back and

1  forth with the websites.

2              And this invention enabled you to

3  actually do some of that interactivity with the website

4  and construct cars and then generate comparable cars to

5  allow you to shop in a more efficient way.  And you

6  could do this in seconds.  You could get comparisons

7  right then and there on the Internet, even in situations

8  where thousands of people might be trying to make the

9  same request at a time.

10             And there's a lot of challenges that go

11 into building a computer system that can handle that

12 kind of load.  So in 2000, they filed for a patent on

13 their ideas, and after going through the lengthy and

14 detailed process at the Patent Office that you heard

15 about, in 2006, the U.S. Patent Office granted a patent,

16 and that's the one we'll be talking about today.

17             Now, as the video explained to you,

18 patents are a way to claim ownership over ideas and

19 intellectual property like a deed allows you to claim

20 ownership over land.  And in order to get our patent, we

21 had to write our ideas down ahead of time.  In other

22 words, we had to write a long -- it's called a

23 specification, and it's a lot of drawings and -- and

24 language that describes exactly what it is that you

25 invented.

1                    There's a section at the end that is the

2      legal claims, like the metes and bounds on a piece of

3      property, that spells out precisely what it is you're

4      claiming as your ideas and your invention.

5                    And the evidence will show you that once

6      you understand what we invented, that AutoData's

7      software at Chrysler infringes that patent.  And -- and

8      I won't get into the details of the infringement case at

9      this point, but I'll just tell you now, we hired a

10     professor of computer science at the University of Texas

11     named Scott Nettles, who studied our patent and studied

12     AutoData's product, and he will explain to you why it is

13     that they infringe our patent.

14                   Now, those are our claims in this case.

15     We're not asking for billions of dollars here, but we

16     are asking for fair compensation for AutoData's improper

17     behavior.  And we're asking for fair compensation for

18     their use of our patent as the law requires.  So that's

19     our side of the case.

20                   And as Judge Bryson mentioned to you,

21     there's actually claims coming back at us in this case.

22     So let's talk about that real briefly.

23                   So after we filed this lawsuit against

24     AutoData, and only after we filed the suit against

25     AutoData, they decided to assert these claims back at

1  us.  And these claims they had never made, ever; until

2  after we filed our case.  They are classic me-too

3  claims.

4              In the legal system, we call them

5  counterclaims, and let's look briefly at what they're

6  saying.

7              Well, first of all, they don't accuse us

8  of infringing any patent.  No patent infringement case

9  by AutoData.  Instead, what they say is that we have

10 taken and used some of their trade secrets.  And a trade

11 secret is different than a patent in a lot of respects,

12 and let me give you just a few.

13             The first way a trade secret is different

14 than a patent is that nobody ever -- no neutral third

15 party and certainly not the government has decided that

16 the things they point to actually are trade secrets.  No

17 one has ever determined that.  No one in the world has

18 ever validated that the things they're going to point to

19 are, number one, actually owned by AutoData.  No one's

20 decided that.

21             Number two, that these things are

22 actually secret.  They claim that they're secret, but no

23 one has ever decided that.

24             And, number three, no one has ever

25 decided that the things they point to actually have

1   value.  And that's a requirement to show something is a

2   trade secret.

3              The basis for their claims is purely

4   their say-so and they only said so, after we filed the

5   suit against them.  And I'd like you, as the case goes

6   on, to pay very close attention to precisely what

7   AutoData says their trade secrets are, because we think

8   the evidence will show the claims they have made have

9   been shifting over time, and we think you're going to

10  have to decide ultimately if the claims they're making

11  are well-defined, well-established, actual trade

12  secrets, or vague, after-the-fact, constantly changing

13  allegations designed just to get back at us.

14             That's an important thing to keep in

15  mind, and the devil is in the details.  We ask you to

16  pay close attention to what they say their trade secrets

17  are, and pay close attention to what they contend we did

18  with them supposedly.  I think that will be telling.  So

19  that's the claim back at us.

20             And to wrap up, we really look forward to

21  presenting our case to you.  And you're going to hear,

22  as you probably can tell, a lot of issues flying back

23  and forth.  We're saying one thing; they're saying

24  something different; but, ultimately, the core of this

25  case is that AutoData wrongly competed with us,

1 essentially by promising Chrysler that they could give

2 them our premium software at a discount price; and then

3 in part, using our own patent to do it.

4           And we'll ask you at end of this case not

5 to award their tactics and not to accept their me-too

6 claims back at us.

7           Thank you.

8           THE COURT:  Thank you, Mr. Cole.

9 Who will give opening statement for the Defense, Mr.

10 Adams?

11           MR. ADAMS:  I will, Your Honor.

12           THE COURT:  Very well.

13 As I mentioned, Ladies and Gentlemen of the Jury, we

14 will break for lunch at the close of the opening

15 statements, and then when we return, we will begin with

16 the evidence.

17           (Pause.)

18           THE COURT:  Are we ready to go?

19           MR. ADAMS:  Good.

20           THE COURT:  Good.

21           MR. ADAMS:  I'll just proceed, Your

22 Honor.

23           THE COURT:  Well, if -- if the -- if the

24 slides are really critical to your opening statement and

25 you would feel disadvantaged by not having them, I think

1  the jury would understand and be happy to break now and

2  have your opening statement after lunch.

3                  My preference would be have them

4  together, but if that really is an important part of

5  your opening statement, we -- I'm happy to wait until

6  after lunch to -- to proceed.

7                  MR. ADAMS:  I apologize, but I do believe

8  it's important to my opening statement.

9                  THE COURT:  All right.  And I take it

10  that we have more than just another -- well, here comes

11  something.

12                  Are we -- well, why don't you consult

13  with your technical folks and see if you've basically

14  got everything ready to go or whether you're going to

15  need --

16                  MR. ADAMS:  If you give me a couple of

17  minutes --

18                  THE COURT:  A couple of minutes.

19                  MR. ADAMS:  -- I'll confer.

20                  THE COURT:  It looks like we're heading

21  in the right direction, so we'll go ahead with this.

22                  (Pause.)

23                  THE COURT:  Are we good to go?

24                  MR. ADAMS:  Yes.  I apologize, but I

25  think we're fit to go.

1                THE COURT:  All right.  We'll start your

2  time running now.

3                MR. ADAMS:  May it please the Court.

4                Ladies and Gentlemen of the Jury, my name

5  is Mike Adams, and I represent AutoData in this dispute.

6  I'm sure you would agree that in making any important

7  decisions, it's a good idea to have all of the facts and

8  information that you can so that you can make a good,

9  reasoned decision.

10                I'd like to tell you in my opening

11  statement about some additional facts and information

12  that I think will be helpful for you and that we're

13  going to present throughout the trial.  With these

14  additional facts, I believe we'll be able to paint a

15  complete picture of what this dispute is all about.

16                Two of the witnesses we're going to

17  present at trial are Mr. Greg Perrier, the gentleman who

18  just stood up.  He's the President and CEO of AutoData.

19  And the other gentleman that we're going to present from

20  AutoData is Mr. Chris Wedermann.  He's the Executive

21  Vice President.

22                I'd like to tell you a little bit about

23  the history of AutoData.  It was founded over 20 years

24  ago in the early 1990s.  Mr. Wedermann was the second

25  employee, and Mr. Perrier joined him soon thereafter.

1                 Mr. Perrier had been working at a

2  family-owned dealership and was asked to join AutoData

3  as a consultant, and ultimately was asked to become the

4  CEO.  It was a small startup -- startup company at that

5  time, and their goal was to provide technology solutions

6  and services to the automotive industry.

7                 From 1990 up to the present, the company

8  has steadily grown both in the number of employees and

9  revenue, and today the company has about 250 employees.

10 Those employees are headquartered in London -- Ontario,

11 which I learned from personal experience is about a

12 two-hour drive from Detroit.  So they're close to the

13 automotive industry.

14                 They also have a facility that's located

15 in Detroit, in the Detroit area.  Starting in the early

16 to mid-1990s, AutoData had already established itself as

17 a successful company in the automotive industry.  They

18 already had customers like General Motors, Ford, and

19 even Chrysler.

20                 And over time, they became known as one

21 of the leading suppliers of technology and services to

22 the automotive industry in North America.  Here's a

23 little interesting fact that you'll hear:  AutoData's

24 technology is used to manage every Ford commercial truck

25 order placed by over a thousand dealerships in North

1 America.

2            The idea of AutoData's technology is it's

3 to help aid auto manufacturers develop their cars,

4 market their cars, and sell their cars to customers.

5 For example, on the chrysler.com website, there's a

6 number of shopping tools.

7            One is called find a car; another one is

8 called select a car, price a car, calculate payments,

9 build a car, or configuration, which you've already

10 heard about; vehicle comparison, dealers, and inventory.

11           Most of these capabilities were in the

12 AutoData software in the 1990s.  And over time, they've

13 added more capabilities and have improved on them.  So

14 AutoData was more than just a data company.  They

15 provided software.

16           During the course of providing their

17 software, though, they learned that it was important to

18 have good quality data to feed to their software.  I

19 like to refer to it as the fuel for the software

20 engines.  If you have bad fuel, the engine is not going

21 to run properly.

22           They also learned that their data needed

23 to be complete, accurate, and flexible, because there

24 were different engines that -- software engines that

25 were going to have to use that data.

1              You heard a little bit about how

2   complicated the data can get, because you have so many

3   different components in vehicles, but they figured out a

4   way to research and gather and organize that -- that

5   data.

6              There's all kinds of things to take into

7   account, such as the engine size, engine type.  You

8   know, if you want extended cab, crew cab, or do you want

9   a CD player, premium stereo.  And you even have to take

10  into account where's the vehicle being sold.  If it's

11  being sold in California, you might have special

12  emissions you have to deal with.  In Alaska, you may

13  even need to get an engine block heater, because it's so

14  cold.

15             So all these things needed to be taken

16  into account, and AutoData figured out a way to organize

17  this data.  It gets even more difficult than that,

18  because, as you know, auto manufacturers have different

19  options and packages that they offer.  And sometimes the

20  options and packages don't match.

21             So you may have a premium package and

22  then a regular package, and you can't necessarily pick

23  both, because one has cloth, one may have leather, and

24  you can't pick cloth and leather at the same time.  And

25  so they developed rules to help the software figure out

1  that if you pick this package, you can't pick another

2  package.

3            And as I indicated, different software

4  engines require different formulations of that -- that

5  data, and they became so successful, after formulating

6  their data, that they were able to sell it to third

7  parties, including folks like Versata.

8            Versata had a need and found it useful to

9  use the AutoData data.  One of the advantages of their

10 data is that they were able to reformulate it in a way

11 that it can work with these third-party engines.

12           So they designed their data to work with

13 their own engines, but they had a trick where they could

14 easily reformulate it on-the-fly so that third parties

15 could use it in their engines -- their software engines.

16           Starting in about the 1995 time, they

17 developed a technology -- a software engine that was

18 called ACE, A-C-E.  And you heard Mr. Cole, in his

19 opening statement, refer to comparison as automatically

20 comparably equipped.

21           Well, I don't know -- that's where the

22 ACE algorithm came -- I mean, the ACE acronym came from.

23 A-C-E, automatically comparably equipped.

24           AutoData had invented that in 1995.  It

25 was not only a software engine, but they figured out how

1  to structure the data so you could compare two different

2  vehicles.

3            Different auto manufacturers refer to

4  their components and models and trims by different

5  marketing terms.  And so if you're trying to decide; do

6  I want a Ford truck or a Chevy truck?  You don't know;

7  is a Ford 150 the same as a Chevy 1500.

8            Well, if you know about trucks, maybe you

9  do, but the software doesn't know that those may be

10 comparable, and so they had to figure out a way to

11 structure their data so that if somebody picked a Ford

12 F150 and they wanted to fairly compare it to a Chevy,

13 the software knew that a 1500 was the same as a 150.

14            There are other examples like that.  Like

15 one company may call it cruise control; another company

16 may call it speed control, but they're the same thing.

17 And so the data has to be matched up so the computer

18 software knows we're dealing with the same components.

19            So they developed that in 1995 and had

20 their first sale of that software probably in the '97

21 time period.  And then interestingly, this is where the

22 business relationship between AutoData and Versata first

23 got started.

24            So if we move to the green timeline,

25 these are some key dates that we're going to be talking

1  about that are involved in the AutoData/Versata

2  relationship.  Very interestingly, Versata approached

3  AutoData in the November 1997 time period and basically

4  said, we have a critical business need to be able to

5  provide to our customers, our auto manufacturers, the

6  ability to automatically comparably equip.  And we also

7  need the data to be able to do that.

8            And so my client -- it was actually

9  Mr. Perrier and Mr. Wedermann met with Mr. Van Dyke, who

10  ultimately became the, quote, inventor of the '821

11  patent, and other Versata folks to talk to them about

12  their technology and their data.  That was done under a

13  confidentiality or a -- or a non-disclosure agreement.

14            And as it turns out, Versata was

15  interested enough in the AutoData technology that they

16  asked them to submit a response to a request for a

17  proposal.  You'll see that document get addressed in

18  court.

19            They -- as it turns out, they ultimately

20  did not want the ACE, or automatically comparably

21  equipped engine, but they were interested in the data,

22  not necessarily for doing vehicle comparison.  But they

23  liked the data enough that they said, well, we think our

24  configuration engines would work well with that data.

25  And they had an important contract coming up with Ford.

1          AutoData had already been working with

2     Ford Canada at the time, and AutoData said, well, can

3     you supply us this data for Ford U.S.  And so they

4     entered into an agreement called a Master Services

5     Agreement.

6          And at that time, AutoData disclosed its

7     data information, which contains a lot of trade secrets

8     about how they structured the data, what type of data

9     they include, so on and so forth that helps the

10    configuration engine run better.

11         You'll hear evidence that after the Ford

12    contract was entered into -- keep in mind, this contract

13    was just to supply data for the Ford configuration

14    engine -- that Versata entered into a contract with

15    Toyota.  And you'll see evidence that Versata actually

16    took the data trade secrets and information that they

17    learned through the Ford contract and applied those to

18    the Toyota contract without AutoData's knowledge or

19    permission.

20         Well, we'll have our own experts to

21    testify about that to explain to you how you can see

22    that the data trade secrets were used from Ford into

23    Toyota.  And Versata profited off of that, because they

24    entered into a contract and made money.

25         And then, also interestingly, even though

1  Versata had said originally they weren't interested in

2  ACE, lo and behold, they offer to Toyota a vehicle

3  comparison engine in June of 1998.

4            As you recall, in November of 1997 is

5  when they had this meeting with Mr. Van Dyke and others

6  and disclosed their vehicle comparison technology.  But

7  Versata said they weren't interested at the time, and

8  here June of 1998, they're selling the technology to

9  Toyota.

10            Well, the relationship, as you heard,

11  between the two parties ended.  And then about two years

12  after the initial disclosure of the AutoData vehicle

13  comparison technology to Versata, Van Dyke -- Mr. Van

14  Dyke and Versata filed for the '821 patent.  That's what

15  we refer to it in the case, and that's the vehicle

16  comparison patent that we're now accused of infringing.

17            Mr. Perrier will tell you that our claims

18  are not just me-too claims.  When he was served with a

19  lawsuit and started looking into the claims, he saw that

20  they were accusing his company of infringing vehicle

21  comparison technology.  And he's like:  Excuse me.  I

22  was back in a meeting with Versata in the 1997 time

23  period, and they told me they didn't have vehicle

24  comparison and wanted to know about our capability.  And

25  now they are having a patent and suing me for it.

1              So we started looking into it, and that's

2 what led us to believe that perhaps they used our trade

3 secrets in order to develop their vehicle comparison

4 technology and then represent to the Patent Office that

5 they were the inventors of that technology.

6              You've heard a little bit about the

7 litigation and the dispute back in the 2001 time period

8 that ended and resulted into a settlement and license

9 agreement.  And Mr. Cole showed you an excerpt from that

10 agreement.

11              So if we can pull up another excerpt from

12 that agreement:  It should be in the green timeline.

13              Mr. Cole showed you a provision in that

14 contract that said this contract's confidential; you're

15 not supposed to tell anything about this contract.

16              What he didn't show to you is this other

17 important section where AutoData was required to

18 basically state that -- well, that their technology may

19 be licensed under one or more patents, including U.S.

20 Patent No. '651, which is a Versata patent.  Above that,

21 you'll see it specifically requires AutoData to mark in

22 a form that human beings can read either on their

23 website or in their software that they may be licensed

24 to these Versata patents.

25              So if we disclose that we were licensed

1   to Versata patents, it was something we were doing,

2   because we were obligated to under the contract.

3               So now this leads us up to the current

4   dispute involving Chrysler, and that's going to be the

5   yellow timeline.

6               So AutoData was invited by Chrysler to

7   participate in this request for a quote; same thing as

8   request for a proposal.  Chrysler sent them this request

9   for quote and they responded -- AutoData responded.

10  Versata did as well.  So they were competing for the

11  same business.

12              Part of the requirements for the Chrysler

13  contract was that the vendor provide shopping tools, the

14  same shopping tools we talked about earlier that

15  AutoData had since the 1990s.  Find a car, select a car,

16  price a car, calculate payments.

17              The interesting thing is that AutoData

18  had already been doing the same work for Chrysler

19  Canada.  This contract that's in dispute was for

20  Chrysler U.S.  Prior to having the contract with

21  Chrysler U.S., they were doing this work for Chrysler

22  Canada.  So it wasn't a lifetime opportunity to do work

23  for Chrysler U.S.  They had been doing work for a number

24  of auto manufacturers, including Chrysler, before they

25  got this opportunity.

1          Versata claims that AutoData was telling

2 people that they had a broad license to Versata

3 technology and that they were a Versata replacement.  I

4 ask you to pay attention to the evidence and see who

5 made these statements, and what evidence is there that

6 AutoData exaggerated the rights that they had to the

7 Versata patents.

8          Plus, you'll see that in responding to

9 the Chrysler request for quote, this was where AutoData

10 had to submit their bid.  They submitted a detailed

11 document that explained why they thought they could

12 satisfy the requirements.

13          In this document, you won't see any

14 reference to Versata licenses, Versata patents.  There's

15 not even a reference to them claiming to be cheaper than

16 Versata.  So they were competing, I think you'll find,

17 on their own merits for this business.

18          Now, after AutoData was awarded the

19 business, the evidence will show that Versata started

20 getting concerned about that.  And you'll hear some

21 testimony from a gentleman by the name of Chuck

22 Sullivan.  Chuck Sullivan used to be the primary

23 Chrysler contact when this bidding process was going on

24 involving the request for quote.  He got deposed in this

25 case.

1            He's not going to testify here live as a

2   witness, but we're going to show you his deposition

3   testimony.  His deposition testimony was after he had

4   left Chrysler.  So he was testifying as a former

5   employee of Chrysler.

6            He's going to say that in June of 1998,

7   he had lunch with Mr. Jacops, who's going to testify

8   here today, and that Mr. Jacops told him around the time

9   that the decision was going to be made, that AutoData

10  was selected, that Mr. Jacops made the comment:  We like

11  to win, and when we don't win, we sue.

12           Mr. Jacops also made comments about

13  AutoData didn't have the right to fulfill this contract,

14  because they didn't have the rights to the Versata

15  patents.

16           Interestingly, though, after AutoData got

17  the contract and ultimately completed the website work

18  for Chrysler and we got sued for patent infringement,

19  the patent infringement doesn't involve anything in the

20  website that got launched.  So what Versata patents was

21  he talking about at that lunch?

22           Later on, in 2010, AutoData added a

23  feature called vehicle comparison that was based on

24  their ACE technology back from 1995.  That's the

25  technology that's accused of infringing the patent, the

1   Versata patent, but it wasn't in the original website.

2                   So AutoData was able to launch that

3   website without using any Versata technology.

4                   So as I said, AutoData did win the

5   Chrysler business.  They were awarded with this lawsuit,

6   but at least they were able to have a successful launch

7   of the Chrysler website.  I think we have a letter from

8   September 2008 that announces the launch.

9                   Chrysler was excited.  They indicated

10  they wanted to express their thanks to everyone who

11  worked so hard to get the launch done and referred to

12  AutoData and Chrysler as a small family, and that they

13  satisfied the requirements under the contract with

14  flying colors.

15                  So, Ladies and Gentlemen, this is the

16  evidence that AutoData intends to present in this case.

17  At the end of the trial, you will have the opportunity

18  to evaluate each side and see, did we fulfill our

19  promises to you to present that evidence.  And I hope

20  that AutoData will have fulfilled that promise.

21                  The attorneys and AutoData appreciate

22  your time and your effort, and we hope that you can help

23  us reach a fair and just resolution of this matter.

24  Thank you.

25                  THE COURT:  Thank you, Mr. Adams.

1            MR. ADAMS:  Thank you.

2            THE COURT:  We will now take our luncheon

3  break.  We will typically take an hour for lunch each

4  day.  We will also typically have a 15-minute break in

5  the morning and a 15-minute break in the afternoon just

6  so you can stretch your legs.

7            But let's -- let's be back in court at

8  12:00 -- I'm sorry -- 1:35.  And I -- we will hear the

9  beginning of the evidence at that time.

10            Thank you.  We'll take a recess.

11            COURTROOM DEPUTY:  All rise.

12            THE COURT:  Let's see.  Do we have

13  Mr. Potts?

14            (Jury out.)

15            THE COURT:  Very well.  Do -- okay.  Very

16  well.

17            If there's nothing further at this time,

18  we will adjourn for our luncheon hour.

19            (Lunch recess.)

20            * * * * * * * * * * * * * * * * * * * * * *

21

22

23

24                    CERTIFICATION

25

```
1              I HEREBY CERTIFY that the foregoing is a

2   true and correct transcript from the stenographic notes

3   of the proceedings in the above-entitled matter to the

4   best of my ability.

5

6

7

8   /s/_____              _____
    SHELLY HOLMES, CSR                   Date
9   Official Court Reporter
    State of Texas No.:  7804
10  Expiration Date  12/31/12

11

12  /s/_____            _____
    SUSAN SIMMONS, CSR                   Date
13  Official Court Reporter
    State of Texas No.:  267
14  Expiration Date  12/31/12

15

16

17

18

19

20

21

22

23

24

25
```