```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                      MARSHALL DIVISION

 3   VERSATA SOFTWARE          *    Civil Docket No.
                              *    2:08-CV-313
 4   VS.                       *    Marshall, Texas
                              *
 5                            *    June 15, 2012
     INTERNET BRANDS, ET AL    *    12:30 P.M.

 6
                      TRANSCRIPT OF JURY TRIAL
 7          BEFORE THE HONORABLE JUDGE WILLIAM BRYSON
               UNITED STATES FEDERAL CIRCUIT JUDGE

 8

 9   APPEARANCES:

10   FOR THE PLAINTIFFS:    MR. SAM BAXTER
                           McKool Smith
11                         104 East Houston, Suite 300
                           Marshall, TX   75670

12
                           MR. SCOTT COLE
13                         MR. JOHN M. SHUMAKER
                           MR. KEVIN M. KNEUPPER
14                         MS. LEAH B. BURATTI
                           MS. KRISTINA S. BAEHR
15                         McKool Smith
                           300 West 6th Street
16                         Suite 1700
                           Austin, TX   78701

17

18   APPEARANCES CONTINUED ON NEXT PAGE:

19

20   COURT REPORTERS:       MS. SHELLY HOLMES, CSR
                           MS. SUSAN SIMMONS, CSR
21                         Official Court Reporter
                           100 East Houston, Suite 125
22                         Marshall, TX   75670
                           903/935-3868
23

24

25   (Proceedings recorded by mechanical stenography,
     transcript produced on CAT system.)
```

```
 1  APPEARANCES CONTINUED:

 2  FOR THE PLAINTIFFS:    MR. DEMETRIOS ANIAPAKOS
                           MR. KINAN H. ROMMAN
 3                         Ahmad, Zavitsanos, Anaipakos,
                              Alavi & Mensing
 4                         1221 McKinney, Suite 3460
                           Houston, TX   77010
 5
 6  FOR THE DEFENDANTS:    MR. MICHAEL P. ADAMS
                           MR. JAMES G. RUIZ
 7                         MR. ANDREW J. SCHUMACHER
                           Winstead
 8                         401 Congress Avenue
                           Austin, TX   78701
 9
                           MS. MELISSA SMITH
10                         Gillam & Smith
                           303 South Washington Avenue
11                         Marshall, TX   75670

12              * * * * * * * * * * * * * * * * * * * * * * * * * *

13                         P R O C E E D I N G S

14              (Jury out.)

15              COURTROOM DEPUTY:  All rise.

16              THE COURT:  Please be seated.

17              Okay.  Any -- you have the special

18  verdict form and you have the final instructions.

19              Any objections to either?

20              Plaintiffs?

21              MS. FITZGERALD:  Yes, Your Honor.

22  We would reurge all of the objections that we made

23  earlier today.

24              And then in addition, we would object to

25  the new sentence on Page 18 that states:  If you find
```

1  that the injured party failed to present adequate proof

2  of actual damages, you may award that party nominal

3  damages in the amount of $1, if that party has proved

4  that contract was formed and breached.

5              We object to the inclusion of that

6  sentence for all the reasons that we've stated earlier,

7  but if the sentence is in the instructions, we believe

8  that it should state:  If you find that AutoData failed

9  to present adequate proof of actual damages, you may

10 award AutoData nominal damages in the amount of $1, if

11 AutoData has proved that a contract was formed and

12 breached.

13        And if you were to make that change, we would

14 ask that the sentence that says:  If you find that a

15 party has proved that it's suffered actual damages, it

16 may recover lost profits, to if you find that Versata

17 has proved that it suffered actual damages, it may

18 recover lost profits.

19             THE COURT:  I think the more generic form

20 is preferable in this context and not prejudicial to

21 your client.

22             And I would also point out that the

23 language in the last sentence is largely taken from

24 footnote -- no, not from the footnote, but from the

25 text, I guess it is, in the Southwest Airlines case.  So

1  the objection is overruled.

2  Anything else on either the instruction or the special

3  verdict form?

4         MS. FITZGERALD:  No, Your Honor.  Well, I

5  would ask that you actually deny these -- the two things

6  we've requested that you've denied and sign these

7  orders, if possible today, so we can file them with the

8  Court.

9         THE COURT:  You mean the -- are you

10  talking about the Rule 50s?

11         MS. FITZGERALD:  Well, no.  This is the

12  written requests for the revised instructions that we

13  discussed.  And then also --

14         THE COURT:  Okay.  Well, I'll do that if

15  you want.  It isn't necessary.  It's certainly in no

16  court that I -- well, of course, I defer to the practice

17  here, but my practice -- my experience, such as it is,

18  has never required an actual signed denial when you're

19  talking about jury instructions.  If you want to submit

20  them, my signature is available for free.

21         MS. FITZGERALD:  Well, since we will be

22  presumably appealing them to your court, I think that

23  we're in good shape.

24         THE COURT:  Definitely.  I think you -- I

25  will say right now that I don't see any reason to

1 believe that with respect to the particular objections

2 that you've made that anything -- there's any procedural

3 defect that would lead me at least to conclude that

4 there's been a waiver.

5           Now, that's -- that's a somewhat

6 qualified statement, I recognize, but I think that's as

7 far as I can go.  If that gives you any comfort, great.

8           If you want me to sign something, I'll

9 look at it, but I think that my -- my view is it isn't

10 necessary.  But I leave that to you.

11           MS. FITZGERALD:  Okay.  And then the last

12 thing I'll add just for the record, we also object to

13 the nominal damages portion of the special verdict form.

14           THE COURT:  I understand.  I understand.

15 Okay.  And I suppose as probably evident from the

16 instructions, I am going to deny both side's Rule 50

17 motions.  We'll see what the jury makes of this case,

18 but I am not prepared to take any of the portions of

19 this case away from the jury at this time.

20           One more matter of business.  Mr. Cole,

21 you objected to the fact and manner of the Court's

22 instructions to the jury with the respect to Plaintiffs'

23 Exhibit 310.  I will invite you at this time to make a

24 request, if you have one, for any kind of curative

25 instruction.

1              MR. COLE:  I think at this -- I don't

2   think a curative instruction would be helpful.  The

3   substance of the instruction we do not have an objection

4   with, given the Court's ruling.  It's more the last

5   thing they heard as they went out and the highlighting

6   of evidence from earlier on in the case.

7              THE COURT:  All right.

8              MR. COLE:  But with the Court's

9   instruction on closing argument, I think that's the best

10  curative instruction at this point.

11             THE COURT:  I'm sorry.  With the Court's

12  --

13             MR. COLE:  The Court's restrictions to

14  opposing counsel --

15             THE COURT:  I see.  Yes, yes, yes.

16  Okay.  Well, if that's satisfactory, is there anything

17  else we need to do?

18             My order of battle would be read the

19  instructions, go directly to Mr. Cole, and --

20             MR. COLE:  Yes, sir.

21             THE COURT:  -- you and Mr. Baxter will

22  decide to -- decide how to divide your time, and then

23  we'll go to -- who's going to go first, Mr. Adams or Mr.

24  Ruiz?

25             MR. ADAMS:  I will, Your Honor.

1                    THE COURT:  Mr. Adams, followed by

2   Mr. Ruiz, followed by Mr. Baxter, and that will then

3   lead to the -- my little short charge to the jury, and

4   then the jury will go out to deliberate.

5                    Any other issues that need to be

6   addressed?

7                    MR. COLE:  Not from Plaintiffs, Your

8   Honor.

9                    MR. RUIZ:  No, Your Honor.

10                    THE COURT:  Very good.  Let's bring the

11   jury in.

12                    I will say one thing.  I am going to

13   advise them this is just because I'm told by

14   Ms. Lockhart that this -- that we should do something --

15   say something about the exhibits.

16                    I'm going to advise them that the

17   exhibits are available for them.  If they request them,

18   they can request them all; they can request specific

19   exhibits; they can request them categorically.  And

20   we'll do our best.

21                    Any objection to that?

22                    MR. COLE:  No, Your Honor.

23                    THE COURT:  All right.

24                    COURTROOM DEPUTY:  All rise for the jury,

25   please.

```
 1                    (Jury in.)
 2                    THE COURT:  Welcome back.  Please be
 3   seated.
 4                    Members of the Jury, the time in the case
 5   has come in which I will give you the instructions from
 6   the Court, and I will read them.  And when I'm finished,
 7   you will hear from the lawyers.  They will argue to you,
 8   and then the case will be in your hands.
 9                    Members of the Jury, you have heard the
10   evidence in this case.  I will now instruct you on the
11   law that you must apply.  Remember, though, that you are
12   the judges of the facts.  The legal term for what I'm
13   going to give you is the jury charge or the Court's
14   instructions.
15                    Now, this has been a long and complex
16   case as you know, and the instructions I'm about to give
17   you will be somewhat long.  They may also be a little
18   difficult to follow at times, because the law that
19   applies to the issues in this case is complex.
20                    But I have made copies of the
21   instructions that I am now giving you that you can take
22   back to the jury room.  Actually, they will be back
23   there in the jury room when you get back to the jury
24   room.  You won't have to worry about taking them.
25                    And you can consult those copies of the
```

1  instructions, if you need to.  So if you miss something

2  as I'm reading, don't worry.  Someone else will pick it

3  up, in all likelihood if you miss it, and you will

4  always be able to check the written copy that will be

5  available in the jury room for you.

6           Now, because I will be giving you a copy

7  of the instructions, I would suggest that rather than

8  taking notes as I speak, you just listen.  It's -- it

9  will probably work better.  You will have, in effect, a

10 complete set of notes in the copy of the jury

11 instructions.

12          After I instruct you on the law, as I

13 mentioned, the attorneys will have an opportunity to

14 make their closing arguments.  And when they do, you

15 should keep in mind that statements and arguments of the

16 attorneys are not evidence and are not instructions on

17 the law.  They are intended only to assist you in

18 understanding the evidence and the contentions of the

19 parties'.

20          Now, I'm going to begin by returning to

21 the subject of the burden of proof, which I discussed

22 with you a little bit at the outset of the case.

23          The preponderance of the evidence

24 standard that you will recall applies to most of the

25 issues in this case.  That means that the party who is

asserting a particular claim must persuade you that each

fact that is necessary to that claim is more likely to

be true than untrue.

If the evidence fails to persuade you

that any fact necessary to prove a particular claim has

been proved by a preponderance of the evidence, you

should find in favor of the other party on that claim.

Now, as I mentioned at the outset, there

are some issues in this case to which a different burden

of proof applies.  You will recall that the law

sometimes requires a party to prove a particular fact or

claim by clear and convincing evidence.  That's a higher

standard of proof than preponderance of the evidence.

It means that you must be left with a clear conviction

or belief that the fact in question has been proved.

I will tell you which issues require

clear and convincing evidence when we get to them.  For

now, all you need to know is that for most of the issues

in this case, the preponderance of the evidence standard

applies, which means that you just have to ask yourself,

am I persuaded that the party with the burden has shown

that the fact in question is more likely true than not.

Now, part of your task as finders of the

facts is to weigh the testimony of the witnesses.

That's a job that is very well-suited to jurors.  For

1   example, if there is a conflict in testimony on a

2   particular point, use your common sense in deciding

3   which witness you believe -- you -- you think is more

4   believable.

5                   If there's a question as to the relative

6   expertise of particular witnesses, use your common sense

7   to decide which witnesses you find more knowledgeable.

8                   The fact that a person has testified as

9   an expert does not mean that you must accept that

10  witness' opinions as true.  As with any other witness,

11  it is up to you to decide whether you find that

12  testimony convincing and choose to rely on it.  Now,

13  certain testimony was presented to you through

14  depositions.  A deposition is a recording of a witness'

15  sworn answers to questions that were asked in advance of

16  trial.  The deposition testimony that you've heard is

17  entitled to the same consideration as other evidence in

18  the case.

19                  I'll turn to the claims in the case now.

20  I'm going to start with Versata's claim that AutoData

21  infringed Versata's patent and AutoData's claim that

22  Versata's patent is invalid.

23                  Now, what is patent infringement?

24                  Once a patent is issued, the owner of the

25  patent, if the patent is valid, has the right to exclude

1  others from making, using, or selling the patented

2  invention throughout the United States for a period of

3  20 years.

4  Infringement -- patent infringement

5  occurs when a person, without the patent owner's

6  permission, makes, uses, sells, or offers for sale

7  something that is within the scope of what a patent

8  covers.

9  Now, how do we decide what the patent

10  covers?

11  We do that by looking at a patent's

12  claims.  The patent's claims are the numbered paragraphs

13  at the end of the patent.  The claims are important,

14  because it is the words of the claims that define what a

15  patent covers and the figures, the pictures in the front

16  of the patent, and the -- and the diagrams.

17  And the text in the rest of the patent

18  provide a description or examples of the invention, and

19  they provide a context for the claims, but it is the

20  claims that he defines the breadth of the patent's

21  coverage.

22  Each claim is effectively treated as if

23  it were a separate patent, and each claim may cover more

24  or less than another claim.  Therefore, what a patent

25  covers ultimately depends on what each of its claims

1  covers.

2              Now, as you've heard, Versata says that

3  AutoData infringes 10 claims of the '821 patent through

4  its various activities in connection with the Chrysler,

5  Jeep, Dodge, Ram truck, and AOL websites.  Versata

6  groups those claims into three categories.

7              First, Versata says that AutoData

8  directly infringes Claims 10, 13, 14, 17, 18, 19, 20,

9  22, and 23.  And I read -- read them all -- I -- I

10  believe, if I have not miscounted, that that is all but

11  Claim 1.  But in any event, those are the -- those are

12  the claims -- by manufacturing, testing, selling,

13  delivering, and importing the Chrysler, Jeep, Dodge, and

14  Ram truck web systems.

15              Second, Versata says that AutoData

16  indirectly infringes Claim 1 by engaging in those same

17  activities.

18              And third, Versata says that AutoData

19  indirectly infringes all 10 claims -- I won't read all

20  the claims, but all 10 of the asserted claims -- through

21  its activities in connection with the implementation of

22  the AOL website.

23              The 10 claims are listed in the written

24  copy, and I just won't recite it for you.  If you need

25  to check, there they are.

Let me explain about direct infringement and indirect infringement.  Well, I'll do that in a minute.

While there are a lot of claims to review, you will notice that there is a lot of overlap between them and that they fall into basically three families of claims.

First, there is Claim 1, which is a claim to a method of comparing products where at least one is automatically generated.

Second, there is Claim 10, which is to a computer system that includes a processor, a computer-readable medium, and a computer code executable by the processor; otherwise, it is much the same as Claim 1.

Now, Claims 13, 14, 17, and 18 are in the Claim 10 family, as I have referred to them.  They are dependent claims from Claim 10, and they each just add one additional feature.

Third, there is Claim 19, which is to a computer program whose code causes a computer system to perform the method mentioned in Claim 1.  So once you figure out the first claim, you've done most of the work necessary to understand all the claims.

Now, many of the claim terms will be easy

1  for you to understand.  For the most part, you can just

2  give the words their ordinary meaning, even though the

3  claim language uses abstract terms rather than concrete

4  examples.

5           There are a few terms, however, that I

6  will define for you, even though my definitions use

7  abstract terms also.

8           The term automatically generate means to

9  require that the computer system generate the second

10 product configuration in response to a request from the

11 user and in accordance with the comparison criteria

12 provided by the user.

13          The terms comparison criteria and

14 criteria upon which to automatically generate mean the

15 product-related information provided by the user that

16 the computer system uses to generate the second product

17 configuration and to facilitate comparisons between the

18 first and second product configurations.

19          Now, some of the claims use the word

20 comprising.  Comprising is a word that's used a lot in

21 patents and not much in ordinary conversation.  It means

22 including or containing.

23          A claim that uses the word comprising or

24 comprises is not limited to products having only the

25 elements that are contained in the claim, but it also

covers processes or products that add additional

elements.

For example, take a claim that covers a

table.  If the claim refers to a table comprising a

table top, legs, and glue, the claim will cover any

table that contains those structures, even if the table

also contains other structures, such as a leaf or wheels

on the legs.

Now, a patent owner has the right to stop

others from using the invention that's covered by the

patent -- by the patent claims during the life of the

patent.  If any person makes, uses, sells, or offers to

sell what is covered by patent claims, without the

patent owner's permission, that person is said to

infringe the patent.

To determine whether there is

infringement, you must compare the alleged three

infringing products with the scope of the patent claims

as I have defined them for you.

In order to infringe a patent claim, a

product or process must include every element of the

claim.  So in determining whether AutoData infringes

Versata's asserted claims, you must determine for the

accused product or process whether that product or

process or the use of that product or process contains

1 each and every element contained in a claim.

2          I'll refer to the separate paragraphs in

3 each of the claims at issue in this case as elements.

4 Sometimes in this case, the parties have referred to the

5 elements of the claims as limitations.  You may recall

6 that term.  That's a common patent law expression, but

7 I'll avoid using it just in the interest of clarity.

8          A claim element is present if it exists

9 in the accused product or process just as it is

10 described in the claim language.

11          Now, you must consider each of the

12 asserted patent claims separately.  In the verdict form,

13 you will be asked to enter a separate verdict for each

14 of the claims asserted in the case.

15          Now, I mentioned a minute ago direct

16 infringement and indirect infringement.

17          Direct infringement refers to

18 infringement in which a single party commits all the

19 acts that are necessary to infringe.  In order to prove

20 direct infringement, it is not necessary to show that

21 the party who is accused of infringement intended to

22 infringe or even knew that it was infringing.

23          As I mentioned earlier, Versata claims

24 that AutoData directly infringes a number of the claims

25 of the '821 patent by making, testing, selling,

1   delivering, and importing the infringing Chrysler, Jeep,

2   Dodge, and Ram truck web systems.

3              As I mentioned a moment ago, there's

4   another form of infringement that's being asserted in

5   this case, and that's indirect infringement.  Now,

6   someone who induces someone else to infringe can be

7   guilty of indirect infringement, even if they themselves

8   did not commit the infringing act.

9              Versata claims that AutoData is liable

10  for indirect infringement by inducing the users of the

11  Chrysler, Jeep, Dodge, and Ram truck websites to

12  infringe the '821 patent.

13             In addition, Versata alleges that

14  AutoData induced AOL and AOL users to infringe the

15  patent by participating in the design sessions for

16  business requirements, usability, and technical

17  implementation of the AOL website, and also by providing

18  tools and data to AOL.

19             Now, to prove that AutoData is liable for

20  indirect infringement, Versata must prove by a

21  preponderance of the evidence first that AutoData took

22  action intending to cause others, such as AOL, AOL

23  users, or the users of the Chrysler, Jeep, Dodge, or Ram

24  truck websites, to infringe the '821 patent;

25             Second, that those users that AutoData

1  induced to infringe actually infringed some claim of the

2  patent;

3              And, third, that AutoData was aware of

4  the '821 patent and knew that others were infringing

5  that patent, or at least that AutoData was aware of a

6  high probability that the acts that it was inducing

7  would infringe Versata's patent, but intentionally took

8  steps to avoid learning about that patent.

9              Now, let's turn to patent invalidity --

10 invalidity.

11             AutoData contends that all of the claims

12 of the '821 patent that Versata is asserting are

13 invalid.  Now, once a patent is issued, it is presumed

14 to be valid.  That means that the fact that a patent was

15 issued to a particular person does not guarantee that

16 the patent is valid, but once it issues, the law says

17 that if a challenger wants to show that it is invalid,

18 the challenger has to make that showing by clear and

19 convincing evidence.

20             So patent invalidity is one of the issues

21 in this case to which the clear and convincing evidence

22 standard applies.  In deciding whether particular claims

23 are invalid, you will interpret the claims in the same

24 way that you have in deciding infringement.

25             If an invention that is set forth in a

patent claim is not new, we say that it was anticipated by the prior art.  An invention that is anticipated by the prior art is not entitled to patent protection.  If you find that AutoData has proved by clear and convincing evidence that any particular claims asserted against it are anticipated by the prior art, then you must find that those claims are invalid.

Now, let me talk a little bit more generally about what this term prior art means.  In the patent law, what came before or what's out there already, so to speak, is often referred to as the prior art.  So you might say that the telephone is prior art to the cell phone, and the cell phone is prior art to the smart phone.

As a technical term in patent law, however, prior art is used to describe those things that you are allowed to look at to see if a particular invention is really new.

Now, for a patent claim to be anticipated by the prior art, every element of the claim in question must be present within a single item of the prior art. In deciding whether or not a single item of prior art anticipates a patent claim, you should consider those things that are expressly stated or present in the item of prior art and also those that are inherently present.

1          Something is inherent in an item of prior

2   art, if it is naturally found in the prior art.  A

3   particular feature is not inherent, however, if it is

4   not necessarily part of the prior art item but merely a

5   possible feature of that item.

6          So what counts as prior art for this

7   purpose?

8          AutoData is relying on prior art that

9   falls into three categories that are recognized by the

10  patent law.  Those categories are:

11         First, anything that was described in a

12  printed publication anywhere in the world more than one

13  year before the filing date of the application for the

14  patent.

15         Now, the filing date for the '821 patent

16  is January 14th, 2000.

17         Second, anything that was in public use

18  or on sale in the United States more than one year

19  before the filing date of the application for the patent

20  in the United States.  That's the second category of

21  prior art.

22         Third, anything that was publicly known

23  or used in the United States by someone other than the

24  inventor before the inventor made the invention.

25         Now, let's talk about these categories in

1  a little more detail.

2          Printed publication.  Printed

3  publications from anywhere in the world are prior art,

4  if the printed publications were published more than one

5  year before the application for the patent was filed.

6  AutoData claims that the manual for its software

7  program, AutoQuote Pro, qualifies as prior art under

8  that test.

9          A document is a printed publication, if

10  it was reasonably accessible to that portion of the

11  public that is most likely to use it.  It is not

12  necessarily that the public -- publication be available

13  to every member of the public.  Publications may include

14  not only such things as books, periodicals, or

15  newspapers but also publications that are not as widely

16  available to the public, such as trade catalogs, journal

17  articles, or scholarly papers that are distributed or

18  available to those working in the field of the

19  invention.

20          A printed publication becomes prior art

21  on the date that it becomes available to the public.

22          Now, a printed publication anticipates a

23  claim if it contains a description of the invention

24  covered by the patent claims that would allow a person

25  skilled in the field of the invention, after reading the

1 printed publication, to make and use the invention using

2 a reasonable amount of effort or experimentation.

3          Second category, public use or on sale.

4 Regardless of the date of the invention, if a product or

5 process that is claimed in a patent was in public use or

6 on sale in this country for more than one year before

7 the filing date of the patent application, it is prior

8 art to the patent claim and anticipates the patent

9 claims.

10          AutoData contends that the subject matter

11 of the asserted claims of the '821 patent was in public

12 use for more than one year before the file date of the

13 '821 patent.  In order for public use to anticipate

14 patent claims, three requirements must be met.

15          First, the use must occur more than one

16 year before the patent application was filed.  Now, the

17 date of the invention for the patent claims is

18 irrelevant to this category of prior art.

19          Second, the use may be by anyone,

20 including the inventor or the patent owner.  If the

21 inventor (sic) was in public use, it is not necessary

22 that those who used it appreciated that they were using

23 the invention at that time.

24          Third, the use must have been public in

25 order for the subject matter to be prior art.

1          Like public use, the sale or offer for

2    sale in the United States of a product may be prior art,

3    and thus anticipate a patent claim covering the prior --

4    the product or a method of making the product, if the

5    product was sold or offered for sale more than one year

6    before the patent application was filed.

7          The date that the subject matter of the

8    patent claims was invented is irrelevant to this

9    category of prior art.

10          In order for there to be an offer for

11    sale, two requirements must be met.

12          First, the product must have been the

13    subject of a commercial offer for sale.

14          And, second, the product must have been

15    developed to the point where there was a reason to

16    expect that it would work for its intended purpose.

17          The product may be the subject of a sale

18    for these purposes, even if it is not ready for

19    commercial production or has not been technically

20    perfected.

21          AutoData contends that the products at

22    issue with respect to this section are Versata's

23    SC Vehicle Compare and AutoData's AutoQuote Pro

24    software.

25          Now, prior knowledge or use by another in

1 the United States.

2         Knowledge or use in the United States of

3 a patented invention can be prior art to the patent

4 claims.  The knowledge or use will be prior art, if it

5 meets the following four requirements:

6         First, the knowledge or use must be by

7 someone other than the inventor.  This is different from

8 the previous two categories where the printed

9 publication or the prior public use or sale could be by

10 the inventor or anyone else.

11         Second, the knowledge or use must be

12 before the filing date of the application, January 14th,

13 2000.

14         Third, the knowledge or use must be in

15 the United States.  Prior knowledge or use outside the

16 United States cannot be relied on to invalidate a patent

17 claim.

18         And, fourth, the knowledge or use must

19 have been public.  Private or secret knowledge or use by

20 someone other than the inventor is not prior art.

21         Let me turn to another category that --

22 of invalidity called obviousness.

23         AutoData contends that the asserted

24 claims of the patent are invalid because the inventions

25 were obvious.  A patent claim is invalid, if the claimed

1  invention would have been obvious to a person of

2  ordinary skill in the art -- in the field, basically, at

3  the time the application was filed.  A claim does not

4  need to be both anticipated and obvious in order to be

5  invalid.

6           Now, you've heard the term a person of

7  ordinary skill in the art or the field a lot in this

8  case.  That term gets used frequently in patent law, and

9  it is particularly important in deciding whether an

10  invention would have been obvious at the time it was

11  invented.

12           A person of ordinary skill in the art is

13  a hypothetical person of average education and training

14  in the particular field but who is aware of all the

15  prior art.  To determine the level of ordinary skill in

16  the art, you may look to factors such as the nature of

17  the field of the invention, the sophistication of the

18  technology, and the typical education level of people

19  working actively in the field.

20           So, for example, if the invention is a

21  way to generate additional energy in a nuclear power

22  plant, the level of ordinary skill is likely to be

23  higher than if the invention is a new way to fold

24  cardboard boxes to make them stronger.

25           In determining whether the patent is

1  invalid because of obviousness, you should consider the

2  content of the prior art, identify the differences

3  between the prior art and the claimed invention,

4  determine the skill level of the person of ordinary

5  skill in the field at the time of the invention, and

6  take into account any objective indications that would

7  help determine whether the invention would or would not

8  have been obvious.

9            If, after consideration of all these

10  factors, you find by clear and convincing evidence that

11  the claim would have been obvious to a person of

12  ordinary skill in the art at the time the invention was

13  made, then you must find the claim invalid.

14            In determining whether the invention set

15  forth in a particular claim would have been obvious to a

16  person of ordinary skill in the field, you may consider

17  whether there is anything that would have prompted such

18  a person to combine the elements or concepts in the

19  prior art as the invention does.

20            But you should keep in mind that a patent

21  claim that consists of several elements is not rendered

22  obvious merely because each of those separate elements

23  was known in the prior art.

24            To choose a simple example, you could say

25  that a piano is really just a combination of wood,

1 ivory, metal, and wires, but that does not mean that

2 inventing the piano would be obvious if you just started

3 with a pile of wood, some wire, some pieces of ivory,

4 and a few chunks of metal.

5        So if the claimed invention combined

6 elements known in the prior art and the combination

7 yielded results that were predictable to a person of

8 ordinary skill in the art at the time of the invention

9 or the evidence shows that there was another reason to

10 combine the elements in the prior art, that evidence

11 would make it more likely that the claim is obvious.

12        On the other hand, if the combination

13 known elements yielded unexpected or unpredictable

14 results, or if the prior art would have led one to avoid

15 combining the known elements, that evidence would make

16 it more likely that the claim on the combination of

17 those elements is not obvious.

18        Now, you should also consider what are

19 regarded as -- what are referred to as objective

20 indications tending to establish obviousness or

21 non-obviousness.  Some of those objective indications

22 include:

23        Whether the invention was commercially

24 successful as a result of the merits of the invention as

25 opposed to other reasons;

1              Whether the invention satisfied a

2   long-felt need;

3              Whether others had tried and failed to

4   make the invention;

5              Whether others came up with the same idea

6   at roughly the same time;

7              Whether the invention achieved unexpected

8   results;

9              Whether others in the field praised the

10  invention;

11             Whether others sought or obtained

12  licenses to the patent infringement inventor;

13             Whether persons skilled in the art

14  expressed surprise or disbelief regarding the invention;

15             And whether the inventor proceeded

16  contrary to the accepted wisdom in the field.

17             The presence or absence of any of these

18  objective indications may help you determine whether the

19  invention was or was not obvious.

20             Now, let me turn to the issue of patent

21  damages.

22             If you determine that Versata has proved

23  any of its patent infringement claims against AutoData

24  and that the claims of the '821 patent that are

25  infringed are not invalid, you must determine the

1  damages to which Versata is entitled.

2          Now, you should not interpret the fact

3  that I'm giving you instructions about damages as any

4  indication that Versata should win on its patent

5  infringement or not.  It is your task to decide first,

6  whether AutoData's liable for the claims asserted

7  against it.

8          Only if you find AutoData liable on one

9  or more of the patent infringement claims will you need

10  to turn to the question of the damages.

11          A patent owner whose patent is infringed

12  is entitled what is called a reasonable royalty as

13  damages for the infringement.

14          A royalty is the amount of money that

15  someone pays a patent owner to be able to use the

16  patented invention.

17          A reasonable royalty is the royalty that

18  would be reasonable for the infringer to pay and for the

19  patent owner to accept for the use of the patent that

20  they both know is valid and that the infringer wants to

21  use.

22          Now, you are to decide what a reasonable

23  royalty would be based on the circumstances as of the

24  time just before AutoData began selling or using the

25  infringing product or process.  You should assume that

1 AutoData knew at that time such things as the level of

2 sales and process -- profits that it would make using

3 the invention.

4 You should also assume that Versata was

5 willing to grant AutoData a license to sell or use the

6 patented invention and that AutoData was willing to pay

7 for that license.

8 In deciding what is a reasonable royalty,

9 you may consider the factors that Versata and AutoData

10 would consider in setting the amount AutoData should

11 pay, if they were negotiating a license in the real

12 world.

13 Here are some factors you may want to

14 consider in determining a reasonable royalty:

15 Whether the patent owner had an

16 established royalty in licensing the invention to

17 others; in the absence of such a licensing history,

18 whether there were any royalty

19 arrangements that were generally used and recognized in

20 the particular industry at that time;

21 What royalties AutoData and others paid

22 for the licensing -- for licensing patents comparable to

23 the patent;

24 Whether Versata had a policy of licensing

25 or not licensing the patent;

1    Whether or not Versata and AutoData are

2    competitors;

3    Whether being able to use the patented

4    invention helps AutoData in making sales of other

5    products and services;

6    The profitability of the product made

7    using the patent;

8    And whether or not it is commercially

9    successful or popular;

10    The advantages and benefits of using the

11    patented invention over products or processes not

12    claimed in the patent;

13    The extent of AutoData's use of the

14    patented invention and the value of that use to

15    AutoData;

16    Whether or not there is a percentage of

17    the profit or selling price that is customarily paid in

18    the particular business for the use of patented

19    inventions comparable to the inventions claimed in the

20    patent;

21    The portion of the profit that is due to

22    the patented invention as compared to the portion of the

23    profit that is due to other factors, such as unpatented

24    elements or unpatented manufacturing processes or

25    features or improvements developed by AutoData;

1    Expert opinions as to what would be a

2 reasonable royalty;

3    And any other factors, which, in your

4 mind, would have increased or decreased the royalty the

5 infringer would have been willing to pay and the patent

6 owner would have been willing to accept, acting as

7 normally prudent business people.

8    Now, that's the end of the instructions

9 on the patent claim.

10    Some water if anyone wants to -- if you

11 have water with you, and certainly feel free to have

12 some.

13    We're through most of the instruction at

14 this point, so bear with me.

15    We now move away from the patent

16 infringement and validity issues to a different set of

17 claims.  On these claims, Versata and AutoData have both

18 asserted claims against one another.

19    First, misappropriation of trade secrets.

20 AutoData contends that Versata misappropriated two of

21 AutoData's trade secrets, the ACE, or automatic

22 comparably equipped algorithm, and what has been

23 referred to as the Ford schema, and that AutoData has

24 been harmed by that misappropriation.

25    Versata denies that it misappropriated

1  AutoData's trade secrets.

2  To prevail on its claim for

3  misappropriation of trade secrets, AutoData must prove

4  by a preponderance of the evidence that a trade secret

5  existed;

6  Versata acquired the trade secret through

7  either improper means or through a confidential

8  relationship;

9  Versata used the trade secret without

10  authorization from AutoData;

11  And the use injured AutoData.

12  A trade secret consists of any formula,

13  pattern, device, or compilation of information that is

14  used in a business and that gives the business an

15  opportunity to obtain an advantage over competitors who

16  do not know or use the trade secret.

17  Matters of general knowledge in an

18  industry are not trade secrets.

19  In order for confidential information to

20  qualify as a trade secret, the owner of the confidential

21  information must take reasonable precautions to protect

22  it.  An agreement between the parties characterizing

23  information as a trade secret is not conclusive as to

24  its status, but it may be evidence of the value or

25  secrecy of the information.

1              There is no precise definition or formula

2   for determining whether any of the items claimed by

3   AutoData actually constituted a trade secret.  Instead,

4   you must make that determination in light of all the

5   surrounding circumstances.

6              But the following factors may be relevant

7   to determining the existence of a trade secret, although

8   these are not the only factors that may be relevant, and

9   you are to weigh them in the context of all the

10  surrounding circumstances.

11             First, the extent to which the

12  information is known outside of AutoData's business;

13             Second, the extent to which employees and

14  others involved in AutoData's business knew the

15  information;

16             Third, measures taken by AutoData to

17  guard the secret -- secrecy of the information;

18             Fourth, the value of the information to

19  AutoData and its competitors;

20             Fifth, the amount of effort or money

21  expended by AutoData in developing the information;

22             And sixth, the ease or difficulty with

23  which the information could be properly acquired or

24  duplicated by others;

25             If you find by a preponderance of the

evidence that Versata misappropriated AutoData's trade

secrets, you will be asked to determine how much of

Versata's profits, if any, resulted from that

misappropriation.

Now, AutoData is not entitled to all of

Versata's income from its relevant contracts with Toyota

but only the net profits resulting from the acts of

trade secret misappropriation.

Breach of contract.

Both Versata and AutoData allege that the

other party breached its contractual obligations.

Versata alleges that AutoData breached the 2001

settlement agreement by discussing the terms of that

agreement with Chrysler and telling Chrysler that it had

a license to patents not covered by the agreement.

AutoData alleges that Versata breached

the 1997 confidential -- confidentiality agreement and

the 1998 Master Services Agreement by using AutoData's

technology or disclosing it to the U.S. Patent Office

and the public.

To recover damages for breach of

contract, a party must prove by a preponderance of the

evidence that the other party failed to comply with

their agreement and that the failure to comply with the

agreement resulted in harm to the non-breaching party.

1  That means that Versata has to prove that AutoData

2  breached the settlement agreement and that the breach

3  caused harm to Versata.

4        Similarly, AutoData has to prove that

5  Versata breached the confidentiality agreement or the

6  Master Services Agreement and that the breach caused

7  harm to AutoData.

8        If you find that either Versata or

9  AutoData or both breached their contractual obligations

10  to the other party, you must assess what sum of money,

11  if any, would fairly compensate the injured party for

12  the injury that it has suffered.

13        If you find that the party has -- has

14  proved that it suffered actual damages, it may recover

15  its lost profits.  To recover damages for lost profits,

16  the injured party must prove that it is reasonably

17  certain that it would have earned profits but for the

18  breach and that the lost profits were a natural,

19  probable, and foreseeable consequence of the breach.

20        If you find that the injured party failed

21  to present adequate proof of actual damages, you may

22  award that party nominal damages in the amount of $1, if

23  that party has proved that a contract was formed and

24  breached.

25        To decide the amount of the damages for

1 lost profits, you have must determine the gross or total

2 amount the injured party would have received but for the

3 breach, and then subtract from that amount the expenses

4 the injured party would have had, if the breach had not

5 occurred.

6         Now, damages need not be established with

7 mathematical precision, but you must have a reasonable

8 basis for your calculation.

9         Tortious interference with prospective

10 business relationship.

11         Versata makes a claim that is known as

12 tortious interference with prospective business

13 relationship.  Versata's claim is that AutoData

14 interfered with Versata's effort to win a contract with

15 Chrysler in 2008 by claiming that AutoData had a license

16 to patented Versata technologies.

17         To prevail on this claim, Versata must

18 prove by a preponderance of the evidence that (1) there

19 was a reasonable probability that it would have entered

20 into a contractual or business relationship with

21 Chrysler;

22         (2) AutoData committed a wrongful act

23 that was a substantial factor in preventing the

24 contractual or business relationship from occurring;

25         (3) that AutoData acted with a conscious

1 desire to prevent the relationship from occurring or

2 knew that the interference was certain or substantially

3 certain to occur as a result of their conduct;

4 And (4) that Versata suffered actual harm

5 or damage as a result of the interference.

6 AutoData asserts the affirmative defense

7 of legal justification.  Legal justification is a

8 complete defense to a tortious interference claim.  To

9 find that AutoData was legally justified in --

10 tortiously interfering with Versata's prospective

11 contracts with Chrysler, you must find that AutoData had

12 a good-faith belief that it was legally entitled to act

13 as it did.

14 Tortious interference damages.

15 First, actual damages.  If you find that

16 AutoData interfered with Versata's prospective business

17 relations with Chrysler, you will be asked what sum of

18 money would reasonably compensate Versata for its

19 damages, if any, caused by the interference.

20 Excuse me.

21 Exemplary damages.  There's another type

22 of damages which is known as exemplary damages that can

23 be awarded in exceptional cases involving tortious

24 interference with prospective business relations.

25 Exemplary damages means an amount that you may, in your

discretion, award as a penalty or by way of punishing the wrongdoer.

Versata is entitled exemplary damages, if it proves by clear and convincing evidence, that the harm it suffered resulted from AutoData's fraud, malice, or gross negligence.

Now, proof of fraud requires proof that the offending party made a material misrepresentation; that the misrepresentation was made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion; that the misrepresentation was made with the intention that it should be acted on by the other party; and that the other party relied on the misrepresentation and thereby suffered injury.

Proof of malice requires proof that the offending party acted with the purpose of causing substantial injury to the other party.

Proof of gross negligence requires proof of an act or omission by the offending party that involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and of which the offending party was aware but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

1              In deciding whether to award exemplary

2  damages, you may consider the following:

3              First, the nature of the wrong;

4              Second, the character of the conduct

5  involved;

6              Third, the degree of culpability of the

7  offending party;

8              Fourth, the situation and sensibilities

9  of the parties concerned;

10             Fifth, the extent to which such conduct

11 offends the public sense of justice and proprietary;

12             And, six, the net worth of the offending

13 party.

14             THE COURT:  Now, that is the end of my

15 legal charge to you.  You will now hear arguments from

16 the lawyers for each side, one hour to each -- one hour

17 to each side.  So they will be dividing their arguments

18 up in various ways, but they have a total each of an

19 hour.

20             I don't know whether they will use it

21 all, but this is a complex case, so we've given them an

22 hour to explain the case to you.  And I think you will

23 find it very helpful.

24             When they finish, I will give you a

25 short, additional charge about the process of

1  deliberations.  Now, at this point, let me pause for a

2  moment and ask the lawyers whether they have any matters

3  they would like to raise with me outside the presence of

4  the jury, if there are any objections.

5          MR. COLE:  None from the Plaintiffs.

6          THE COURT:  No objections.

7          Any objections?

8          MR. ADAMS:  Nothing from the Defendants,

9  Your Honor.

10          THE COURT:  No objections.

11          Well, in that case, we don't have to send

12  you out.  We can have the counsel begin their argument.

13  So we will call on Mr. Cole --

14          MR. COLE:  Yes, Your Honor.

15          THE COURT:  -- for the Plaintiffs.

16          MR. COLE:  Thank you.

17          THE COURT:  -- to give the Plaintiffs'

18  opening argument.

19          Just to be clear, let me give you a bit

20  of a scorecard here.  Mr. Cole will argue the first part

21  of the argument for the Plaintiffs, then Mr. Adams, and

22  Mr. Ruiz will divide the argument for the Defendants,

23  and then I believe Mr. Baxter will come back with the

24  rebuttal argument on behalf of the Plaintiffs.

25  Go ahead.

```
 1              MR. COLE:  May it please the Court.

 2              THE COURT:  Oh, excuse me.  Mr. Cole, I

 3    went on for so long, I think maybe an opportunity for a

 4    leg stretch might be good here.

 5              MR. COLE:  Yes, Your Honor.

 6              THE COURT:  We can get everybody's blood

 7    flowing.

 8              MR. COLE:  Myself, too.

 9              THE COURT:  Thank you.  Me, too.

10              Let's see.  We've been going almost an

11    hour now, I think.  All right.  Let me ask the lawyers

12    about how you would like to proceed in terms of our

13    afternoon break.  I don't know that we want to go -- I

14    bet the jury doesn't want to go two more hours without a

15    break.  Does anybody object to our having the afternoon

16    break at the conclusion of your argument?

17              MR. COLE:  That would be perfect with us.

18              THE COURT:  Is that okay with everybody

19    on the Defense?

20              MR. COLE:  Mine will probably be about

21    30ish minutes, I think.

22              THE COURT:  All right.  And a break at

23    the close of the Plaintiff's argument is that all right?

24              MR. RUIZ:  That will be fine, Your Honor.

25              THE COURT:  Okay.  That's what we'll do.
```

1  Very good.  Why don't we begin.  Mr. Cole.

2                  MR. COLE:  Thank you, Your Honor.  May it

3  please the Court.

4                  In opening statement, I told you this was

5  a case about unfair competition.  And I think after

6  we've seen the evidence, we've learned something else,

7  and that is this is also a case about unfair litigation.

8                  And what do I mean by that?  What I mean

9  is the contrast between the types of proof you saw from

10  us and from AutoData.

11                  And when we proved our case, our case

12  that they violated our intellectual property rights, we

13  called Dr. Nettles and marched through every claim and

14  every element of every claim of our patent.  It was

15  long, it was painful, but it is what the law requires.

16                  We took every element of every claim,

17  showed evidence, explained why AutoData's product, in

18  fact, meets that evidence -- excuse me, meets that

19  element.  And in response to that, AutoData offered

20  nothing to suggest that they do not infringe our patent.

21  Now, contrast that with AutoData's case that we took

22  their intellectual property, and I think you'll see a

23  marked contrast.  It is probably best summed up by Mr.

24  Perrier's testimony on Wednesday afternoon.  This is his

25  summation:

1              What would you like to get in this

2 proceeding?

3              I want my compare stuff back.  What they

4 stole from me, I want it back.

5              They asked you to find a violation of

6 their intellectual property.  What intellectual

7 property?  Their compare stuff.

8              Throughout this trial, we've heard other

9 phrases of their various claims.  They've called it that

10 we've taken the essence of their ideas, we have taken

11 the flavor of their trade secrets.  We have used and

12 taken the basic concept of their ideas, the abstract of

13 their ideas.

14              It's been phrased in different ways, but

15 the common denominator is that their claim that we took

16 something that belonged to them have been vague, they

17 have been ever-changing.  And you saw it most on

18 cross-examination of their witnesses because every time

19 somebody was asked to specify precisely what these trade

20 secrets are, they fought it tooth and nail.

21              The common denominator on

22 cross-examination from AutoData's witnesses was,

23 priority number one, do not get pinned down on what the

24 trade secrets are with any detail.  That's not fair.  If

25 you accuse someone of taking your property, you need to

1  be able to say with specificity what that property is.

2           AutoData was never able to do that, and

3  the reason is they don't have any trade secrets really.

4  It doesn't make them a bad company.  It doesn't mean

5  they don't have good products or good people.  It just

6  means they don't have precisely defined trade secrets

7  and certainly means that we didn't take or use or do

8  anything wrong with any of it.

9           And, in fact, when you -- when you step

10 back even further, the essence of what they did here

11 today over the last week was they exaggerated their

12 claims of intellectual property.  They offered an

13 overreaching claim that they own, in fact, property that

14 they don't own.  And that actually marries up with the

15 other side of this case, which is our case about the

16 Chrysler deal.  Because as you remember from opening and

17 throughout this case, we -- we argued and we believe the

18 evidence shows that in trying to win the Chrysler deal,

19 AutoData did the same thing.  They over-promised to

20 Chrysler their IP rights.  They told Chrysler that they

21 had the rights, broad rights, to our ideas, our

22 innovation and our patented technology; and they didn't

23 have those rights.  They overstated their intellectual

24 property rights here in this case, and we believe the

25 evidence shows they did the same thing to win Chrysler

1  in the first place, and that's what brought us here.

2  Okay.  What I'd like to do now is show you -- you're

3  going to get a series of questions -- excuse me -- that

4  you're going to have to answer, and I'd like to walk

5  through each one and tell you what we believe the

6  evidence shows the answer should be and talk about some

7  of the evidence.

8              So, Mr. Diaz, if we could put up Question

9  No. 1.

10             Okay.  The first question is patent

11 infringement.  And you'll see there's an answer for each

12 claim there.  That's 1A is whether they infringe, and

13 there's a separate answer for each of the, I think, 10

14 claims at issue.  We believe the answer for each of

15 these is going to be yes.  And Dr. Nettles, again, this

16 was the death march through the patent from Dr. Nettles.

17 And, again, Dr. Stubblebine, their expert, did not offer

18 any testimony whatsoever that they don't infringe.

19             That's clear, we believe.

20             Second, this is also under patent

21 infringement 1B, this is the validity defense.  This is

22 AutoData's argument that we don't -- it doesn't matter

23 if we infringe their patent because their patent is

24 invalid.  That's their argument.  Now, we believe the

25 evidence is clear here that the answer is no.  In other

 1  words, no, the patent is not invalid.  That's kind of

 2  confusing, I know; but we believe 1A is yes, 1B is no.

 3  Now, what's the evidence on validity?  Basically they

 4  brought in, they had this demonstration of AutoQuote

 5  Pro, their software that Mr. Wedermann told you they had

 6  since '95 or '97, I believe he said.  But in order to

 7  actually prove up that that product invalidates our

 8  patent, they had to go through the same process that Dr.

 9  Nettles did.  In other words, they had to take all that

10  evidence and then go through each element of each claim

11  in that patent and explain how each element of each

12  claim is met by that piece of software.  They did not do

13  that.

14            In fact, what you saw is Dr. Stubblebine

15  put up one of the claims, and they basically quickly

16  ticked through some, but not all, of the claim elements,

17  and he talked about, well, that was in the AutoQuote

18  Pro, that was in the AutoQuote Pro.  He didn't point to

19  any evidence other than basically remember that

20  AutoQuote Pro did this, remember that it did that, and

21  he skipped steps as Dr. Nettles clarified today.

22            They didn't talk about all the claims

23  either.  They did not do what the law requires them to

24  do, which is to prove each element of each claim was, in

25  fact, in that product.  And it's clear even from Dr.

1   Stubblebine's testimony that that product was not a

2   two-computer system.  And Dr. Nettles testified, Jeff

3   Van Dyke testified, Josh Walsky testified, and Seth

4   Krauss testified that the technical difficulties going

5   from a one-computer system to a distributed system that

6   is capable of going on the internet are difficult.

7   Those are not easy problems to solve.

8               And so, even if you take everything that

9   they said as true, that does not prove up that that

10  product invalidates our patent.  And not only that, the

11  law is clear as Judge Bryson instructed you, our burden

12  to prove infringement is by a preponderance of the

13  evidence.  Their burden to prove invalidity is by clear

14  and convincing evidence.  In other words, their burden

15  to prove invalidity is higher than ours.  They were

16  required to do more than we were, and instead they did

17  less.

18              Now, the third question -- Mr. Diaz --

19  oh, I'm sorry, I skipped the second.  Back, back, sorry.

20              There we go okay.  Sorry.

21              All right.  So, that's 1A and B.  Now,

22  we'll go to the next page, which, I guess, is 3.  Okay.

23  All right.  1C, that's actually the argument I mentioned

24  earlier that they claim that while they did not actually

25  have a two-computer system, it would have been obvious

1  to do that.  That was Dr. Stubblebine's testimony; but,

2  again, Dr. Nettles said otherwise, Seth Krauss said

3  otherwise, Jeff Van Dyke said otherwise and Josh Walsky.

4  We think the evidence is that that was not an obvious,

5  easy thing to do.  They admit there are differences,

6  they claim those differences are obvious; but we don't

7  think the evidence backs that claim up.

8                Can you put it back up?

9                All right.  So, we think the answer to 1C

10  is another invalidity question is no for every one of

11  those 10 claims.  So, basically, yes to 1A, and then no,

12  no.  And then that means there is an infringed patent

13  that is valid; and if you have that, and we believe the

14  evidence shows it, you then get to 1D, which is the

15  damages answer.

16                 This is the patent infringement damages.

17  And Mr. Mills, our damages expert, testified to the

18  number of 137,200.  We believe that's the right amount,

19  and we don't believe that their expert, Mr. Ratliff --

20  he did offer some testimony in contradiction of that,

21  but we think it was really thoroughly impeached.

22                 $137,200, we believe is the clear answer

23  to the patent infringement damages.

24                Okay.  Let's go to the next question, if

25  we could, Mr. Diaz.

1                This is breach of contract, do you find

2      that Versata -- this is our breach of contract case --

3      has proved by a preponderance of the evidence that

4      AutoData failed to comply with the settlement agreement?

5      Now, the settlement agreement, again, I know there's

6      different contracts here, so it's a little confusing.

7                The dispute the parties had back in the

8      late 1990s, if you recall, AutoData started that, they

9      filed a frivolous lawsuit against us, we responded with

10     a patent infringement case, and then in 2001, the

11     parties agreed to settle their differences.

12               Now, an important part of that, as we

13     showed you, was a provision that says the parties to

14     that agreement are not to disclose, confirm or discuss

15     the terms of that agreement at all.  We agreed to that,

16     they agreed to that.  And that's the provision we

17     believe the evidence shows was broken here in connection

18     with the Chrysler deal.  And just to be clear, that

19     confidentiality provision was important, and it was most

20     important in exactly the situation that it was broken

21     here.  It is most important that when parties agree to

22     settle their disputes, that settlement is not used

23     against you in competition, and that's exactly what

24     happened here.  They used this settlement agreement in

25     order to assure Chrysler, despite its concerns, that

1  they could do anything we could do.  And that's exactly

2  the situation we had in mind when we required this in

3  the first place.

4          What's the testimony on that?  The first

5  piece of testimony, Mr. Diaz, I don't know if you can

6  pull up Slide 8, Mr. Jacops' testimony.

7          Mr. Jacops testified that -- you'll

8  recall the sushi lunch, this was June 25th, 2008, he was

9  meeting with Chrysler's Chuck Sullivan.  And at this

10 point, it was clear that they had already been told that

11 auto -- some company, one of the big competitors, and we

12 know there were only two, one of the other competitors

13 had said that they had a license to our entire

14 intellectual property portfolio.

15         And he -- Mr. Jacops testified later that

16 while no names were -- were made during that

17 conversation, it was very clear from the context, very

18 clear from the basic relationship of the parties that

19 that was talking about AutoData.  That is a clear breach

20 of the settlement agreement.  There's no question --

21 nobody has even disputed it.  If, in fact, they told

22 them that they had a license to our entire intellectual

23 property portfolio that that would be a breach.  They

24 don't even contest that.

25         Now, what other evidence is there?  Mr.

1  Sullivan, the other party to the sushi lunch, was also

2  asked about that exact conversation.  And what Mr.

3  Sullivan said was, I don't remember exactly, but I

4  certainly couldn't dispute it.  And I asked him, well,

5  if Mr. Jacops comes and testifies that you told him that

6  AutoData told you they had a portfolio license, well, I

7  can't confirm it, but I can't deny it either.  In other

8  words, both parties to that conversation are in

9  agreement.  Now, Mr. Sullivan doesn't remember the

10 details, but he does not dispute what Mr. Jacops

11 testified here on Monday.

12            Third piece of evidence was the

13 deposition of Dennis Ephlin, one of AutoData's

14 employees, who testified unequivocally that he talked to

15 Mr. Perrier about this subject, Mr. Perrier told him go

16 tell Chrysler, there's no issues, we've got a contract,

17 we've got our own technology, no problem here, nothing

18 to see.  And then he was very clear in his testimony he

19 went and told that to Chrysler.  Clear evidence of a

20 breach.

21            Next piece of evidence on this,

22 Plaintiff's Exhibit 117.  This was a document we looked

23 at a couple of times including in opening statement.

24 Go to the next page.  If you can blow it up.

25            Again, this is from Dennis Ephlin to Greg

1 Perrier, Chris Wedermann.  In today's status meeting,

2 Chuck, again Chuck Sullivan, mentioned something about a

3 perpetual license that AutoData has with Trilogy on

4 config and wanted to understand more.  There is no

5 question that Chuck Sullivan knew about this perpetual

6 license on config.  And we think the evidence earlier

7 shows that Mr. Sullivan went into the sushi lunch

8 already knowing that because he brought it up with Mr.

9 Jacops.

10                Now, given the context and given that

11 evidence, we don't think that -- excuse me -- we think

12 the evidence is clear that, in fact, AutoData did

13 exactly what we said.  They assured Chrysler because

14 when Chrysler was looking for a replacement for Versata,

15 they were concerned and AutoData offered assurances that

16 there was nothing to worry about because they had a

17 complete license to our technology.

18                Now, let's go to the next cause of

19 action, which is the tortious interference.  Okay.  This

20 one has several parts, too.

21                Question 3A:  Do you find Versata has

22 proved by a preponderance of the evidence there was a

23 reasonable probability that it would have entered into a

24 contract with Chrysler?

25                This is talking again about the

1   replacement bid in 2008, was there a reasonable

2   possibility -- excuse me, reasonable probability that we

3   would have won that deal.  And what's the evidence on

4   that?

5              Okay.  So, what's the evidence that there

6   was a reasonable probability that we would have won that

7   business had AutoData not broken the contract and not

8   misrepresented the scope of their intellectual property

9   rights?

10             Well, first of all, we had been the

11  vendor, we had been providing the software for Chrysler

12  for four years at that point.  Second, Plaintiff's

13  Exhibit 117, which we just looked at, the part right

14  below the part I was just going to mention specifically

15  that Chrysler was prepping and super-sensitive to

16  Trilogy patents.  This is a very important document.

17  Chrysler's mental -- Chrysler's mind during this process

18  is that they were super-sensitive to our patents.  The

19  notion that AutoData -- AutoData's representations,

20  misrepresentations to them about what rights they had

21  was on a very important issue to Chrysler.  Had they not

22  done that, Chrysler would have known AutoData had a

23  limited license to a small part of our patent portfolio,

24  and nothing like a portfolio license that would allow

25  them to do anything they want.  That was a crucial fact.

1                  We heard from Chuck Sullivan in his

2   deposition testimony that you saw that he asked

3   everybody to assure him that they had the legal rights

4   to do everything they were requesting in the RFP.  Mr.

5   Sullivan wouldn't have done that if it wasn't an

6   important issue.  He asked every vendor to assure him

7   that they had the legal rights to do everything in the

8   RFP.  And we know from the testimony here today that

9   they actually infringe one of our patents.  In fact, as

10  I mentioned, AutoData doesn't even dispute infringement

11  here.  We know that.

12                 And your common sense tells you that if

13  you're Chrysler and you're trying to come up with a

14  new -- new software or you're trying to come up with a

15  replacement for us to do the same thing we did and save

16  money, the last thing in the world that you would want

17  or need is a messy lawsuit about who can do what to

18  whom, and I think your common sense would tell you that

19  that is simply something that they would have avoided at

20  all costs.

21                 Okay.  Now, let's put that all in context

22  a little bit as well.

23                 If we could put the jury charge back up.

24                 So, we think the answers to 3A, B, C, and

25  D are all yes -- sorry, I missed one.  Right.  Okay.

1    Sorry.  Let's put D off for now.  A, B, and C, yes,

2    these are the tortious interference claims.  Now, let me

3    provide a little more context to flush out the rest of

4    the evidence on this subject.

5                   Okay.  So, again, our contention is we

6    would have won this deal but for their wrongdoing.

7                   Now, we know from the evidence that there

8    were only three competitors here.  There was Versata,

9    there was AutoData, and there was a third company called

10   Chrome; but we know for sure that Chrome was not a

11   viable option.  And Plaintiff's Exhibit 656 proves this.

12   Plaintiff's Exhibit 656 was a deposition on written

13   questions, a sort of written-out deposition of Chrysler,

14   we saw this in the case, and it was talking about

15   Chrome.  And at the bottom it says, I do not recall that

16   pricing -- excuse me, I do recall that pricing was not a

17   factor in the final review of Chrome's RFQ response as

18   they did not meet the technical requirements of the RFQ.

19   In other words, just because you're cheap isn't really

20   the point if you can't do the technical work.  Chrome

21   couldn't do the technical work.  And AutoData overstated

22   their legal right to do the technical work.  That leaves

23   Versata who had proven it could do the work because we

24   had been there for four years doing it.

25                   Now, let's put -- let's put a little more

1 context up here. We know, and I mentioned this in

2 opening statement, that what Chrysler was looking for --

3 And this is PX 352, Mr. Diaz.

4         What Chrysler was looking for in this RFP

5 process was to find somebody who could offer the same

6 functionality that we were currently offering at a lower

7 price.

8         And if we could go to the second page.

9 Blow up the top there.

10         This is AutoData's notes of an early

11 meeting with Chrysler. As a first phase, this would

12 enable Chrysler to replace the current software while

13 maintaining the existing functionality. That's

14 important, maintaining the existing functionality and

15 look and feel. They wanted the same thing they already

16 had, and they wanted it for less. So, again, if

17 AutoData didn't have the legal right to do what we could

18 do, they couldn't meet Chrysler's goals.

19         Second, we know from -- we won't pull

20 this document up to save a little time, but we saw Mr.

21 Jacops testify and looked at some documents that showed

22 there was substantial support for Versata in Chrysler.

23 They had a lot of fans there. Now, there were others

24 that didn't like us as much, but we had a lot of support

25 in Chrysler. And if Chrysler knew that nobody else

1  could do the work that was necessary, they would have,

2  in fact, stayed with us.  We know from Plaintiff's

3  Exhibit 117 that Chrysler was super-sensitive to our

4  patents.

5           Now, what else do we know?  There were

6  some unusual things about how this process rolled out

7  from the time that AutoData started working.  If you

8  recall, the contract that AutoData ultimately won, they

9  started work on that in May of 2008.  May of 2008,

10 AutoData starts work on the replacement for us.  Now,

11 what's interesting though is the contract was not signed

12 until September of 2008.  So, they started work months

13 before the contract was ever signed.  And you saw Bing

14 Burris, one of the depositions, he testified that nobody

15 at Chrysler would ever do things without a contract.

16 That was highly, highly unusual and something that is

17 simply not done.

18           Now, why would they do that?  Well, I

19 think the evidence shows you they did that because they

20 were hedging their bets.  In other words, they gave the

21 business to AutoData, but they were not sure enough to

22 sign the contract yet.  So, instead, they let AutoData

23 begin work under the assurances that they had given

24 Chrysler but held off on signing the contract until they

25 knew how things were going to turn out.

1            Chrysler was in the mode to hedge their

2   bets; and if it didn't work out, the evidence shows you

3   that what Chrysler would have done is come back to

4   Versata because they were telling Versata all along that

5   we were still in the running, not to go away.

6            Now, let's look at Plaintiff's Exhibit,

7   30.  This shows this pretty well.

8            Now, at the very top, this is Dennis

9   Ephlin, again the AutoData and this is in July, this is

10  during their implementation but before the contract was

11  signed, and they're about to have a meeting with Versata

12  who doesn't know that AutoData is hard at work replacing

13  them.  And they say, listen, everyone who is going to be

14  on this call, it's important, we need to treat this as a

15  discovery session.  We are not under contract, we don't

16  have deadlines or build issues, we are on a SOW, that's

17  a statement of work, exploring some of the issues in a

18  discovery-type work.

19           Now, why would they go to the trouble of

20  deceiving Versata about the status of their contract, or

21  perhaps did they not have a contract like the evidence

22  showed?

23           Now, one final point on this issue.

24           If we could look, Mr. Diaz, at PX 134,

25  second page.

1          There was a little bit of history here,
2  too.  And history a lot of times can teach you a lot.  A
3  little earlier AutoData actually replaced Versata in
4  Canada.  Now, you recall AutoData's based in Canada, and
5  they have strength there.  And if we look at the top,
6  you can see something interesting.  During the course of
7  their attempt to replace us in Canada, some problems
8  happened, and they're talking about that.
9          Now, Nancy and Neal are nervously
10  supporting us -- this is AutoData -- but have mentioned
11  that if we do not have this functioning come Friday, she
12  will -- in all caps -- turn us off and go back to
13  Trilogy.  We think the same thing would have happened
14  here.
15          Okay.  Now, let's go back to the charge,
16  if we could, Mr. Diaz.
17          All right.  So, A, B, C, yes, yes, and
18  yes.  That basically proves that we -- that they
19  interfered with our contract and -- let's see -- but for
20  this, we would have won the business.
21          Now, 3D, this is a defense, it says, even
22  if you answered yes, do you find AutoData was legally
23  justified to intentionally interfere.  I don't believe
24  we've heard much evidence on that.  We'll see what
25  AutoData's lawyers say, but we can think of no legal

1 justification that they have to intentionally interfere

2 with our contract to misrepresent to Chrysler the scope

3 of their rights.  We can think of no justification for

4 that.

5               Okay.  Let's go to the next question.

6               Okay.  This is damages for -- now, this

7 is damages for -- it's a little confusing here -- Either

8 the breach of contract that we looked at earlier or the

9 tortious interference claim that we just talked about.

10               In both situations the damages claim

11 we're making is the same.

12               So, again, we're saying that Chrysler --

13 excuse me, AutoData broke our contract by talking about

14 the license and then misrepresented the scope of that

15 license.  Both of those lead to the same conclusion

16 which was that we would have won that business instead.

17 And we believe the damages in that situation, as Mr.

18 Mills testified, were between 11- and $14.6-million.

19               We, of course, believe the higher number

20 is more appropriate.  It's ultimately up to your

21 discretion, but we believe the evidence will support a

22 14.6-million-dollar award for both of those causes of

23 action.

24               And keep in mind that Mr. Ratliff, their

25 damages expert, had no criticism of the 5-million-dollar

1    a year profit figure that Mr. Mills offered, he didn't

2    disagree with that.  And, in fact, remember also that

3    that 5-million-dollar a year figure that underlies this

4    calculation, that is less than AutoData is making today

5    at Chrysler.

6                    Okay.  Let's go to the next question.

7                    Now, this is a question on punitive

8    damages, exemplary damages.  Now, I'm not going to spend

9    too much time on this.  But Question No. 5 is a question

10   that asks you are the conditions here -- are there

11   conditions here that would possibly justify the

12   imposition of exemplary damages?

13                   And we believe the evidence does show

14   that AutoData's tortious interference resulted in fraud.

15   As I mentioned, they misrepresented the scope of their

16   rights.  And if it resulted from fraud, the answer to

17   Question A is yes.

18                   Now, 5B is the amount.  We're not going

19   to suggest an amount for you on this.  If you believe

20   the conditions are such that exemplary damages would be

21   appropriate, we believe there are; but if you do, that

22   is something that is in your discretion, and we will

23   leave it up to you if you feel that's appropriate and

24   whatever amount you feel is appropriate.

25                   Okay.  Now, let's move on to the next

1  question if we could.  Now, we're getting to AutoData's

2  claims.  This is their counterclaim for misappropriation

3  of trade secrets.  Okay.  So, what -- the first thing

4  they have to do in order to make this cause of action is

5  they have to prove that they have a trade secret or in

6  this case two, three, our however many they're claiming.

7              And what a trade secret is -- and I asked

8  this of Dr. Stubblebine -- there's a formula, pattern,

9  device or compilation of information that it belongs to

10 AutoData and gives them advantage over their

11 competitors; so, that's the first step.

12             The second step is you've got to find

13 that whatever that was was not a matter of general

14 knowledge.  Now, I think the answers to both of these

15 are no.  Actually, all three.  We think the answers to

16 both of these are no, and that's a result of their

17 constantly shifting claims.  They haven't proven any

18 specific formula, pattern, device or compilation of

19 information that belonged to them, none whatsoever.

20             They certainly haven't proven that those

21 things, whatever they may be, are not a matter of

22 general knowledge.  And frankly, this is why they've

23 been so evasive on this subject.  They don't want to be

24 specific because then you can point to something in the

25 public that says, hey, this thing you're claiming,

1 that's a matter of general knowledge.  But if you keep

2 changing your position on that every five minutes, it's

3 hard to pin them down and find something in the public

4 that would prove this thing really isn't a secret.  They

5 have not proven their case at all.

6          Now, the third one is a question of if

7 you find that they actually have a trade secret, you

8 still have to show that they took reasonable precautions

9 to protect it.  Now, I mean, they did testify that they

10 locked the door, I don't know if that's enough.  We

11 don't think the answer is yes, We don't think they

12 proved that anyway.  But that, I think, is really not

13 the focus of the dispute here.

14          Now, let's go to the next cause of

15 action.  Okay.  Now, here we get to another important

16 point.  This is what we call the use section.  In other

17 words, even if you find they have trade secrets, which

18 we don't think you should, but if you do, you still have

19 to find in addition that they proved that the alleged

20 trade secrets, whichever ones we're talking about, were

21 misappropriated by us in applications and components

22 provided to Toyota in 1998.  Okay.

23          So, where have they been on that issue?

24          Well, first, the first position was that

25 we used this in Toyota because we put it in a product

1  called SC Vehicle Compare, you heard about that, and

2  several other products that you heard Mr. Ratliff

3  testify was the initial basis of his opinion.  We took

4  their trade secrets and put them into those products,

5  sold those, gave those to Toyota.  That was the initial

6  position.

7            After that, they then fell back to the

8  position that we put this in SC Vehicle Compare by

9  itself and sold that to Toyota.  That was their next

10 position.  That lasted as long as Mr. Perrier's

11 cross-examination where he admitted on cross that, in

12 fact, SC Vehicle Compare does not contain any of their

13 trade secrets.

14            We can get that one up.  I think that's

15 Slide 1, I believe.

16            This is from Mr. Baxter's cross.  So, we

17 didn't use any of your trade secrets in SC Compare; is

18 that correct?

19            Answer:  That's correct.

20            So, that theory fell under the evidence

21 as well.  And you know it fell under the evidence

22 because when Mr. Anaipakos was crossing Mr. Ratliff on

23 this exact point, Mr. Ratliff said, well, I saw that

24 testimony, but I believe Mr. Stubblebine, their expert

25 who said it doesn't contain the trade secret, not Mr.

1  Perrier, the CEO, who said it doesn't.  That shows you

2  all you need to know about the theory that SC Vehicle

3  Compare contained our trade secrets.  They proved

4  absolutely nothing.  In fact, the evidence conclusively

5  shows it doesn't.

6          Now, there's another problem with this

7  theory even if Mr. Perrier had never taken the stand,

8  and the other problem is that that product was never

9  given to Toyota.  There's no -- there's no debate about

10  that at all, never given to Toyota.

11          Now, after that, AutoData fell back to

12  yet another position, and that position was we wrote up

13  a schema that supposedly took their trade secrets and we

14  gave this piece of paper to Toyota with the schema in it

15  and that was what justifies getting every penny of the

16  profits we made from Toyota.

17          Well, that theory then fell when Mr.

18  Krauss came in and explained how those pieces of paper

19  that they were pointing to were never even given to

20  Toyota.  So, the piece of paper theory fell by the

21  wayside.

22          And finally by the end of the trial, I

23  suppose their theory is going to be that we improperly

24  used their trade secrets internally and never gave them

25  to anybody.  And we heard Mr. Adams cross-examining Mr.

1  Krauss, I think, today.

2                Question -- this is from the draft of the

3  transcript from today.

4                Question:  I haven't heard any testimony

5  of anybody giving any trade secret to Toyota, have you?

6                Answer:  Sorry.  The only alleged

7  transfer of this information was to Toyota.

8                I think it's been established now that

9  those documents didn't go to Toyota.  So, I suppose they

10 may come up here in a few minutes and say that actually

11 we misappropriated their trade secrets by taking them

12 and using them internally somehow and never giving them

13 to Toyota, but that's still enough for them to claim --

14 make a claim against us.

15                Well, there's a problem with that theory

16 if they try to articulate it.  And the problem with that

17 theory is the contract.  Plaintiff's Exhibit 452, this

18 is the contract --

19                We don't have to bring it up, Mr. Diaz.

20                This is the May 1998 contract that they

21 point to and they say we breached this contract.  Well,

22 it says in Section 7.1, you'll have this in your jury

23 room if you ask for it, Plaintiff's Exhibit 452, Section

24 7, License, it says they gave us a license to this stuff

25 they gave us, whatever it is, a nonexclusive,

1  nontransferable license for the sole purpose of

2  designing and prototyping new customer facing

3  applications for auto manufacturers like Toyota.

4           And you heard Mr. Krauss say we actually

5  tried to get AutoData involved in the Toyota deal.  And

6  even if we used some trade secret they have, which I

7  think, again, the evidence is clear we didn't, even if

8  we did, they said we could.  We tried to work with them

9  to get that business.  It didn't work out.  But the

10 contract authorizes us to do that.

11          So, they have no theory despite all the

12 ones they've gone through, no theory at all that we used

13 their trade secrets improperly even if they can prove

14 one in the first place.

15          Now, I will --

16          I think that's all the questions, isn't

17 it, Mr. Diaz?  Oh, I'm sorry, there's one more.

18          So, the answer on their trade secrets is

19 no.  Now, the last one they have a breach of contract

20 claim, too, which is the same thing as their trade

21 secret claim.  Their breach of contract argument is they

22 gave us confidential information that we used

23 improperly.  What confidential information?  The same

24 thing they're pointing to as their trade secrets.  So,

25 for all those same reasons, the answer to that is no.

1 Now, this last question is on damages if you did find a

2 breach of contract.  Now, this is -- again, we think

3 there's no way the evidence will support getting here at

4 all; but if you do, there's an interesting thing here.

5 　　　　　　It says you may award one dollar if you

6 find that AutoData has failed to present proof of actual

7 damages.  Now, it may seem like a trivial thing, like,

8 well, you know, what if I think there's something to

9 that, I'll award a dollar, it's no big deal, right?

10 　　　　　　Now, I can't go into the reasons, but I

11 can say this:  It is extremely important if you ever got

12 to this question, extremely important, that the answer

13 to that question be zero.  In other words, the actual

14 damages they proved, which is nothing, it is extremely

15 important to write zero rather than $1 even though that

16 seems like a small difference.

17 　　　　　　Two final points and I'm done.  A couple

18 things that I'd be interested to see from them, and I'd

19 ask you to listen for in their closing argument, number

20 one, are they going to show you any evidence at all of

21 anything that we gave to Toyota whatsoever that would

22 possibly implicate a trade secret.  Listen to that,

23 let's see what they say.

24 　　　　　　Second, now, they claim that this --

25 there was a lot of debate about this schema, who

1 | invented the schema, was it them, was it us, was it
2 | joint, whatever.  Mr. Krauss came in here and Mr.
3 | Kneupper walked him through how he and his partner had
4 | built the schema before AutoData ever came along.

5 | Let's see if they can point to any
6 | development documents of theirs where they are
7 | developing, creating this schema before that ever
8 | happened, let's see if they can show you that.

9 | Now, with that, I'm going to sit down,
10 | and Mr. Baxter will have about 17 minutes to close up.

11 | Thank you very much.

12 | THE COURT:  Now, we'll take our afternoon
13 | break at this point, but unlike -- well, let me just say
14 | that it's important, I think, that you not --
15 | particularly important at this stage that you not
16 | discuss the case among yourselves because you haven't
17 | heard from everybody, and we don't want you to, in
18 | effect, start deliberating before you've heard from
19 | everybody.

20 | We'll take a little shorter break than
21 | usual.  Let's just take -- well, let's take a little
22 | over 10 minutes, let's take until 2:25.

23 | The other thing is the -- the -- by now
24 | the copy of the instructions should be in there in your
25 | jury room, but don't look at it at this point.  You'll

1   have plenty of opportunity to do that.  At this point,

2   just take the next 12 minutes to relax.  Please be ready

3   to come back at 2:25.  Thank you.

4                    (Jury out.)

5                    THE COURT:  Okay.  Absent any further

6   business, I'm seeing none, we'll be adjourned for 10

7   minutes.

8                    (Recess.)

9                    (Jury in.)

10                   THE COURT:  Okay.  Are we ready?  Thank

11   you.

12                   MR. ADAMS:  May I proceed, Your Honor?

13                   THE COURT:  You may, Mr. Adams.

14                   MR. ADAMS:  May it please the Court.

15   Ladies and Gentlemen of the Jury, I'm here to give our

16   closing statement on behalf of AutoData.

17                   I wanted to start off by reminding you of

18   a statement -- actually a couple of statements that were

19   made at the beginning of this case by Versata.  They

20   stated that AutoData was just a data company, that they

21   wanted to move into the software area that Versata was

22   in, and that the 2008 Chrysler contract was a

23   once-in-a-lifetime contract.

24                   Well, we brought down Mr. Perrier,

25   Mr. Wedermann, and Mr. Otten from Canada, and they spent

1 their time here, and they explained to you the history

2 of AutoData, its product development, its data

3 development, and the services that they provided, and

4 the fact that they've had major automotive customers

5 since the early '90s up to the present.

6 　　　　　　　So it's just false and misleading to say

7 that the Chrysler contract was a once-in-a-lifetime

8 opportunity.  They know that we've been in this industry

9 from the beginning.

10 　　　　　　　In fact, they developed this innovative

11 ACE technology that you've heard about.  Mr. Perrier

12 testified that he met up with a customer, General Motors

13 Canada, who brought the idea to his attention.  That

14 particular customer was having trouble comparing

15 different vehicles and really wanted a way to do it

16 automatically.

17 　　　　　　　So Mr. Perrier brought it back to his

18 team.  His team happened to be Mr. Wedermann and

19 Mr. Otten.  And you'll recall Mr. Otten stating that

20 they kicked Greg out of the room and starting doing some

21 real work behind the scenes.  I think Mr. Otten

22 testified that he and another gentleman kind of locked

23 themselves in a room and came out three days later, and

24 they had created the ACE technology.

25 　　　　　　　Then we heard from Mr. Wedermann who

1 talked about how the ACE technology actually made it

2 into a successful commercial product called AutoQuote

3 Pro.   Mr. Wedermann demonstrated that product for you, a

4 product that's been in the marketplace since '97/'98,

5 well before the patent application that was applied for

6 by Versata.

7            Now, I'd like to start by talking about

8 our trade secret misappropriation allegations.   The

9 whole dispute started in the late 1997 time period.   We

10 see some notes that Trilogy had in their internal

11 business records where they were keeping an eye on

12 AutoData.

13            They had already identified AutoData as a

14 company that had dynamic competitive compare.   You heard

15 Mr. Van Dyke testify that he never even heard of

16 anything other than static compare, which is like

17 putting two brochures next to each other, yet their own

18 internal notes show that they were aware that AutoData

19 had not only dynamic competitive compare but other

20 software products as well.

21            And so obviously, they were interested in

22 meeting with AutoData to learn about their capabilities.

23            You heard how they invited AutoData to

24 come to Trilogy and respond to an RFP where they were

25 seeking information that would enable them to have their

1  own competitive comparison capability.

2          And the day after that meeting, the

3  Trilogy folks that were at that meeting, including

4  Mr. Van Dyke and others, put down in writing a report of

5  their notes from the meeting.

6          As you'll recall, they were very

7  complimentary and impressed by AutoData.  They're good

8  guys to work with; they're smart; really raised the bar.

9  They already solved our problem of equivalent vehicle

10  compare, which is exactly what Trilogy was trying

11  develop themselves.

12          In particular, Mr. Van Dyke commented,

13  I'd like to second that these guys were obviously

14  bright.  The capabilities they seem likely to be able to

15  provide, has sent my head spinning for the past day.

16  If that's not somebody who is impressed, I don't know

17  who is.

18          We heard Mr. Wedermann testify about the

19  meeting and how Trilogy seemed very interested in

20  learning about the details of their software and their

21  data capability.  And he also has a distinct memory of

22  the meeting, because he remembers that he and

23  Mr. Perrier came down from Canada.  They were dressed in

24  their Sunday best, and got into this meeting, met with a

25  bunch of recent college graduates, one who was in shorts

1   and flip-flops, and that happened to be Mr. Van Dyke.

2              After the meeting, AutoData reported what

3   they thought the purpose of the meeting was.  And they

4   sent a letter to Trilogy, basically indicating that they

5   understood that Trilogy's critical business need was to

6   be able to provide their clients with the ability to

7   automatically comparably equip.

8              And if you'll recall, ACE is the acronym

9   for automatically comparably equip.

10             And, of course, AutoData respected their

11  trade secrets and didn't want anybody to use them

12  without authorization.  And so Mr. Perrier reminded them

13  shortly after the meeting that even though they had

14  already signed the November 6th, 1997 confidential

15  agreement, he reminded them again:  By the way, the

16  information we disclosed at the meeting is confidential.

17  Please respect my confidential information.

18             Then AutoData responded to the RFP

19  process.  You will recall that it came in two sections,

20  but the second section had kind of a secret sauce or the

21  very most sensitive trade secrets.  And so AutoData

22  provided those separately with extra non-disclosure

23  confidentiality protection.

24             It provided them a package of various

25  items, including tables, diagrams, databases, sample

files, and most importantly, it provided the ACE

algorithm.  You've heard it called the pseudo-algorithm.

It just means that a human being can read it, and it

hasn't been converted into computer code yet as

testified by Mr. Otten.

Then we heard testimony from Mr. Van Dyke

and others about how several months later, they started

working on their product called SC Vehicle Compare.

After meeting with AutoData, they never

expressed any interest in jointly developing the

competitive comparison technology with AutoData.

They just decided they were going to move

on to something else, and they continued to develop the

technology themselves.  And just a few months later,

after that November 1997 meeting, they were really

bragging about selling SC Vehicle Compare to Toyota.

Now, you've heard lots of statements in this case about,

well, it hasn't been developed yet.

Well, it was certainly developed far

enough along that Mr. Van Dyke testified that the

algorithm that was part of a specification they were

putting together for the Toyota project basically

described the work that he had done to develop his

algorithm.  This is the algorithm that appeared in the

Toyota document.

1          And about that same time of this

2   description of the algorithm is when they made the sale

3   to Toyota of the SC Vehicle Compare and other products.

4   They definitely promoted that product when they entered

5   into this contract and received compensation in return.

6          It didn't matter that they hadn't built

7   it yet.  They promised they would deliver it, if they

8   built it, and it was an item that they promoted, and it

9   was a product that they had, based on AutoData's

10  pseudo -- pseudo-algorithm trade secret.

11         Interestingly, we've heard a lot of

12  testimony about how they haven't built it as if they're

13  bragging and as if there's something wrong with the fact

14  that AutoData had their own ACE product that was

15  functioning and in the marketplace.

16         Now, very important part of the trial, at

17  least for me, was when Mr. Otten was testifying.  At the

18  time, Mr. Cole was cross-examining him and went up to

19  Mr. Otten and showed him an excerpt of a document.  So

20  it wasn't the complete document; it was just an excerpt.

21  And it turned out it was an excerpt from the Toyota

22  document that Trilogy had authored.  Mr. Otten had never

23  seen that document before and was asked to review it on

24  the spot and asked:  Does that look like your ACE

25  algorithm?

1          And he was very confident in saying yes.

2    He wasn't prepared to see that document.  It was just

3    put in front of him.  He instantly identified it as

4    AutoData's ACE algorithm.

5          Now, the other trade secret that's in

6    issue is the Ford schema.  And that was provided

7    pursuant to a Master Services Agreement.  So after

8    Trilogy and AutoData did not enter into a business

9    relationship regarding comparison technology, they at

10   least entered into a business relationship where

11   AutoData was going to provide data and data schema to

12   Trilogy so that they could fulfill their contract with

13   Ford.

14         At that time, AutoData was also a Ford --

15   also had Ford as a customer.  You heard Mr. Wedermann

16   talk about how he had developed the schema and explain

17   in detail all of the details of it, the fact that when

18   he developed it, the uniqueness of it, and the fact that

19   AutoData kept it confidential and trade secret.

20         The schema, as you saw near the end of

21   the trial, had a notation at the top that it was

22   authored by Mike Ryksen, who was an AutoData employee,

23   ADMS -- that's AutoData Marketing Systems -- and that

24   the schema was dated 1998 and was copyright-protected to

25   ADMS.

1              This schema was attached to the

2 agreement, so it wasn't just like a draft document

3 floating around.  Both parties decided that the contract

4 would be based on the schema that was attached as an

5 exhibit.

6              Mr. Wedermann explained that the schema

7 did include some sections that were provided by Trilogy.

8 He wasn't trying to claim credit for the whole thing.

9 He just explained that the core part of the schema was

10 his and how he had incorporated Trilogy's contributions.

11 Mr. Wedermann's contribution is the section highlighted

12 in yellow, and Trilogy's -- Trilogy's contribution is

13 the section highlighted in green.  And then you heard

14 from Mr. Stubblebine who explained how that schema

15 somehow ended up in the Toyota project.  So we now have

16 two trade secrets that were disclosed to Trilogy that

17 Trilogy decided to use for the Toyota contract.

18              Now, as you'll be instructed -- or as you

19 were instructed by the Court, trade secret

20 misappropriation doesn't require that anybody be a bad

21 actor.

22              Now, I don't know what happened with

23 regard to the trade secrets and how they ended up in the

24 Toyota project.  I have my suspicions, but I don't know

25 for sure.  I suspect it was just a bunch of young recent

college graduates, young engineers who were working

hard, probably weren't even told that this was being

provided under a confidentiality agreement.  They were

probably told go meet with these guys, see what

capabilities they have, and see if you can develop some

projects.

You recall that they have this boot camp

at Trilogy for new-hires and were expected to perform

and develop new products, and they wanted to impress the

president of the company, Mr. Liemandt, with their

innovative ideas.

And so, again, who knows why these trade

secrets ended up in Toyota, and we're not blaming

anybody, and we don't have to prove that it was done

with bad intent.  All we have to show is that we had

trade secrets and that those trade secrets were used by

Trilogy for the Toyota project.

Now, I think opposing counsel is trying

to mislead you when he says there's no evidence that

Toyota received those trade secrets.  Basically, what

he's saying is, if I steal the Coca-Cola formula and

develop my own Coke product, and then I sell the Coke

product, the person who buys the Coke product doesn't

have the trade secrets.  That's right.

We're not saying that Toyota has the

trade secrets, because they're hidden behind the scenes in the code.  But they were used by AutoData to come up with those products.

Now, let's turn to the jury charge and in particular, I want to see Question No. 8.  Here you'll be asked to decide, did Trilogy violate either the Master Services Agreement or the November 1997 confidential agreement.  And we believe you should answer yes.

It's clearly more likely than not that AutoData's trade secrets ended up in the Toyota project. There's lots of evidence, lots of documents that show things just don't add up.

How does a company want to get vehicle comparison technology, meet with a company that has it already in the marketplace, and then suddenly a few months later, they have their own technology.

Well, let's -- let's turn to Question No. 6.  So Question No. 8 was, did they breach the contract. Question No. 6 is, did they misappropriate the trade secrets.

Here, we have three things that we need to establish that it was a trade secret.  There's been plenty of evidence, I believe, to establish that.  We have to establish that it was not of general knowledge.

1  I think that's been fairly well-established.

2                     And we also have to establish that

3  AutoData took reasonable measures to protect it.  You've

4  heard about the measures they take internally at

5  AutoData to not let their trade secrets out.  They

6  signed confidentiality agreements that remind people

7  that receive their trade secrets to respect and abide by

8  those confidentiality agreements.

9                     So I think there is plenty of evidence in

10  the record to prove that they did protect their trade

11  secrets.

12                     Now, let's go back to the PowerPoint.  I

13  want to go back to the AutoQuote Pro technology, because

14  this is the main piece of, quote, prior art that we're

15  relying on to claim that the '821 patent is not valid.

16  And despite what you've been told, the Judge did not

17  instruct you in the jury instructions that Defendants

18  have a burden to go through a death march through each

19  of the claims and each of the claim elements.

20                     We believe Dr. Stubblebine did a

21  sufficient job establishing -- with a representative

22  claim why that claim was invalidated by the AutoQuote

23  Pro.  We don't need to march through each of the claims.

24  He clearly testified that his analysis would have been

25  the same for the other claims.  It would have been a

 1  waste of time to repeat it for all 10 claims.

 2           As I've already indicated, AutoQuote Pro

 3  was in the marketplace in the '97/'98 time period, well

 4  before the filing date of the '821 patent.  You saw it

 5  in operation in the courtroom.

 6           You saw how Mr. Wedermann was able to

 7  configure one vehicle and then was able to hit a

 8  button -- well, he was able to pick a second vehicle,

 9  decide in the first vehicle what features were

10  important, like engines, transmission, stereo, whatever,

11  and then hit a button, and the second vehicle would be

12  comparably equipped with the same type of equipment.

13           Now, Versata alleges that that's not --

14  that's not sufficient to establish invalidity, because

15  the AutoQuote Pro system didn't follow the one -- first

16  computer/second computer language of the patent claims.

17  I believe Mr. Wedermann testified, no, the AutoQuote Pro

18  system did work with more than one computer.  It did

19  have a first computer and a second computer.

20           We acknowledge that the first computer

21  and the second computer do slightly different things

22  that what the claim talks about, but I think it's pretty

23  inherent that it wouldn't be that big of a stretch to

24  say, well, okay, let's have the second computer do what

25  the first computer was doing.

1          Nonetheless, Mr. Wedermann testified that

2  at the same time the AutoQuote Pro product was in the

3  marketplace, they had a contract with a company called

4  ARI who asked them to take their technology and put it

5  in a web-based environment.  That web-based environment

6  had a client server structure just like the Internet.

7  And so at the same time they had AutoQuote Pro, they

8  also were modifying their software products to work on

9  the Internet, and Mr. Wedermann testified it only cost

10  them $35,000.  Well, they only charged $35,000, I should

11  say.  So it wasn't like it was an expensive, complicated

12  project that AutoData was expecting to make a lot of

13  money for.

14          There's one other important issue with

15  regard to invalidity.  It's called the on-sale bar

16  issue.  In most countries, as soon as you sell an

17  invention, a product containing an invention, you can no

18  longer get a patent, but in the United States, the

19  Patent Office gives you one year from the date you sell

20  your product to apply for a patent application.

21          Here I think there's plenty of evidence

22  that the SC Vehicle Compare was on sale and in the

23  marketplace in the June 1998 time period.  And as the

24  Court just instructed you, you don't have to have a

25  working product to establish on-sale bar.  You just have

1  to show that the product is ready for commercial

2  production.

3           It doesn't have to be technically

4  perfected.  You just have to have the essence of the

5  invention, and that's -- the algorithm that was

6  described in the Toyota document is the essence of the

7  invention as multiple witnesses have testified to.  All

8  they had to do is go to the next step and convert that

9  algorithm to computer code.

10          So let's go back to the jury charge, and

11 I want to go to Questions 1A and 1C.

12          So with regard to 1A -- I'm sorry --

13 let's start with 1B.  With regard to 1B, this is where

14 you're asked, does the AutoQuote Pro basically, by

15 itself, indicate that the '821 patent is invalid.  And

16 we think the answer is, yes, because their distinction

17 regarding first computer and second computer, we don't

18 think, is significant enough to argue that it's not

19 prior art that invalidates their technology.

20          But even if you don't agree with that,

21 let's go to 1C.  You will get the opportunity to decide,

22 even if the difference is computer one and computer two,

23 would it have been obvious to take the AutoQuote Pro and

24 put it in a web environment where a first computer and a

25 second computer were doing what the patent covered?

1  Given the fact that AutoData did do that at the same

2  time they had AutoQuote Pro in the marketplace, I think

3  the answer has to be yes.

4          Now, finally, with regard to

5  infringement, Versata claims that we're not disputing

6  infringement.  That's not the case at all.  Our main

7  argument is the patent's invalid.  And you can't

8  infringe an invalid patent.  That's our primary

9  argument.

10          Nonetheless, it's not our burden to prove

11  we don't infringe.  That would be like it would be our

12  burden to prove we didn't steal.

13          No, that's not the way burden of proof

14  works.  They have to prove that we infringe.

15          And let's go back to the PowerPoint.

16          We don't think they've satisfied their

17  burden.  You heard Versata's own expert indicate that

18  the ACE engine does not infringe the '821 patent.  Their

19  other expert said it did.  Their own experts are

20  conflicting on whether or not the ACE technology

21  infringes.

22          Nonetheless, they argue that the AOL

23  technology infringes.  Their expert acknowledges that

24  the AOL technology does not contain the ACE engine, but

25  he says that AutoData infringes, because we sell data to

 1  AOL.  That's all we do, is we give them data, and

 2  somehow that means we are indirectly infringing the

 3  patent.

 4              We asked them, well, who's infringing the

 5  patent then?

 6              He said the consumers, the people that

 7  use the website are infringing.  And we're inducing them

 8  to infringe apparently by selling data to AOL.  That

 9  just doesn't make sense.

10              So let's go back to the jury charge.

11              Question 1A and 1 -- 1A asks, did Versata

12  prove by a preponderance of the evidence that AutoData

13  directly or indirectly infringed the '821 patent?

14  We think the answer is no as to all those claims.

15              Thank you.

16              THE COURT:  Thank you, Mr. Adams.

17              Mr. Ruiz.

18              MR. RUIZ:  Thank you, Your Honor.

19              I'm the second runner in the relay, so

20  I'm the one who didn't get a break, but I don't want to

21  end today without first thanking each of you.  You've

22  taken a week out of your lives to come and do your civic

23  duty and help solve a dispute that's very important to

24  AutoData.

25              You heard Mr. Adams say that the three

most senior people from AutoData flew down here from Canada, and even put themselves in the hot box and swore under oath to tell you the truth, because it's that important to them.

And each of you are going to help make a decision that will hopefully end the last -- three years and nine months of litigation they had to experience.

You heard about some litigation in 2000 and 2001, and they had that seven years of peace, and now they've had another three years of litigation.  And, hopefully, your decision today will help bring peace, at least for seven years, and hopefully more.

So I'm going to talk to you about the claim that actually has us here in Marshall, Texas. Versata sued AutoData, claiming that they made a misstatement.  Now, when you're trying to figure something out, you learn in grade school you ask those questions.  And what are the questions?

It's who, what, where, and how.  So let's talk about this misstatement.

Who said it?

When I'm done, you're going to have less than 20 minutes left, and there's no more evidence.  And maybe they'll tell us, but who made the statement that they claim is the basis of why we're all here?

1          They've never identified who made it.

2   And they've never identified who it was made to.  So we

3   don't know who made this alleged misstatement and who it

4   was made to.  You won't see a single document that

5   identifies it.

6          Then we don't know what was said.

7   They've never even brought up what was said that has

8   dragged us all here today.

9          Nor have they brought up where it was

10  said.  We heard about the conversations at the lunch,

11  the sushi lunch we heard about.  We've never heard about

12  where this supposed misstatement was made, and we don't

13  even know when it was said.  No one has told you when

14  the statement was made.

15          And finally, we don't know how -- even if

16  the statement was made, how it affected Chrysler's

17  decision to terminate Versata and award the contract to

18  AutoData.  They talk about proving stuff with

19  specificity.

20          They haven't proved any of these, and

21  maybe when Mr. Baxter comes up to conclude this trial,

22  we will finally get the answer to all these questions.

23  Now, you remember, again -- well, I left one off.  I

24  left off why.  And the question is, why are we here,

25  then?  If they haven't proved any of those, why are we

1  here?

2                  And I think it's all captured in this one

3  bit of testimony from Mr. Sullivan, who's an integral

4  witness in this case.  And what did Mr. Sullivan say at

5  that famous sushi lunch?

6                  (Video clip playing.)

7                  QUESTION:  In any event, at this lunch,

8  tell me what you remember about this discussion.

9                  ANSWER:  I remember that -- that -- that

10  he was upset and he said that -- that we like to win,

11  and when we don't win, we sue; that he told me that they

12  had taken litigation against others.

13                  (End of video clip.)

14                  MR. RUIZ:  Now, you heard Mr. Jacops

15  testify that Mr. Sullivan was a good friend of his, and

16  Mr. Sullivan -- Chrysler is not in this lawsuit.  They

17  have no dog in the fight, but yet he goes out and he

18  says:  Mr. Jacops, my friend, told me straight out, when

19  he wanted that contract, if he doesn't win, he sues.

20  And you heard about the RFP; we discussed it.  And the

21  RFP is Defendants' Exhibit 195.  And one thing you'll

22  notice about the RFP -- we heard testimony that Chrysler

23  was very important to them to do two things.

24                  One, they wanted to finish the launch of

25  the website in 100 days, so they had very strict

1    deadlines.  And, two, they wanted it to be cheaper.

2    They needed cost savings.  And that was some of the

3    criteria that was involved.

4                   So Chrysler submits the bid.  Does

5    Versata get it?

6                   Let's look.  Let's go to the next slide.

7    Defendants' Exhibit 198, the termination letter.

8    Versata's contract with Chrysler is terminated on April

9    29th, 2008.  Chrysler says we're terminating your

10   agreement.  We'll give you the 90 days' notice that we

11   need.  So Versata has now been terminated by Chrysler.

12                   So do the RFP.  They submit the bid.

13   Now, you'll see in the schedule in the RFP, which is

14   Pages 29 and 30 of the RFP, it has the timeline that

15   Chrysler is going to go through the RFP process.  And it

16   says you submit your bids by March 31; within the next

17   two weeks, we're doing a presentation.  We'll invite

18   everyone down to do a presentation.

19                   Plaintiffs' Exhibit 309, this is a very

20   important document, because in this document -- it's the

21   document that the Versata people wrote, reporting back

22   about what happened at that presentation.  And you'll

23   see quotes like:  Well, the guy told me

24   sorry-to-see-me-go speech.  And then another person

25   says:  You know, a Chrysler person came up to me and

1  apologized for how badly we were treated at the

2  presentation to Chrysler.

3               But more important, these are the

4  decision-makers.  These are people who are interviewing

5  Versata for the job.

6               Next slide.

7               One of the Versata people report back

8  that Versata isn't really going to make the final

9  consideration, because their pricing's too high.  So why

10 did Chrysler -- why did Versata lose?

11              Well, they lost for price.  And the price

12 shows up right off the bat.  And they're trying to --

13 they aren't really going to make it, because their

14 pricing is too high.

15              So Chrysler never intended to hire

16 Versata.  In fact, you heard that Versata finished third

17 out of three.  Number two was Chrome, and you've heard

18 they've gone out of their way to say, well, Chrome

19 couldn't even meet the technical requirements.

20              So what does that say about Versata's

21 chances of being hired by Chrysler that they finished

22 behind Chrome in the process?

23              So what was next?  Quality concerns.

24              On the quality concerns we heard from Mr.

25 Bing Burris.  And he testified that with Chrysler, they

1  were having difficulties, that it was challenging to get

2  Versata to make changes to the site and that they were

3  expensive.  And he said and that's why they decide to

4  terminate them.  That's why you do an RFP, to change out

5  who provides it.

6              So Versata was let go, because Chrysler

7  wasn't happy with their work.  So there were quality

8  concerns.

9              And what else does Mr. Burris say?

10             He says also, Versata was litigious, and

11  he said that there was concern -- they had an estranged

12  relationship with Versata at times, and I think there

13  was some concern that Versata was litigious or could be

14  litigious.  Chrysler wanted to cut its ties with

15  Versata, because it felt that having them as a partner

16  risked getting in a place where they'd be sued by

17  Versata.

18             And if you recall, there's a pattern

19  here.  When AutoData and Versata were partners in 2001,

20  it wound up in litigation.  So Chrysler wanted to make

21  an exit.

22             So what they're trying to tell you now

23  is, well, that's not why all these people at Chrysler --

24  who, again, have no dog in the fight -- they're not

25  really telling you the truth.  We lost because AutoData

basically either lied on their resume or lied in their

job interview.  They misstated some facts.

Well, let's see why AutoData won.  Again,

Mr. Jacops' good friend testified that when AutoData

replaced Trilogy, the speed of the upload was reduced

from six weeks to one day.

And also Chrysler saved $3 million a year

going with AutoData.  And most importantly, his managers

stopped complaining to him.  That's why AutoData won.

They went to the presentation.  They impressed everyone,

and they got the job.

You also heard Mr. Sullivan say that

after he met with Mr. Jacops, that it was Mr. Jacops who

told him that AutoData only had a partial license, and

he talked to his legal staff.  And this is Chrysler's

Legal Department, which is a large organization.  And

they said they had no problem with giving the work to

AutoData.

So, again, AutoData won because they were

the better provider at a lower cost.

Now, let's go and look at the resume.

Now, obviously they had to file a

response to request, and I want you to look at

Defendants' Exhibit 192.  This is AutoData's response to

the Chrysler request.

1          Now, you remember when we went through

2  the one for Versata, they had all the stuff about all

3  their intellectual property rights and their legal

4  rights.  You notice they never showed you one sentence

5  in this response to Chrysler's request for quote that

6  was false.  They never showed you one sentence in this

7  request that talks about any license to a Versata

8  patent.

9          This is quite a lot of information

10 they're submitting to get the job.  Not a single thing

11 in here was false, and they never showed you anything

12 was false.

13          So what is the basis of their claims?

14          Well, the basis of their claims comes

15 from Mr. Jacops, and, again, it's the sushi lunch.  And

16 he says that -- now, Mr. Jacops is no longer an employee

17 at Versata.  And it's important to note that not a

18 single officer or an employee came here today or this

19 week to testify or even be present.  They didn't bother

20 to show up on a case that they say is very important to

21 them.

22          Instead, it's consultants they have paid

23 to show up here and testify.  So Mr. Jacops, he may be

24 paid as a consultant to be here, but I don't think he

25 was going to lie for $625 an hour.

1            And what does he say?  Does he say that

2   Mr. Perrier said that -- told Mr. Sullivan that there

3   was a license on June 1st at a meeting at a Starbucks?

4   No.  Instead, he says that he was told there may be a

5   company that says that they have a license to the

6   intellectual property portfolio, and that -- would that

7   be a problem.  He said we never mentioned any company.

8            And Mr. Sullivan said, well, there may be

9   a company that said it, not that there was or that one

10  did, nor did he say which company or where he heard it

11  from.  He could have heard it from another Chrysler

12  person, if anything similar to that was said.  He just

13  said, well, there may be a statement.

14            That -- if that's the case, then every

15  time a person gets hired over another person or gets

16  business over another person, all a company has to do is

17  say, well, I heard that someone told me that you made

18  some false statement to get the job, so I'm going to sue

19  you.  And everyone can be here one day.

20            That's really the position that Versata's

21  taken.  They don't have to prove who said it to who,

22  when it was said, and what was said.  If they lose the

23  job, they can drag you to court.

24            So when someone accuses someone of lying

25  on a resume or a job interview, how would you figure out

1  if it was done?

2            Well, let's talk to the people in the

3  meetings.  Mr. Sullivan again:  Did anyone at AutoData

4  tell him that they had a patent?

5            Well, he says no.  He really asked them

6  if they were legally allowed to do it.

7            And then Mr. Jacops says, when we asked

8  him, well, did AutoData need a license to comply with

9  your RFP, and he says obviously, no, because they

10  complied.

11            And you heard when we took him on the

12  stand, none of the patents they put in their RFP

13  response are infringed by AutoData doing the work for

14  Chrysler until 2010.  They sued in 2008, August 8, 2008.

15  And that's important, because in August 8, 2008, you

16  heard Mr. Ephlin say that he got called by Chrysler,

17  because someone read an article in the newspaper, and he

18  said it was ever what the newspaper said.

19            And the newspaper talked about the

20  complaint, and in the complaint Versata -- the

21  allegations they made here today, they made in the

22  complaint.  They filed it with the court, and it became

23  a public record.  They told the entire public we had a

24  limited license agreement, and we believe AutoData lied

25  about it.

1                    So everyone knew at that point in time,

2    but yet even then, they never said who said it to who,

3    when, what was said, and the impact.

4                    So who else talked about this?

5                    Well, Mr. Burris.  What did Mr. Burris

6    say?  They asked him, did anyone in the process have any

7    conversations about licenses?

8                    No, I don't recall that.

9                    Is it fair to say that part of the RFP

10   process you didn't have any discussions with anyone

11   concerning the extent of the license?

12                   Right.  That's fair.

13                   So the two people who supposedly would

14   have been the ones who heard it both said, no one talked

15   to me about licenses and patents.  So we -- so

16   obviously, then who was it said to?

17                   Well, what else does Mr. Burris say?

18                   Well, he says, we go to the how.  Let's

19   assume it was said.  Would it have impacted it?  What

20   decision -- was the decision to use AutoData based on

21   any license?

22                   And his answer was no.

23                   So even if the statement was made,

24   Mr. Burris says that wasn't the reason why they were

25   hired.  And you heard Mr. Mills on the stand, their

1   damage expert testify, it was a but-for analysis.

2   If AutoData was hired for any reason, other than

3   misrepresenting a license, the damages are zero.  He

4   testified if -- if the statement was not the reason why

5   Chrysler hired AutoData, their whole case falls apart

6   and the damage is zero.

7                   Well, we heard from Chrysler, and their

8   whole case falls apart.

9                   Now, what did Mr. Jacops say?

10                  He said they didn't need a license to

11  comply.

12                  Now, was a license required?

13                  Let's go to the next one.  We're going

14  backwards.  We need to go forward.

15                  MR. KING:  That's it.

16                  MR. RUIZ:  I'm sorry.  So license

17  required?  No.

18                  Let's move.  Okay.  Let's go for it.

19                  All right.  So let's go to the damages.

20                  On the misappropriation of trade secrets,

21  in this case, AutoData is accusing Versata of

22  misappropriating his trade secrets.  In essence, to go

23  with another analogy, AutoData is saying that Versata

24  used someone else's work and entered it into the science

25  fair competition, that AutoData didn't come up with it.

1          Now, if someone accuses someone of

2   entering someone else's work in the science fair

3   competition, how do you determine if it really was their

4   work?

5          It's pretty simple.  You say here, show

6   me how you did it.  Do it again without the help of

7   others.

8          And what have we learned?

9          Versata can't do it.  It's 2012.  They

10  still can't do competitive vehicle compare.  If it was

11  their own work and they invented it in 2000 as they say,

12  why can't they build it?  Why haven't they expanded on

13  it?

14          Everyone testified that configuration and

15  comparison is where the industry is going.  Twelve years

16  later, they still haven't figured out how to do it,

17  because it wasn't their work.

18          Now, you heard AutoData on the other

19  hand, they have built all these other products on it.

20  They keep on upgrading their product, because they know

21  how to do it.  It is their work.

22          So they showed you a document from

23  Mr. Jacops, his testimony saying, I don't know if -- if

24  SC Compare has my trade secrets.

25          But if you'll notice on the exhibits,

1  you'll see just about all the documents have below them,

2  Attorney's Eyes Only, Highly Confidential.  And you

3  heard Mr. Jacops, Mr. Wedermann, and Hans Otten testify,

4  I wasn't allowed to see any of the documents.  I mean, I

5  was told I couldn't.  You have to defer to the experts.

6              So, what were the experts, what did they

7  say, the ones who were actually allowed to see the

8  Trilogy documents.  Dr. Stubblebine and Mr. Ratliff,

9  they both testified if you look at their documents, what

10 Mr. Perrier didn't get to see, you'll see the

11 misappropriation.  And they found there was

12 misappropriation.

13             And the law says that if Versata steals

14 AutoData's trade secrets, it has to turn over the net

15 profit resulting from that misappropriation to AutoData.

16 And Mr. Ratliff got on the stand and he said the two

17 other contracts, the net profit was $2-million.  You

18 didn't hear Mr. Mills dispute that.  He never disputed

19 it because it was $2-million.

20             So, let's go to the verdict form, and

21 let's go to the breach of contract claim.  Now, the

22 breach of contract claim, the confidentiality agreement

23 is Defendants' Exhibit No. 30, it's a pretty short

24 document.  And in this document, you'll see that any

25 information given or disclosed to Versata was only

1 allowed to be used as authorized by this agreement.

2 That didn't include giving it to Toyota, that didn't

3 include giving it to anyone else.

4          The Master Services Agreement is

5 Defendants' Exhibit No. 61, and this document, same

6 thing, it restricted the use only to the projects in

7 this document and no other use.

8          So, when we get to this question, did

9 they disclose or use the trade secret information, the

10 answer is yes.  And with respect to the damages, you

11 heard Mr. Perrier testify that he wants his stuff back.

12          So, did he want to go and sue for breach

13 of contract damages?  No.  But did they breach?  Yes.

14 And the answer should be a dollar.

15          If we go to the misappropriation

16 question, since the cat's out of the bag, since they've

17 got a patent which they're now suing us on and they

18 publicly disclosed the algorithm, did AutoData, did they

19 prove there was a trade secret and it was

20 misappropriated?  Well, did they take reasonable

21 precautions?  Yes.  NDAs, three of them, the MSA has a

22 confidentiality agreement.

23          Next slide.

24          So, what were the damages?  It was

25 undisputed.  The profits from Toyota which the Court

1  instructed you that if you find that they

2  misappropriated the trade secret, Versata has to turn

3  over all their profits.  That's the law.  Undisputed,

4  $2-million because they should not have gotten that

5  money by using our trade secrets to get the work.

6                    And then the final slide is the breach of

7  contract.

8                    So, why sue?  Why does Versata want to

9  sue?  Well, you see why they want to sue.  All the

10 executives of AutoData are in this courtroom.  The last

11 week they've been here, they haven't been working to

12 develop new products, they haven't been working on

13 developing new clients.  They've had to have been bogged

14 down and spend their time and resources on litigation.

15                   Versata, on the other hand, they don't

16 have to be bogged down because they can hire people to

17 show up.  Smart, hard-working young businessmen who give

18 quality work and save their customers a substantial

19 amount of money should be rewarded, not sued by big

20 plotting competitors who are just disgruntled because

21 they didn't get the work and they keep on losing work.

22 I mean, this isn't about unfair competition, it's about

23 free competition.  If people can't compete freely and

24 fairly, then small businessmen will never move up

25 because the big companies can always just sue them and

1    bog them down to keep them down.

2              On the other hand, if big companies go

3    and steal small businessmen's trade secrets and use it

4    for their own gain and for a competitive edge, the law

5    says they need to pay for it.  And we believe that --

6    and we ask you the jury to send a message that that

7    conduct is not permitted and is not acceptable in this

8    community.

9              And I want to thank you again for your

10   time.

11             THE COURT:  Thank you, Mr. Ruiz.

12             MR. RUIZ:  Thank you.

13             THE COURT:  Mr. Baxter?

14             MR. BAXTER:  May it please the Court.

15             I really do love trials.  I've been doing

16   it all my life.  But I'm glad this one's over, and one

17   reason is that you've unfortunately had to witness

18   something that you don't see too often.  You've seen

19   witnesses from the other side that were willing to say

20   and do anything to try to win this lawsuit.  And that's

21   really a very sad proposition, folks.  And I wanted to

22   go over some of that and show you exactly what the facts

23   are and why their case against us amounts to nothing

24   except some fabrication.  And then I'm going to go back

25   and explain why you need to find for Versata both on the

1  patent case and on the breach of contract case.

2              But let's start if we can, please, with

3  what their claim really is about.  And the first claim

4  is that they said we stole their trade secrets and we

5  gave them to Toyota.  As a matter of fact, you'll find

6  that in the Judge's question is did we, in fact, give

7  that information to Toyota?  And I was struck today,

8  it's one of those moments that happens in a trial maybe

9  once in a decade when a lawyer slips up and tells the

10  jury what the evidence really is.

11             And that happened today with Mr. Adams

12  when he's questioning our expert today, and he says,

13  okay, I haven't heard any testimony of anybody giving

14  any trade secrets to Toyota, have you?

15             And so, apparently after a week of trial,

16  after trying to prove that we stole their trade secrets

17  and gave it to Toyota, Mr. Adams in a moment of candor

18  said, I haven't heard any evidence from anybody that we

19  gave -- Versata gave trade secrets to Toyota, have you?

20  And our expert had to agree he hadn't heard any evidence

21  about that either.

22             But yet, even this afternoon they still

23  want to complain to you and say, oh, they stole our

24  stuff.  And that stuff, as they put it, is two things.

25  Number one, they said we took their AutoData Compare and

1  we put it into our project and we sold it to Toyota.

2  They said that this afternoon.  Even though all the

3  documents and all the evidence says otherwise.

4          As a matter of fact, we asked Mr. Perrier

5  about it; and he had to say when we asked him if, in

6  fact, there was a SC Compare functionality at Toyota, he

7  had to say, no, there's not, I've never seen it, it

8  doesn't exist, they don't have it.

9          And so, I was kind of wondering why they

10  were still pushing this theory that, in fact, Toyota had

11  it.  I don't know to this minute because all the

12  evidence says contrary, Mr. Adams says it, Mr. Perrier

13  says it, the documents say it, and the experts say it.

14  So, you've got to ask yourself, why do they still

15  continue to try to push a position that is just

16  factually wrong.  And I guess they want to win so bad

17  because they'll take those facts and say white is black

18  and black is white, and it doesn't make any difference

19  to them.  And that's just not right.

20          The other thing that they said we stole

21  was the schema, that they developed a schema for Ford

22  and we gave it to Toyota.  Now, if you don't take any

23  other document back in the jury room with you, please

24  write down Exhibit No. 234, it's Plaintiffs' Exhibit

25  234.  It's a little long, but I'm going to go through

1   it, and I think you're going to find it very

2   instructive, and it proves the point about why, in fact,

3   this has been sort of a sad case.  If you look at the

4   document --

5                   And, Mr. Diaz, I want you to go to the

6   exhibit number or the page number which is 050 in that

7   document.

8                   And this is a handwritten set of notes

9   addressed to Mr. Adams Stein at Trilogy, and it comes

10  from Mr. Mike Ryksen.  Now, the truth is that Mr. Ryksen

11  was the only developer they had working on this product.

12  Mr. Wedermann never told you that he, in fact, did not

13  write one line of code on this project, not one.  He was

14  a salesman by then.  He didn't do development.  He

15  didn't write code top side or bottom.  But Mr. Ryksen

16  did, and he was really the only one they were talking

17  to.  And if you'll look at 234 at Page 050, 0-5-0, there

18  is a e-mail, a fax actually, that he sends to --

19                  Go to the next two pages, if you would,

20  please, Mr. Diaz, one more, one more.

21                  This is in his handwriting.  And he, as

22  you heard, received from Versata the schema that Versata

23  wrote.  As a matter of fact, they had the backbone, they

24  had all of this written already, and they sent it to

25  him.  The problem is he didn't know how to do it, he

1  didn't know what it meant.  And instead of all those

2  boxes that you saw being his, that's not true.  Look at

3  the document.  He starts listing out questions.  And the

4  e-mail that's attached to it has even more questions.

5              He says, Part class, should division ID

6  be included here, question mark; number field, what is

7  this used for; description field, should this be

8  included, not in table; what's the difference between a

9  description and a name; part, what's the difference

10  between a description and a name; price rules, not sure

11  what they're used for; include packaging part, what is

12  this used for?

13              He doesn't know.

14              Part, price rule, what is the

15  relationship with the other table; general questions,

16  option groups, how do you handle this?  The answer was,

17  by the way, you don't have to put them in.  Option

18  variations, how do you handle this?

19              Those never even made it into the schema.

20  Look at the entire document, and you will see all the

21  questions they were asking, and then you can match up.

22  If you take that document, the document that we sent

23  them, and it has all these headings where we explain to

24  them what we want the schema to look like and how we

25  developed it and how they're going to populate with

1  their data, and it matches up exactly to the boxes in

2  the diagram that you saw that they're trying to claim

3  credit for.

4         Now, we put Mr. Krauss on the stand to

5  explain how it got developed.  And I'm thinking, you

6  know, if I'm going to cross-examine Mr. Krauss because

7  the case comes down to this, Mr. Krauss said we

8  developed it, they did not.

9         So, here's how that cross-examination has

10  to look like.  Oh, Mr. Krauss, you say you developed it,

11  let me show you all these development documents we got

12  from AutoData.  Not one.  Not a page.  Not even a

13  question.  I wanted to ask him, well, look at this box

14  here, doesn't it say copyrighted, it says, copyrighted

15  for AutoData?  I mean, if they worked on it together, it

16  wouldn't be copyrighted anyway.

17         And he says, well, look, it says, Mr.

18  Ryksen did this.  He said, yes, when you generate it off

19  Mr. Ryksen's computer, it's going to put his name on it.

20  But he didn't write any of it.  And they didn't ask him

21  a single question about that, nor show him a single

22  document in which they actually developed it.

23         That, ladies and gentlemen, tells you

24  everything you want to know about their case and what

25  about what their witnesses will do because their

witnesses will try to take credit for something they

didn't do, and they will try to prove that we made

something that we didn't make in spite of all the facts

to the contrary, and that's just not true.

Now, if you look at the rest of the

documents, for example, if you write this number down,

246, write down Exhibit 246, and this is a document from

Mr. Krauss written in September of 1999.  And in

September of 1999, he doesn't know anything about a

lawsuit, he doesn't know that there's a controversy

about who wrote the schema, he knows nothing.  But

here's what he writes, I used and published this schema

to ADMS, that's AutoData, for Ford and CarOrder uses the

same schema for their data providers.

Contemporaneously when this is going on,

there are documents that you have access to that Mr.

Krauss wrote that says, I wrote the schema.  And you can

look at the documents he sent AutoData, and they don't

understand them, and they have to ask questions about

them because they can't write this schema.  And that

tells you everything you want to know about their case.

Now, let's go back to our case just a

moment.  The first is patent infringement.  And I heard

something I hadn't heard before.  Well, I know we didn't

put on any evidence that we don't infringe, our expert

1   never mentioned it, he didn't go through the claims and

2   explain how we didn't do this, and we didn't do this;

3   but just trust me, we don't infringe.  Then he says,

4   wait a minute, okay, so we do infringe, the patent

5   invalid.

6           Now, what's the problem here is you heard

7   our expert, Dr. Nettles, say if you're going to show

8   invalidity, you've got to go through the claims, each

9   one of them, just like we did on infringement, and show

10  that that's in the prior art, that it's in the Auto Pro

11  (sic), wherever it is.  They didn't do that.  And the

12  reason they didn't do that, their excuse is, oh, it

13  would take a lot of time, we weren't interested.  The

14  reason they couldn't do it is because they don't have

15  the proof that it did everything in our patent.  As a

16  matter of fact, they skipped elements.  Even the ones

17  they went through, they skipped elements.

18          And you can't just say, well, wait a

19  minute, I've got some evidence that we had prior art on

20  this element, the rest them we're just going to skip,

21  you can't do that.  And the Judge told you you couldn't

22  do that, and you follow the charge on that.

23          It's absolutely essential that they prove

24  that each and every element of every claim was in the

25  prior art, and they didn't even try.  Now, that damage

1  award, by the way, is $137,000.  We're not trying to

2  gouge anybody over that.

3          The other claim is that they, in fact,

4  interfered and they breached the contract with us.  Now,

5  let's talk about the breach of the contract, how did

6  that come about.  You'll remember there was litigation

7  between these two parties before.  But not that we were

8  litigious, they sued us.  And I asked Mr. Perrier on the

9  stand, well, wasn't that litigation frivolous; and after

10  a few hems and haws, he finally said, yes, it was

11  frivolous.

12          Now, when we asked him on his deposition,

13  and I showed it to him, he said absolutely not.  But now

14  he's in front of a jury, and I guess all the evidence

15  has been discovered, and he thought he ought to fess up

16  and tell the truth.

17          And he said, okay, that lawsuit is

18  frivolous.

19          Well, what happened?

20          Well as a result of that, they settled a

21  lawsuit, and they had to, as part of that, enter into an

22  agreement that if they got as part of the compensation

23  in that lawsuit, when we were going back and forth, the

24  rights of one of our patents, they couldn't reveal that

25  to anybody.  And they agreed to it, and they were in

1    such bad shape in that lawsuit, they had to agree to it.

2              You know, when you got the short end of

3    the stick, sometimes you just have to do stuff you don't

4    want to do.  And I've never seen that provision in a

5    license before, but they had to do it this time.

6    So what did they do?

7              Well, we know from a certified fact from

8    both Mr. Perrier and from his subordinate, Mr. Ephlin,

9    that at a minimum, they revealed to Chrysler that they

10   had a license to something of ours, and that breached

11   the contract right there.

12             But more importantly -- and here's what

13   counsel wanted to know about -- more importantly, did

14   they tell them they had something broader?

15             And that's when we get down to the sushi

16   lunch, and it's undisputed about what happened there.

17   What happened is Mr. Sullivan, who works for Chrysler,

18   out of the blue tells Mr. Jacops that one of the

19   competitors -- and there's really only one; Chrome

20   really isn't a competitor -- has indicated to Chrysler

21   that they have a portfolio-wide license.

22             What that means is they have a license to

23   everything we have in the patent world, they've got a

24   license to it, so don't worry about it.  And we know

25   from the documents that Chrysler was very sensitive to

1  Trilogy's patents, and they, in fact, believed we were

2  litigious even more.

3           They also said, well, wait a minutes,

4  that's not true, because, really, Chrysler didn't like

5  you; chrysler didn't like the way that you did business.

6  And he showed you part of a document a while ago about

7  what Chrysler's position really was, but you remember

8  that we showed you that document, and it's 309.

9           And let's get 309 up here just a second

10  and go to the second page.

11           And here's what Chrysler, the people on

12  the ground at Chrysler that use our product, that were

13  going to have to change to a different product, here's

14  what they said.  They said, feedback on the Versata

15  presentation, they weren't going to make the cut,

16  because it came in high, and the person that dealt with

17  our software and our product said that she didn't agree

18  with that thinking, because you get what you pay for,

19  but Purchasing made the decision for us; we may not have

20  a choice.

21           Then it says that the rest of the bids

22  from the other sides are delusional, and she said, since

23  Versata has experience and you guys know the data

24  issues, garbage in/garbage out, she would choose us and

25  it would be us hands down and that she'll continue to

1   beat the drum for us for what it's worth.

2            But Chrysler, in fact, wanted a lower

3   price, but here's what else they wanted.  They wanted it

4   hassle-free.  And having been told -- and they were told

5   by AutoData, that's the who told them -- and they told

6   them before the June 25th sushi lunch, because

7   Mr. Sullivan knew it.

8            They were told, wait a minute, we've got

9   a license to the entire portfolio, and that made it

10  really easy -- easy for Chrysler to go with the cheap

11  bid as opposed to the people who knew what they were

12  doing.  They got it cheaper, and now they say we can't

13  be sued, even though Versata may be litigious, because

14  these people have a license.

15           That, Ladies and Gentlemen of the Jury,

16  is untrue.  And not only does it breach the contract

17  because they said they would never ever mention that to

18  anybody, but they overstated it, just like they have in

19  this lawsuit.

20           And they overstated it to our detriment,

21  and it caused us to lose the contract.  And that's why

22  we're damaged to the tune of between 11 million and

23  $14.6 million, which would have been our profits.

24           Mr. Diaz, can you get the jury form up

25  for me just a moment?

1            And so the answer to Question No. 1,

2   Ladies and Gentlemen, is yes to each of the claims.

3   They don't even put up a fight about that.  At the end

4   of the day, they roll over and said, okay, we understand

5   we infringe.

6            The real fight's on invalidity.  The

7   answer on each of these is no, and the reason is, is

8   that when they had a chance to prove the patent was

9   invalid -- and, remember, I told you last Monday that I

10  thought Judge Bryson would tell you the patent is

11  presumed to be valid, and he did, that they have to, by

12  clear and convincing evidence, prove to you that every

13  single element of every claim was in the prior art.

14           And they didn't even try.  They skipped

15  elements.  They left claims out.  They didn't even get

16  near it.  The answer to that is no.

17           Go to the next one.

18           Well, this one is, is it obvious?  And I

19  don't think even with a straight face, they can say it

20  was obvious.  They said it took hard work to develop

21  these sorts of things, that people on the streets just

22  couldn't do it.  It wasn't obvious to anybody.  They

23  didn't even try on that, so the answer is no.

24  And the damage amount is $137,000.

25           Next one.

1           Breach of contract.  Have we proved by a

2    preponderance of the evidence that they failed to comply

3    with the settlement agreement?

4           The answer is yes.  And we know for sure

5    that Mr. Perrier told his associate to tell Chrysler

6    we've got licenses; don't you worry about it.  And that

7    breaches the contract that they signed with us, because

8    they had to, because they had filed a frivolous lawsuit

9    and they were caught in that trap, and they wanted to

10   get out.  They would ordinarily never touch it with a

11   10-foot pole, but once they agreed to it, they had to

12   stick by it.  And they didn't do it, so the answer is

13   yes.

14          What's the next question?  The next

15   question is, do you find that Versata has proved by a

16   preponderance of the evidence that there was a

17   reasonable probability that it would have entered on

18   into a contract with Chrysler?

19          And the answer to those three questions

20   is yes, and the reason is Chrome was not really a

21   competitor.  And once Chrysler had the hurdle of they

22   don't have a portfolio license, we're the only choice.

23          And not only that the people on the

24   ground at Chrysler wanted us to win, because we had

25   proven better technology.  Had there been a bump in the

road?  Absolutely.  You can't have one of these when

people aren't fussing back and forth, but they never

said it didn't work.  They never said they didn't like

us.

          The people that dealt with us said they

loved us and we won hands down.  It was only because

they, in fact, were told that somebody with a cheaper

price had a license to all of our stuff, so why did they

care.

          Remember the document that we showed you

a little while ago that said they wanted the same feel

and the same look and the same functionality they had

before.  They wanted us.  The answer to that is yes.

          And the last question was, are they

legally justified?  The answer is no, and I didn't even

hear an argument from counsel about how they were

legally justified.

          THE COURT:  Mr. Baxter, two minutes.

          MR. BAXTER:  Thank you, Your Honor.

          Next question.

          The damage number is easy to compute.

It's the profits that we would have made.  We showed you

what those were, what the numbers were.  There were

fully burdened costs.  That answer is easy.

          Next question.

1          And this question has to do with, if you

2     find that they interfered and they did so on what's

3     known as -- on an egregious basis, we say yes.  That

4     amount of money is up to you.

5                Next question.

6                Now, this has to do with AutoData's

7     claims, and as I told you, the Judge asked you, well,

8     did they really have a trade secret?

9                And the answer is, no, they did not.  And

10    you heard the experts say why they didn't.  The answer

11    to all three of those is no.

12               Next question.

13               Did you find that -- that Versata

14    misappropriated?

15               And as I told you, Judge Bryson asked you

16    specifically about Toyota, two things, SC AutoCompare,

17    which we never delivered to them, so we couldn't have

18    violated it there; and, two, the schema that we wrote

19    and all the documents say we wrote it.

20               You look at those documents, and you'll

21    be convinced that the answer is no, and, therefore,

22    there's no need to even answer that next question.

23               Next one.

24               Do you find that the evidence that we

25    failed to comply by the confidentiality agreement?

1   The answer is no.  And as Mr. Cole told you, there is a

2   question here that says, well, okay, they didn't prove

3   anything, no damage proved, but go ahead and put a

4   dollar in.

5           Ladies and Gentlemen, for reasons that

6   are legal, it's very, very, very important that answer

7   be zero.  You know if they put $1 in there, they didn't

8   really want to talk about it about why it was just $1.

9   I'd be embarrassed, too.

10          But the answer to that is no to begin

11   with, and you don't even have to answer to the B part,

12   but the B part answer is zero.

13          Ladies and Gentlemen, I know it's been a

14   long, hard week.  You've heard stuff that you never

15   thought you'd have to consider in your lives.  But it's

16   an important case, and if nothing else, it's important,

17   because the system demands that people come to court and

18   be honest with you of what happened.

19          And, unfortunately, you've seen an

20   example, and you cannot let people abuse the system.

21          And we eagerly await your decision.

22          Thank you.

23          THE COURT:  Thank you, Mr. Baxter.

24          Now, it is time for you to deliberate on

25   your verdict.  The first thing you should do when you

1  retire to the jury room is to select a foreperson who

2  will be responsible for communicating with the Court as

3  needed.

4          You should then begin your deliberations.

5  Your verdict on each issue must be unanimous.  There

6  will be a verdict form in the jury room waiting for you

7  when you retire for your deliberations.

8          And when you've reached a unanimous

9  verdict as to each question on the verdict form, the

10  foreperson is to fill in the answers on the verdict

11  form.

12          Now, make sure you read the questions

13  carefully.  As you've seen the questions on the screen,

14  it's the same form as you'll see in the jury room.  But

15  some of the questions may not require answers, depending

16  on how you answer other questions.

17          Do not reveal your answers to any of the

18  questions until you're discharged.  Also, you should not

19  reveal your numerical division on any issue during the

20  course of your deliberations, even to me.

21          When you return to announce your verdict,

22  please bring the special verdict form with you, the one

23  with the questions answered.

24          Now, I expect that when you get to the

25  jury room to begin your deliberations, you may feel a

1  little overwhelmed.  This has been a very complicated

2  case, and there's a lot of evidence and argument to

3  think about.  But I think you will be pleasantly

4  surprised that as you start working methodically through

5  the case, things will begin to seem more manageable.

6              I hope and expect that you will listen to

7  one another's views respectfully, even if initially you

8  disagree on some issues.  Discussing the issues from

9  different perspectives can often help in formulating

10 your own ideas about how particular issues should be

11 decided.

12             Now, if you wish to see any of the

13 exhibits, you're free to see them.  Just give a note to

14 the court security officer, who will be taking care of

15 you during your deliberations.  You can ask to see all

16 the exhibits or you can just ask for some of them, if

17 you like.  Just let us know what you want, and we'll get

18 the exhibits that you want for you.

19             If you want -- if you have a question or

20 otherwise want to communicate with me at any time,

21 please give a written message or question to the court

22 security officer, who will bring it to me.  You probably

23 will not get a reply right away, as I ordinarily will

24 have to summon all the lawyers and get their input

25 before I can respond to the questions.  So it's not

1  something I can get right back to you on, but we will

2  endeavor to get answers to your question.

3            And if you do have a question that's

4  hanging you up, you're entitled to ask.  I will tell

5  you, though, that once the case is submitted to you, we

6  will not be able to take any additional evidence or

7  testimony.  And in most instances, in my experience,

8  we'll just have to tell you to rely on your recollection

9  of the evidence.

10            I think you will find in most instances,

11  if you put your heads together, you will recall the

12  evidence that you need to get over the problem.  That's

13  one of the reasons there is a group of you.  Eight

14  memories are better than one.

15            And finally, trust your common sense

16  throughout the process.  As I mentioned, the founding

17  fathers of this country had great confidence in the

18  sound common sense of the American jury.  They had

19  confidence in you to do your job diligently and well.

20            These parties have confidence in you, and

21  so do I.

22            You may now retire for your

23  deliberations.

24            (Jury out.)

25            THE COURT:  Thank you.  I -- I just

1  wanted to take this moment -- you may be seated, please.

2            I will take a moment of your time -- I

3  don't want to do this after verdict, because after

4  verdict, half of you will not want to hear from me for

5  one reason, and the other half will not want to hear

6  from me for quite a different reason, I suspect.

7            I do have a couple of things that I'd

8  like to say.  First of all, I want to thank you and

9  congratulate you on a highly skilled and professional

10 presentation throughout this week.  It has been a

11 pleasure to be here and watch highly talented,

12 hard-working attorneys practice their profession.

13            And this goes not just for the work done

14 in court but also for the written work that has been

15 submitted over the course of this case.  I have been

16 highly impressed with the quality of the representation

17 on both sides of this case.

18            Let me thank also -- and this is a

19 heartfelt thanks -- the court staff in this case,

20 Ms. Martin, who was here during the first three days of

21 the trial, Ms. Lockhart, who is here now, as the

22 courtroom deputies, and Ms. Holmes, who has been here

23 throughout, are terrific, professional, knowledgeable,

24 and dedicated public servants.  And I am amazed at how

25 good they are.

1              There is also, I think, this same kind of

2    quality throughout this -- this courthouse.  It's

3    remarkable.  This little courthouse is a jewel of

4    quality people who not only really know their business

5    and throw themselves into it with great enthusiasm, but

6    they are the nicest people on Earth.

7              And I'd particularly like to call out a

8    group of people that maybe some of you haven't seen in

9    the course of the trial.  It's the group of people who

10   have been working late into the night putting together

11   your daily transcripts.  That is hard, hard work, and

12   they are as friendly and upbeat, and they throw

13   themselves into it.

14             It's a remarkable place, and it has been

15   a real pleasure to be here.

16             Thank you.

17             (Recess.)

18             (Jury out.)

19             COURTROOM DEPUTY:  All rise.

20             THE COURT:  Okay.  We have a note.  By in

21   large, this looks pretty straightforward.  I notice my

22   eye was drawn immediately to Plaintiff's Exhibit 310.

23   It seems to me we simply -- do we have everybody that

24   needs to be here?

25             MR. COLE:  Yes, Your Honor.

1          THE COURT:  All right.  You can have a

2   seat.  Sorry.

3          I think with respect to 310, we just tell

4   them that exhibit is not in evidence and leave it at

5   that, period.  That's the infamous exhibit that --

6          MR. ANAIPAKOS:  Your Honor, I may have

7   not heard, but what was the question they asked?

8          THE COURT:  Oh, haven't you seen the

9   note?

10          LAW CLERK:  We haven't given them --

11          THE COURT:  Oh, I'm sorry.  I thought you

12   had given them the note.  I'm sorry.

13          Why don't you give them the note?  I'm

14   sorry, I thought the note had been distributed.  Yes, we

15   have a note and --

16          LAW CLERK:  Sorry.

17          THE COURT:  No wonder you looked a bit

18   puzzled.

19          MR. ANAIPAKOS:  That's usually the way I

20   look.

21          THE COURT:  All right.  Anyway, they want

22   one, two, three, four, five, six, seven, eight, nine,

23   and the Bing Burris deposition.

24          Now, it's not clear to me, when they say

25   the Bing Burris deposition, whether they want to see the

1   video or whether they would be satisfied with the

2   transcript.  They probably -- they may understand that

3   there's a transcript, but they may want the video.

4                  Let me hear from both sides as to how you

5   want to proceed.  You see the 310 that I'm talking

6   about?

7                  MR. COLE:  Yes, Your Honor.

8                  THE COURT:  All right.  Let me hear from

9   the Plaintiffs.

10                  MR. COLE:  I guess --

11                  THE COURT:  Igor, could you be digging up

12   the exhibits as best you can?  You need another copy?

13                  LAW CLERK:  Yes, do you have the -- the

14   handwritten one up there?

15                  THE COURT: I left it back in the --

16                  LAW CLERK:  Okay.  I'll run --

17                  THE COURT:  But -- yeah, all right.

18                  Sorry, our -- why don't you go ahead, I

19   think we can proceed.

20                  MR. COLE:  I don't think it's a huge

21   difference, but from our standpoint, it would probably

22   be more efficient to just give them the transcript of

23   the deposition, but --

24                  THE COURT:  Well, here's what I propose

25   -- well, let me hear from the defense, and then I'll

1  tell you what I propose.

2         MR. ADAMS:  I was going to suggest

3  actually the video, because that's what they recall, but

4  I assume they probably want to see it again.

5         THE COURT:  Yeah, they may.  I was going

6  to propose that we do kind of two stages.  One would be

7  dig up all of these exhibits, tell them that 310 we

8  can't give them because it is not in evidence.

9         Now, you know, I guess the most neutral

10 way to say it is not in evidence or has not -- is not --

11 not in evidence may be -- is that the best way to

12 articulate it?  Because they're -- they must be -- how

13 in the world did they remember that?  Well, I guess

14 they -- it's remarkable what they -- they remember, but

15 they did remember it.  All right.  Not in evidence is

16 the language I would propose.

17        Then for the -- we dig up everything

18 else.  I don't know that we want to excerpt the pages

19 they want for three of the exhibits.  Is 3 -- excuse me,

20 is 309 the Vanessa Kelly e-mail, or is there a separate

21 exhibit that's the Vanessa Kelly e-mail?  I can't tell

22 whether they're giving us an additional request.

23        MR. KNEUPPER:  It is 309.

24        THE COURT:  It is 309.  Okay.  So we give

25 them the exhibits.  We tell them 309 (sic) is not in

1  evidence, and I would propose that we give them the

2  transcript pages of the Bing Burris deposition with a

3  statement in a note back to them that if they wish to

4  see the Bing Burris deposition, we have the facilities,

5  I take it, to show that.  Do we -- we have the people

6  here who can do that?

7              MS. BAEHR:  We do, Your Honor.

8              THE COURT:  Okay.

9              MR. KNEUPPER:  Your Honor, one issue to

10  correct, I believe you said to tell them 309 is not in

11  evidence.  310 is the --

12              THE COURT:  Did I say that?  I meant 310

13  is not in evidence, 309 is, and that's the Vanessa

14  Kelly -- yeah, all right.

15              So is that -- is that a sensible way to

16  proceed?  You know, we could bring them in, show them

17  the Bing Burris deposition, but if -- if really all they

18  want to see is what he said and they'd be happy with the

19  deposition, I guess that's a little -- with the

20  transcript, that's a little quicker.

21              MR. KNEUPPER:  One note on that, Your

22  Honor, I just -- as to how the Court wants to proceed, I

23  believe Mr. Burris' deposition was about 30 to 34

24  minutes in length, so if there's a --

25              THE COURT:  I think that's about right.

1          MR. KNEUPPER:  -- section they want to

2   see or -- but -- just to note that for the Court.

3          THE COURT:  Well, that's right, and that

4   means we're committing them to probably, in effect,

5   better part of an hour just bringing them in, putting it

6   up, and so forth, when they may only want to rifle-shot.

7   It looks like they've done some rifle-shooting already.

8          So why don't we offer them the

9   deposition?

10         Is that okay?

11         MR. ADAMS:  Yes, that's fine, Your Honor,

12  that seems like a good approach so they --

13         THE COURT:  With a note saying, if you

14  would like to see it, we can set it up for you.

15         MR. ADAMS:  Yeah.

16         THE COURT:  Let's do a little drafting on

17  the fly here.

18         Enclosed are the exhibits you requested,

19  except for PX 310, which is not in evidence.

20         MR. ADAMS:  Your Honor, are you

21  comfortable that the jury will understand the

22  significance of that?

23         THE COURT:  I'm not sure they will

24  understand the significance of it, but I am weighing --

25  I'm not sure I want them to know too much about what --

1   I mean, the significance of it, if we say it's not in

2   evidence or was not admitted into evidence, the trouble

3   is, was not admitted was not quite correct, because it

4   was, and then it was withdrawn.

5           MR. ADAMS:  I was going to suggest, not

6   in evidence and not to be considered.

7           THE COURT:  Yes?

8           MR. ANAIPAKOS:  My view on that

9   respectfully, Your Honor, is you gave them a very

10  explicit instruction at the end of the case on that

11  exhibit.  They understand it.  The Court's charge says

12  to consider only the evidence.

13          THE COURT:  Yeah.

14          MR. ANAIPAKOS:  You're telling them it's

15  not in evidence, that's sufficient.

16          THE COURT:  Yeah.  I'm inclined to start

17  that way, and I guess if they come back to us and ask

18  for more -- I just can't think of a way to articulate it

19  that doesn't raise more questions than it answers.

20          So -- which is not in evidence, period.

21  The -- we are providing you with a copy of the

22  transcript -- court reporter's transcript -- court

23  reporter's transcript of the Bing Burris deposition.  If

24  you would like to view the video of that deposition, we

25  can show it to you.

1               Good?

2               MR. COLE:  That's fine.  I don't know

3   that it's necessary, but we might tell them how long the

4   video is so they can time allocate in their mind --

5               THE COURT:  Not a bad idea.

6               Objection?  No objection?

7               MR. ADAMS:  No objection.  The other

8   thing that I was thinking about is since only portions

9   were designated, I don't know if we have a copy handy

10  that's got the portions that were designated

11  highlighted.

12              MR. COLE:  It would be in the transcript.

13              THE COURT:  Yeah, what we've got is a

14  transcript that -- I mean, Ms. Holmes is taking down the

15  entire --

16              MR. ADAMS:  Oh, I see what you're saying.

17              THE COURT:  -- deposition as he spoke.

18              MR. ADAMS:  Got it.

19              THE COURT:  So --

20              MR. ADAMS:  That makes sense.

21              THE COURT:  All right.

22              MR. ADAMS:  I thought you were talking

23  about the actual deposition transcript.

24              THE COURT:  Let's see, the video of the

25  deposition -- does somebody have how long -- how long it

1  is?

2               MR. COLE:  I think it was 34 minutes.

3               LAW CLERK:  36 minutes, Judge.  I have

4  36, maybe a little less.

5               THE COURT:  Igor has 36.  You've got 34?

6               LAW CLERK:  I may have rounded.

7               MR. COLE:  We'll go 35.

8               THE COURT:  35 minutes.  Okay.  Creative

9  approximation.

10              All right.  I'm going to write a note.  I

11  guess we should do it -- we should type it up and send

12  it back to the -- to the jury.

13              Can you -- have you got all the exhibits?

14              Yeah, let's do this, you all know your

15  exhibit boxes better than we do, obviously.  Can you

16  send exhibit -- wise people up and pull out these

17  exhibits, and, meanwhile, we'll be writing the note.

18              And, let's see, do we have somebody that

19  has a clean copy of the -- what day did Bing Burris'

20  deposition come in; do you recall?

21              MR. ADAMS:  I think it was Wednesday.

22              THE COURT:  Was it Wednesday?  I somehow

23  thought --

24              MR. KNEUPPER:  No, I believe it was

25  Tuesday.

```
 1                    THE COURT:  I thought it was Tuesday.
 2  All right.
 3                    MS. BAEHR:  Tuesday -- Tuesday afternoon.
 4                    MR. KNEUPPER:  Afternoon.
 5                    THE COURT:  Tuesday -- yeah.
 6                    Does somebody have or can somebody make
 7  available to us those pages, because I --
 8                    MR. ANAIPAKOS:  Yes, we have the daily
 9  copy, Your Honor.
10                    THE COURT:  Yeah, okay.  Well, if you
11  don't mind providing that material to us, it will save
12  us having to go back and -- and pull it out and we can
13  get this back to the jury more quickly.
14                    Why don't we -- let me see, is that it?
15  Is that the only thing we need?
16                    Oh, there is the one other issue.  They
17  have specified particular pages of 234 and 452.  I
18  hardly see why, since they know the pages they're
19  interested in, why we should pluck out only those pages.
20                    I'd be inclined to give them the whole
21  exhibits, but maybe we should acknowledge that they've
22  asked for pages and say something along that line.
23                    Is there a reason why we shouldn't do it
24  that way?
25                    MR. ANAIPAKOS:  Your Honor, from the
```

Plaintiff's standpoint, I think you should give them the whole exhibit and then tell them the pages are contained in there.

THE COURT:  Yeah, that's my --

MR. ADAMS:  I agree.

THE COURT:  All right.  Okay.  You have requested particular pages from PX 0234, PX 452, and PX 202.  We are sending you the full text of those exhibits.  The pages you requested are contained therein.  All right.  One of my favorite words.

Okay.  Is that okay?

MR. KNEUPPER:  It's acceptable from us, Your Honor.

MR. ADAMS:  I'm fine, Your Honor.

THE COURT:  Okay.  I think we have -- now, if you all could stick around, we will try to type this up.

Yes?

MS. SMITH:  No.

THE COURT:  Oh, you were just standing. I appreciate that.  I thought you had a point that you wanted to raise.

Okay.  We will put this package together. If you all could -- could wait around, I want everybody obviously to look at the final product, and you've got

1  the -- have you got the Bing -- did you get the

2  transcript?  They've gone to get the transcript.

3              And if you all could pull out those

4  exhibits and you could leave them on Mr. Helman's desk,

5  we'll be typing up the responsive note.

6              LAW CLERK:  All rise.

7              (Recess.)

8              (Jury out.)

9              THE COURT:  Okay.  So we have the --

10             LAW CLERK:  You have the exhibits.

11             THE COURT:  Do you have Bing Burris?

12             LAW CLERK:  No, we're waiting --

13             THE COURT:  We're collating Bing Burris.

14  Okay.  We'll be with you in just a second.  I think

15  we're -- we're at the end of the process of putting

16  everything together.

17             Let me tell you what I'm going to do, I'm

18  going to mark Bing Burris deposition on the top of that.

19             Is that agreeable to everybody?

20             MR. COLE:  Yes, Your Honor.

21             THE COURT:  All right.

22             MR. ADAMS:  Does it start in the middle

23  of the page or --

24             THE COURT:  Well, what I'm going to do is

25  I will cross out everything -- well, I can either start

1  out -- it starts -- the deposition itself starts on Line

2  21.  Ms. Baehr's instruction starts on Line 11.  I can

3  either cross out the very top part of it, or I can cross

4  out Ms. Baehr and go right down to the beginning of the

5  deposition and just say, Bing Burris deposition, and

6  then have a little arrow going down from there.

7                     Is that agreeable?

8                     MR. ADAMS:  We're fine either way, Your

9  Honor.

10                     MS. BAEHR:  We're agreeable with that,

11  Your Honor.

12                     THE COURT:  You don't mind being crossed

13  out?

14                     MS. BAEHR:  I don't mind being crossed

15  out.  It might be better in this case, actually.

16                     THE COURT:  No, no.  All right.

17                     MR. ADAMS:  Your Honor, I think we have

18  the same issue on the last page.

19                     THE COURT: I will take care of the last

20  page, as well.  Okay.  The whole last page here goes

21  out.

22                     MR. ADAMS:  Okay.  Backside?

23                     THE COURT:  I am correct that it's

24  B-u-r-r-i-s, correct?

25                     MR. ADAMS:  Correct.

1          MR. KNEUPPER:  Yes, Your Honor.

2          THE COURT:  All right.  Okay.  And you

3   have a -- you have the note that goes with that?

4          LAW CLERK:  Yes.

5          THE COURT:  Why don't you put that -- the

6   Bing Burris deposition on top?

7          Okay.  That's good.  Okay.  I think we're

8   ready to go.  Do you want -- just allow counsel to look

9   at the package --

10          LAW CLERK:  Sure.

11          THE COURT:  -- so that they're satisfied

12   that we haven't slipped something in there.

13          MS. SMITH:  Thank you.  Thank you.

14          MR. ANAIPAKOS:  Judge, this is going to

15   be silly, but I'm going to say it anyway.  I think, with

16   all due respect, we should probably give them the

17   materials in the order that they requested them.

18          THE COURT:  It's not silly.

19          LAW CLERK:  They already are in --

20          THE COURT:  And --

21          LAW CLERK:  Except for the Bing Burris

22   deposition.

23          THE COURT:  Except for Bing Burris.

24          MR. ANAIPAKOS:  That's my point.

25          THE COURT:  Oh, okay.  We'll put Bing

1  Burris on the bottom.  I just -- well, that's fine.

2              MR. ANAIPAKOS:  Admitted, it was silly,

3  but I couldn't resist.

4              THE COURT:  No, I mean, that's fine.  My

5  judgment is it's not silly.

6              MR. ANAIPAKOS:  Thank you, Your Honor,

7  you're very kind.

8              LAW CLERK:  You don't think we'll get --

9              THE COURT:  That was my only concern that

10 it might --

11             LAW CLERK:  Because it's not in a folder.

12             THE COURT:  Do we happen to have an extra

13 folder in the house, a blank folder, and I'll write Bing

14 Burris deposition on the --

15             LAW CLERK:  We can put it in a folder in

16 chambers.

17             MR. KNEUPPER:  We might be able to

18 salvage the folder from Exhibit 310 if we rip off the

19 side.

20             THE COURT:  No, no, no, don't do that.

21 Don't do that.

22             Let's -- I tell you what, I think I will

23 -- I think I will overrule the not silly objection and

24 go with Bing Burris on the top right underneath the

25 note, response.  They'll get -- I think this looks like

1  a pretty intelligent jury.  I think they'll figure it

2  out.  We'll go that way, unless somebody feels very

3  strongly about that.  Okay.

4                  LAW CLERK:  All rise.

5                  (Recess.)

6                  (Jury out.)

7                  COURT SECURITY OFFICER:  All rise.

8                  THE COURT:  The jury has apparently

9  reached a verdict in this case.

10                  Do we have -- we don't have everybody?

11                  MS. SMITH:  We don't.  They're on their

12  way.

13                  THE COURT:  Okay.  We'll wait for

14  everybody.  I suppose it's not -- doesn't -- please be

15  seated.

16                  Let me do one thing before -- I realize

17  that as simple as the previous note and exchange was, it

18  really is supposed to have been on the record.  My

19  mistake.  And I'd like to do a little backfilling on

20  that.

21                  What happened, for the record, is that a

22  jury note came in -- Mr. Schumacher, I'm explaining the

23  circumstances of the previous note.  There's nothing new

24  here.

25                  MR. SCHUMACHER:  Okay.

THE COURT:  Which requested the print version of the deposition of Charles Sullivan.  With the agreement of counsel for both sides, I've prepared a one-sentence response to the jury and the jury was provided with a copy of the deposition.

Counsel in accordance with that account of the events?

MS. SMITH:  Yes, Your Honor.

MR. COLE:  Yes, Your Honor.

THE COURT:  Thank you.  Let's see, is everybody and -- no, I guess is everybody here from your side, Mr. Baxter?  Mr. Cole?

MR. COLE:  Yes, Your Honor.  Mr. Anaipakos will be right back.  He was just outside.

THE COURT:  Okay.  We'll wait for him to get back.

Okay.

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  Please be seated.

Mr. Foreperson, has the jury reached a verdict in this case?

THE FOREPERSON:  Yes, sir, Your Honor, we have.

1            THE COURT:  Will you please hand the

2  verdict to the Bailiff?  Thank you.

3            Thank you.

4            I will now read the verdict.

5            This is Question No. 1:  Do you find that

6  Versata has proved by a preponderance of the evidence

7  that AutoData directly or indirectly infringed the

8  following claims of U.S. Patent No. 7,130,821, the '821

9  patent?  Answer yes or no for each claim.

10            Claim 1, no.  Claim 10, no.  Claim 13,

11  no.  Claim 14 -- excuse me -- no.  Claim 17, no.  Claim

12  18, no.  Claim 19, no.  Claim 20, no.  Claim 22, no.

13  Claim 23, no.

14            B:  Do you find that AutoData has proved

15  by clear and convincing evidence that any of the

16  following claims of the '821 patent are invalid as

17  anticipated by prior art?  Answer yes or no for each

18  claim.

19            Claim 1, yes.  Claim 10, yes.  Claim 13,

20  yes.  Claim 14, yes.  Claim 17, yes.  Claim 18, yes.

21  Claim 19, yes.  Claim 20, yes.  Claim 22, yes.  Claim

22  23, yes.

23            C:  Do you find that AutoData has proved

24  by clear and convincing evidence that any of the

25  following claims of the '821 patent are invalid due to

1  obviousness?  Answer yes or no for each claim.

2           Claim 1, yes.  Claim 2 -- excuse me --

3  Claim 10, yes.  Claim 13, yes.  Claim 14, yes.  Claim

4  17, yes.  Claim 18, yes.  Claim 19, yes.  Claim 20, yes.

5  Claim 22, yes.  Claim 23, yes.

6           If you answered yes to any question --

7  claim in response to Question No. 1(a) and no to the

8  same claim in Question No. 1(b) and Question No. 1(c),

9  what sum of money if paid now in cash would fairly and

10 adequately compensate Versata as a reasonable royalty

11 for AutoData's infringement of the '821 patent, answer

12 in dollars?

13          Answer:  Zero dollars and zero cents.

14          Question No. 2:  Do you find that Versata

15 has proved by a preponderance of the evidence that

16 AutoData failed to comply with the settlement agreement

17 of 2001?  Answer yes or no.

18          Answer:  No.

19          Question No. 3:  Do you find that Versata

20 has proved by a preponderance of the evidence that there

21 was a reasonable probability that it would have entered

22 into a contractual or business relation with Chrysler?

23          Answer yes or no.

24          Answer:  No.

25          If you answered yes to Question No. 3(a),

do you -- I'm going to read it anyway even though this
is blank, but I -- I will read it anyway -- do you find
that Versata has proved by a preponderance of the
evidence that AutoData intentionally interfered with
Versata's prospective contractual relations with
Chrysler?   Answer yes or no.

The answer is blank.

Similarly, the next two are blank, but I
need to read them.

If you answered yes to Question No. 3(b),
do you find that but-for this intentional interference
Versata would have entered into a contract with Chrysler
for website services in 2008?  Answer yes or no.

Answer:  Blank.

If you answered yes to Question No. 3(c),
do you find that AutoData was legally justified to
intentionally interfere?  Answer yes or no.

Answer:  Blank.

Question No. 4:  What sum of money, if
any, paid now in cash would reasonably and fairly
compensate Versata for its lost profits damages arising
from AutoData's failure to comply with the settlement
agreement of 2001 and/or AutoData's intentional
interference with Versata's prospective relationship
with Chrysler?  Answer in dollars.

1                     Answer:  N/A.

2                     Question No. 5:  If you found that

3     AutoData tortiously interfered with Versata's

4     prospective relations with Chrysler by answering yes to

5     Question No.  3(a), 3(b), and 3(c), and no to Question

6     3(d), do you find by clear and convincing evidence that

7     the harm to Versata from AutoData's tortious

8     interference was the result of malice, fraud, or gross

9     negligence attributable to AutoData?  Answer yes or no.

10                    Answer:  N/A.

11                    If you answered yes to Question No. 5(a),

12    what sum of money, if any, if paid now in cash should be

13    assessed against AutoData and awarded to Versata as

14    exemplary damages for AutoData's tortious interference?

15                    Answer in dollars.

16                    ANSWER:  N/A.

17                    Question No. 6:  Do you find that

18    AutoData has proved by a preponderance of the evidence

19    that any capability described by AutoData as a trade

20    secret is a formula, pattern, device, or compilation of

21    information that AutoData uses and that gives AutoData

22    an advantage over competitors who do not know or use it?

23                    Answer yes or no.

24                    Answer:  Yes.

25                    B:  Do you find that AutoData has proved

1  by a preponderance of the evidence that this capability

2  or capabilities was or were not a matter of general

3  knowledge in the industry?  Answer yes or no.

4                    Answer:  Yes.

5                    Do you find that AutoData has proved by a

6  preponderance of the evidence that AutoData took

7  reasonable precautions to protect the alleged trade

8  secrets?  Answer yes or no.

9                    Answer:  Yes.

10                    Question No. 7:  Do you find that

11  AutoData has proved by a preponderance of the evidence

12  that Versata misappropriated AutoData's alleged trade

13  secrets in applications and components provided to

14  Toyota in 1998?  Answer yes or no.

15                    Answer:  Yes.

16                    If you answered yes to Question No. 7(a),

17  how much of Versata's profits from the Toyota contracts,

18  if any, are attributable to AutoData's trade secrets?

19                    Answer in dollars.

20                    $2 million and no cents.

21                    Do you find that AutoData has proved by a

22  preponderance of the evidence -- I'm sorry, this is

23  Question No. 8.  Do you find that AutoData has proved by

24  a preponderance of the evidence that Versata failed to

25  comply with either the 1997 confidentiality agreement or

1  the 1998 Master Services Agreement?  Answer yes or no.

2            Answer:  Yes.

3            If you answered yes to Question No. 8(a),

4  what sum of money, if any, paid now in cash would

5  reasonably and fairly compensate AutoData for its lost

6  profits damages arising from Versata's failure to comply

7  with the 1997 confidentiality agreement or the 1998

8  Master Services Agreement?  You may award one dollar if

9  you find that AutoData has failed to prove -- present

10 proof of actual damages.  Answer in dollars.

11           Answer:  One dollar.

12           Signed the 15th of June 2012, Joe E.

13 Brumble, presiding juror.

14           That is your verdict.  I accept the

15 verdict.

16           Do I have a request to poll the jury?

17           MR. BAXTER:  No, Your Honor.

18           THE COURT:  No request to poll the jury.

19           Very well.  I am not allowed by the

20 general rules of practice to comment to your verdict,

21 but I am allowed to comment on your service, and I want

22 to congratulate you for having worked very hard and

23 obviously late into the night and having put great

24 effort and serious mindedness into this process.

25           The parties thank you, the Court thanks

1  you, and I congratulate you for your service.  It is

2  another demonstration that the Founding Fathers had a

3  good idea when they put their trust in the good common

4  sense of the American jury, and I thank you for

5  participating in this with us.

6            Now, I am going to allow you to go back

7  to the jury room now.  If you would wait just a few

8  minutes, I will come in in a few minutes and discharge

9  you, and then you will be free to go.

10            COURT SECURITY OFFICER:  All rise for the

11 jury.

12            (Jury out.)

13            THE COURT:  I will plan to enter judgment

14 on -- you may sit.

15            I only have a couple of comments.  I will

16 plan to enter judgment on the verdict.  Is there

17 anything else that either party would like me to do at

18 this point that we need to do to complete the

19 proceedings?  Motions, there is a -- I guess it's the

20 28-day period for motion for relief from the judgment --

21 28 days from the entry, I think, from the judgment, if

22 my recollection is correct, which will probably be

23 Monday.

24            I would entertain requests, if any are

25 made, for modification of that time period, but for now,

1  that's the time period that governs it.

2                    Is there anything further that needs to

3  be done?

4                    MR. RUIZ:  Not from the defense, Your

5  Honor.

6                    MR. COLE:  No, Your Honor.

7                    THE COURT:  Very well.  We will stand

8  adjourned.  And I will now discharge the jury.

9                    (Court adjourned.)

10                   ************************

 1

 2

 3                          CERTIFICATION

 4

 5              I HEREBY CERTIFY that the foregoing is a

 6     true and correct transcript from the stenographic notes

 7     of the proceedings in the above-entitled matter to the

 8     best of my ability.

 9

10

11

12     /s/_____                    _____
       SHELLY HOLMES, CSR                        Date
13     Official Court Reporter
       State of Texas No.:  7804
14     Expiration Date  12/31/12

15

16     /s/_____                _____
       SUSAN SIMMONS, CSR                        Date
17     Official Court Reporter
       State of Texas No.:  267
18     Expiration Date  12/31/12

19

20

21

22

23

24

25