**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| VERSATA SOFTWARE, INC., *f/k/a* TRILOGY SOFTWARE, INC.; and VERSATA DEVELOPMENT GROUP, INC., *f/k/a* TRILOGY DEVELOPMENT GROUP, INC. §§§§§§ | |
| Plaintiffs, § | CIVIL ACTION No. 2:08-cv-313-WCB |
| v. §§ | |
| INTERNET BRANDS, INC., *f/k/a* CARSDIRECT.COM, INC., AUTODATA SOLUTIONS COMPANY, and AUTODATA SOLUTIONS, INC. §§§§§ | |
| Defendants. § | |

**MEMORANDUM AND ORDER**

In the course of trial held during the week of June 11th, 2012, the Court excluded a document that the plaintiffs sought to have admitted into evidence.  The Court excluded the document on hearsay grounds and under Fed. R. Evid. 403.  This Order describes the background against which the issue arose and sets forth the legal grounds for the Court's ruling.

**I.     Background**

This evidentiary issue arose during litigation between plaintiffs (collectively "Versata") and defendants (collectively "Autodata"), both of which are providers of website software and services to automobile manufacturers.  Among Versata's claims in the litigation were claims accusing Autodata of breach of contract and tortious interference with a prospective business relationship by misrepresenting to Chrysler Corporation the scope of a license that Autodata had from Versata.

At trial, Versata sought to introduce into evidence PX 310, an e-mail sent by Versata employee Mike Biwer to several other Versata employees.  The e-mail was sent at 5:59 pm on Wednesday, June 25, 2008.  The subject line reads, "Update from Randy on his meetings in Detroit today."  The text reads, in pertinent part, as follows (ellipses in original):

> Just a quick update from my conversation with Randy this afternoon....he is going to send out more complete notes later today or tomorrow....
>
> 1. Chuck Sullivan – lunch
> -cordial meeting
> -Chuck likes Versata...inherited decision from Chrysler to move in a different direction...i.e., AutoData (AD)...the ship has set sail
> -feedback he has gotten is that there is little to no IP risk given the approach they are taken
> >Chuck was told that AD has a license to our broader portfolio (not true)
> >Randy does not feel Chuck fully understands the complexity of the issue or perhaps is not worried given what he's been told internally
> -this one is going to take several cycles to resolve
> -we need to work with Lance on developing options and next steps
>
> More to follow...
> Mike

The substance of the luncheon meeting between Mr. Jacops ("Randy") of Versata and Mr. Sullivan ("Chuck") of Chrysler was an important issue during the trial.  Mr. Jacops testified at trial regarding the meeting, and Mr. Sullivan testified by deposition about the same meeting. The contents of the Biwer e-mail, and in particular the line stating, "Chuck was told that AD has a license to our broader portfolio (not true)," were therefore potentially significant.  The problem is that the e-mail consisted of hearsay, several layers deep.

First, the e-mail was an out-of-court statement by its author, Mr. Biwer.  It is therefore hearsay to the extent it was offered to prove the truth of any of the assertions contained within it. Fed. R. Evid. 801(c).  Second, Mr. Biwer's e-mail purported to report statements made to him earlier in the day by Mr. Jacops.  Mr. Jacops's statements constitute a second layer of hearsay.

Third, Mr. Biwer reported in the e-mail that Mr. Jacops had passed along statements made by Mr. Sullivan of Chrysler. The statements purportedly made by Mr. Sullivan regarding Autodata's rights with regard to Versata's intellectual property constitute a third layer of hearsay. Fourth, Mr. Biwer reported that Mr. Jacops said that Mr. Sullivan "was told" that Autodata had a license to Versata's "portfolio." That statement is supplemented in the e-mail by the parenthetical comment, "not true." The statement of the unknown declarant who purportedly told Mr. Sullivan that Autodata had a license to Versata's portfolio constitutes a fourth level of hearsay. It is not clear whether the fourth declarant was the last in the chain of declarants, as the statement that Mr. Sullivan "was told" that Autodata had a license to Versata's portfolio does not make clear whether that statement came from someone at Autodata or someone at Chrysler who was passing on information obtained, directly or indirectly, from Autodata. The use of the passive voice ("was told") leaves that issue unclear. Finally, as to the parenthetical comment, it is entirely unclear who the declarant was—Mr. Biwer, Mr. Jacops, Mr. Sullivan, or someone else.

When the issue of the admissibility of PX 310 first arose prior to trial, Versata argued that the e-mail was admissible either as non-hearsay, to supply context for other statements purportedly made at the luncheon meeting between Mr. Jacops and Mr. Sullivan, or under the hearsay exception for statements of present sense impression, Fed. R. Evid. 803(1). At that time, the Court ruled that the e-mail was not admissible under the "present sense impression" exception; however, the Court ruled that it could be admissible for non-hearsay purposes if its admission were accompanied by a limiting instruction advising the jury that the e-mail could not be considered for the truth of any assertions contained within it. As an example of the possible relevance of the document for non-hearsay purposes, the reference to the luncheon meeting

3

between Mr. Jacops and Mr. Sullivan in the e-mail, which was dated June 25, 2008, helped identify the date of that meeting.  Accordingly, when the e-mail was first offered during trial, the court admitted it subject to a limiting instruction directing the jury not to consider the e-mail for the truth of any of its contents.

Later in the trial, it became clear that the relevance of the e-mail for non-hearsay purposes was marginal and the issue of what Autodata told Chrysler about its rights vis-à-vis Versata's intellectual property was important.  The Court therefore reconsidered its decision to admit the e-mail subject to a limiting instruction and instead ruled the e-mail inadmissible for all purposes.  The Court based its ruling on Fed. R. Evid. 403, finding that the risk of prejudice and the difficulty the jury would likely have in following the Court's limiting instruction under the circumstances outweighed the minimal relevance of the e-mail for any legitimate non-hearsay use at trial.  See Nash v. United States, 54 F.2d 1006, 1007 (2d Cir. 1932) (L. Hand, J.) (sometimes a limiting instruction amounts to a "recommendation to the jury of a mental gymnastic which is beyond, not only their powers, but anybody's else").

When the Court decided to exclude the e-mail, Versata changed its position with regard to the admission of the e-mail for non-hearsay purposes only and argued that the e-mail should be admitted without restriction.  After giving Versata an opportunity to make an evidentiary proffer and hearing argument on the issue, the Court held that PX 310 was inadmissible as hearsay.  At the close of  all the evidence, the Court advised the jury that although PX 310 had previously been admitted subject to a limiting instruction, that exhibit was now excluded and was not to be considered by the jury for any purpose.

## II.    Discussion

The critical statement in the Biwer e-mail ("Chuck was told that AD has a license to our broader portfolio (not true)") presents multiple layers of hearsay.  At trial, Versata argued that the e-mail was admissible either as non-hearsay or based on the sequential application of several hearsay exceptions, and it made a proffer and offered legal argument in support of admissibility. The Court disagreed and excluded the e-mail.  Because the issue arose at a point during trial when there was no opportunity for the Court to set forth the grounds for its ruling in detail, the Court stated at the time that it would likely issue an order on this issue to provide a fuller explanation of its ruling.  This is that order.

### A.  Non-Hearsay

Versata argued at trial that the Biwer e-mail was admissible to provide context for statements made at the luncheon meeting.  To the extent context was important, the e-mail was not necessary to supply the context in which various statements may have been made at the luncheon meeting, as both parties to the meeting testified at trial—Mr. Jacops through live testimony and Mr. Sullivan by way of deposition.  Moreover, the Court stated that if the e-mail were admitted for non-hearsay purposes, it would have to be accompanied by a limiting instruction, a proposition with which Versata agreed.  Trial Tr. (June 13, AM session) 165.  Yet the Court had previously concluded that the relevance of the e-mail for non-hearsay purposes was outweighed by the risk of prejudice and confusion that would result from the admission of the e-mail subject to a limiting instruction.  The Court reaffirmed that view during Versata's argument.  Id. at 165-66.  The Court continues to be of the view that the non-hearsay purposes for which Versata offered the e-mail were swamped in significance by the hearsay aspects of the

e-mail and that it was proper to exclude the e-mail from evidence even if it had been accompanied by a limiting instruction directing the jury to use it only for non-hearsay purposes.

### B. Hearsay Exceptions

Versata argued that various hearsay exceptions would apply to the e-mail, including the "business records" exception, Fed. R. Evid. 803(6), and the "present sense impression" exception, Fed. R. Evid. 803(1). The Court and counsel for Versata also discussed the exception for "then existing mental, emotional, or physical condition," Fed. R. Evid. 803(3).

None of those exceptions—separately or in conjunction—provides a sufficient platform for the admission of the Biwer e-mail. First, the e-mail was not shown to be a record of the sort that qualifies for admission under the business records exception, as it was not prepared and retained as part of a routine recordkeeping system, but was simply an example of an occasional communication among Versata employees regarding events of interest affecting the company. Second, even if Mr. Biwer's e-mail satisfied the formal requirements of the business records exception, Mr. Jacops's statements to Mr. Biwer that were reported in the e-mail do not qualify for admission under the present sense impression exception, as the critical portion of his statement to Mr. Biwer was not shown to have been made during the occurrence of the event reported or immediately thereafter. Third, even if Mr. Jacops's statements were admissible under the present sense impression exception, Versata has pointed to no convincing reason to conclude that Mr. Sullivan's statements contained in the e-mail would be admissible, either under that exception or any other.

The following is a more detailed discussion of each of Versata's proposed theories of admissibility.

1.      **Business Records**

Versata argued at trial that the Biwer e-mail was admissible as a record of regularly
conducted business activity under Rule 803(6).   The Fifth Circuit has characterized that
exception to the hearsay rule as requiring the following:

> (a) That the document have been made "at or near" the time of the matters
> recorded therein; (b) that the document have been prepared by, or from
> information transmitted by a person "with knowledge of the matters recorded";
> (c) that the person or persons who prepared the document have been engaged in
> preparing it, in some undertaking, enterprise or business which can fairly be
> termed a "regularly conducted business activity"; (d) that it have been the "regular
> practice" of that business activity to make documents of that nature; and (e) that
> the documents have been retained and kept in the course of that or some other
> regularly conducted business activity.

Wilander v. McDermott Int'l, Inc., 887 F.2d 88, 91 (5th Cir. 1989), aff'd, 498 U.S. 337 (1991);

see also United States v. Ned, 637 F.3d 562, 569 (5th Cir. 2011).

The reliability of business records—and the reason they are excluded from hearsay—"is
said variously to be supplied by systematic checking, by regularity and continuity which produce
habits of precision, by actual experience of business in relying upon them, or by a duty to make
an accurate record as part of a continuing job or occupation."   Fed. R. Evid. 803(6) advisory
committee's note; see also 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal
Evidence § 803.08[2] (Joseph M. McLaughlin 2d ed. 1997) ("Memoranda that are casual,
isolated, or unique do not qualify as business records.").

Tracing the business records exception back to its origins, Wigmore emphasized the
importance of the requirement that the record in question be made as part of a "habit and system
of making such a record with regularity."   5 John Henry Wigmore, Evidence in Trials at
Common Law § 1522, at 442 (Chadbourn rev. 1974).  He explained that the entry must be "part
of a series of entries or reports, not a casual or isolated one. . . .   [A] memorandum casually

7

made, would not answer this requirement." Id. § 1525, at 446.  Likewise, the Supreme Court in

its classic business records case, Palmer v. Hoffman, 318 U.S. 109, 113-14 (1943), explained

that the critical element in making particular entries eligible for admission is whether the entries

were "made systematically or as a matter of routine to record events or occurrences, to reflect

transactions with others, or to provide internal controls" for the business, such as "payrolls,

accounts receivable, accounts payable, bills of lading and the like."  As the Fifth Circuit put it,

the rationale for the business records exception "rests on the assumption that business records are

reliable because they are created on a day-to-day basis and '[t]he very regularity and continuity

of the records are calculated to train the recordkeeper in habits of precision.'"  Rock v. Huffco

Gas & Oil Co., 922 F.2d 272, 279 (5th Cir. 1991), quoting McCormick on Evidence § 306 at 872

(3d ed. 1984).

Applying those standards, the Court found at trial that Mr. Biwer's e-mail was not a

regularly kept record within the meaning of the business records exception and thus lacked the

features courts have identified as giving business records the reliability necessary to render them

admissible against a hearsay objection.  The Court reaffirms that finding now and concludes, for

the following reasons, that the Biwer e-mail was not admissible under the business records

exception to the hearsay rule.

1.  First, Versata has failed to show that the Biwer e-mail was made and kept in the

course of a regularly conducted business and as a regular practice of the business.  To be sure, in

the course of Versata's proffer in support of the admission of PX 310 Mr. Jacops testified that

communication via e-mail was a "regular business practice" at Versata and that one of the

responsibilities of Versata employees was to "regularly send e-mails around that would recount

. . . meetings and conversations."  Trial Tr. (June 13, AM session) 155:21-156:16.  He also

testified, however, that such e-mail updates were sent only "if there was something substantive which you'd want to communicate to the team, you would do it at the end of the day when you had time or wrapping things up."  Trial Tr. (June 13, PM session) 14:12-24.  While he testified that e-mails were used "to keep the team informed" as to matters of concern to the company, and "so that we would remember what we talked about and understood," Trial Tr. (June 13, AM session) 156:8-16, he did not testify that the e-mails were retained as company records to be consulted later and relied upon for purposes of company operations.

The essence of Mr. Jacops's testimony was that e-mails reporting on events pertinent to the business would be sent at a time convenient to the sender if the sender regarded the subject matter of the e-mail as worthy of communicating to others.  That evidence reflects the use of internal communications for information-sharing purposes based on instances of perceived need and convenience, not a system for preparing and retaining business records as a regular and routine practice.  In that regard, Versata failed to show that documents such as Mr. Biwer's e-mail were prepared as a matter of business routine as opposed to sporadically, subject to the judgment of the maker of the document.  See Wilander, 887 F.2d at 92 (concluding that hearsay statement should not have been admitted as a business record when "there was no showing that the document was kept in the course of some regularly conducted business activity or that it was the regular practice of the business to make such reports"); United States v. Robinson, 700 F.2d 205, 209-10 (5th Cir. 1983) (notes of meetings were not admissible under Rule 803(6) because proponent never established that "it was the regular practice of that business activity" to have the notes made); see also United States v. Ramsey, 785 F.2d 184, 192 (7th Cir. 1986) ("Occasional desk calendars, in which entries may or may not appear at the whim of the writer, do not have the sort of regularity that supports a reliable inference.").

2.   A further problem with Versata's business records theory regarding the Biwer e-mail is that while Mr. Jacops testified that e-mails were created in the ordinary course of Versata's business, he did not testify that e-mails were routinely retained so as to be available for later use. That omission is important.   The Fifth Circuit has emphasized the importance, for purposes of the business records exception, of showing that the records in question were "retained and kept in the course of . . . regularly conducted business activity." Wilander, 887 F.2d at 91; see United States v. Holladay, 566 F.2d 1018, 1020 (5th Cir. 1978) (holding that notebooks were admissible upon showing that they were part of a bookkeeping system that was "continuously maintained" by defendant's business); United States v. Jones, 554 F.2d 251, 252 (5th Cir. 1977) (record must be "made and preserved in the regular course of business").   In fact, the Fifth Circuit has noted that the fact that particular ledgers were destroyed at the end of each week might by itself defeat a showing that the ledgers were kept "in the course of a regularly conducted business activity." United States v. Wells, 262 F.3d 455, 460 n.3 (5th Cir. 2001).   See also id. at 462 n.8 (Rule 803(6) requires that a record be "made pursuant to established procedures for the routine and timely making and preserving of business records") (emphasis added); Rambus, Inc. v. Infineon Techs. AG, 348 F. Supp. 2d 698, 705 (E.D. Va. 2004) (business records exception requires that it be the regular practice of the business "to make and keep the record at issue"; declaration in support of admission of e-mail evidence as a business record "must show that the proffered record was made and kept as a regular practice by the business activity from which the document comes") (emphasis added).

The careful analysis by Judge Rosenthal in Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC, No. H-6-1330, 2008 WL 1999234 (S.D. Tex. May 8, 2008), makes this

point clear.  In that case, which involved a question as to the admissibility of an e-mail under the business records exception, the court explained that the proponent of an email

> made by an employee about a business matter [under Rule 803(6)] must show that the employer imposed a business duty to <u>make and maintain</u> such a record. Courts examine whether it was the business duty of an employee to <u>make and maintain</u> emails as part of his job duties and whether the employee routinely sent or <u>received and maintained</u> the emails.

<u>Id.</u> at *12 (emphasis added).  Judge Rosenthal then cited with approval three other cases in which the admissibility of emails under the business records exception was discussed.  In the first, <u>DirectTV, Inc. v. Murray</u>, 307 F. Supp. 2d 764 (D.S.C. 2004), Judge Rosenthal characterized the ruling of the court as holding that sales records contained in emails were admissible "when the sales orders were regularly received by email and the emails <u>were retained as records of each order</u>" (emphasis added).  In the second, <u>New York v. Microsoft Corp.</u>, No. Civ A. 98-1233, 2002 WL 649951 (D.D.C. Apr. 12, 2002), she characterized the court's ruling as declining to admit e-mails under the business records exception because "there was a 'complete lack of information regarding the practice of composition and <u>maintenance of</u>' the emails" (emphasis added).  In the third, <u>United States v. Ferber</u>, 966 F. Supp. 90, 98 (D. Mass. 1997), she characterized the court's decision as holding that in order for an e-mail to be admissible under Rule 803(6), "there must be some evidence of a business duty to make and regularly maintain records of this type"; she noted that the court in that case excluded the proffered e-mails because, "while it may have been [an employee's] routine business practice to make such records, there was  <u>no sufficient evidence that [the employer] required such records to be maintained</u>" (emphasis added).

In this case, Versata adduced evidence that Mr. Biwer prepared e-mails to update others within the company, but it did not introduce any evidence that he or the company routinely

retained copies of those e-mails for later consultation.[1]   In fact, the intrinsic evidence from the Biwer e-mail tends to rebut any contention that the e-mail was part of a system of regularly maintained business records.   The text of the e-mail strongly suggests that it was not intended to become a permanent record of the luncheon meeting, as Mr. Biwer wrote that the e-mail was "[j]ust a quick update on my conversation with Randy this afternoon....he is going to send out more complete notes later today or tomorrow."   In sum, Versata has failed to satisfy its burden of showing that the Biwer e-mail was one of a series of e-mails that were routinely "made and maintained in the normal course" of Versata's business.   Canatxx, 2008 WL 1999234, at *13.

Versata argued at trial that in an age of ever-increasing reliance on electronic communication, the definition of business records must be broadened to encompass e-mails such as the one in question.   The issue, however, is not the medium used to create the record, but the practice and process of the business in preparing the records in question.   If the record— regardless of form—is made with regularity as part of the business's conduct of its affairs, it is regarded as more likely that the record will be accurate and complete, as the business's

---

[1]   The fact that a copy of the Biwer e-mail was produced for trial purposes does not establish that such e-mails were routinely retained for consultation and use.   Copies of electronic correspondence are frequently subject to retrieval, at least absent affirmative steps to eradicate them from a computer system.   However, the fact that a party may be able to retrieve an electronic record, such as in connection with litigation, does not mean that the party has retained that document in a system of records that have been "kept" or "maintained" as business records for subsequent use and consultation.   See United States v. Jackson, 208 F.3d 633, 637 (7th Cir. 2000); Michael H. Dore, Forced Preservation: Electronic Evidence and the Business Records Hearsay Exception, 11 Colum. Sci. & Tech. L. Rev. 76 (2010) ("Many electronic records . . . remain in a company's files only because the company had a duty to preserve them once it reasonably anticipated litigation or a government subpoena.   The company otherwise typically would have deleted those electronically stored data in the regular operation of its business to make room on its burdened servers. . . .   [S]uch presumptive deletion undermines the trustworthiness and reliability of a business record, and thus the rationale of Rule 803(6).   Courts should therefore focus on the unique elements of the creation and preservation of electronic evidence, and consider whether a company truly kept the record at issue in the course of business, or simply because a duty to preserve required it.").

operations may depend on such records being maintained accurately.  That rationale applies with less force to occasional communications among representatives of the business.  In that setting, there is no special degree of reliability that is associated with the record—beyond the usual expectation that people will be honest and accurate in their business-related communications with others.

If occasional communications among employees of a business that relate to the operation of the business were to qualify as business records for purposes of Rule 803(6), that would convert the exception for "business records" into an exception for "business communications" and would open the door to a vast array of communications within a business, contrary to the conventional understanding of the business records exception.  See Monotype Corp. PLC v. Int'l Typeface Corp., 43 F.3d 443, 450 (9th Cir. 1994) (distinguishing between computer printouts of bookkeeping records and e-mails; "E-mail is far less of a systematic business activity than a monthly inventory printout.  E-mail is an ongoing electronic message and retrieval system whereas an electronic inventory recording system is a regular, systematic function of a bookkeeper prepared in the course of business.").

3.  Of course, even if the Biwer e-mail had satisfied the formal requirements of the business records exception, that would not render it admissible without more.  As a general rule, the business records exception requires a showing that "each actor in the chain of information is under a business duty or compulsion to provide accurate information."  United States v. McIntyre, 997 F.2d 687, 699 (10th Cir. 1993); see also Fed. R. Evid. 803(6) advisory committee's note ("If, however, the supplier of the information does not act in the regular course, an essential link is broken; the assurance of accuracy does not extend to the information itself,

and the fact that it may be recorded with scrupulous accuracy is of no avail."); 2 Kenneth S. Broun, <u>McCormick on Evidence</u> § 290 (6th ed. 2006).

The Fifth Circuit has held that a document that otherwise qualifies as a business record but contains hearsay statements not within the personal knowledge of the maker of the record may be admitted if the hearsay statement or statements contained within the record are subject to other hearsay exceptions.  <u>Wilson v. Zapata Off-Shore Co.</u>, 939 F.2d 260, 271 (5th Cir. 1991) ("[I]f the source of the information is an outsider, . . . Rule 803(6) does not, by itself, permit the admission of the business record.  The outsider's statement must fall within another hearsay exception to be admissible because it does not have the presumption of accuracy that statements made during the regular course of business have."); <u>accord</u> <u>United States v. Patrick</u>, 959 F.2d 991, 1000 (D.C. Cir. 1992).  In this case, even assuming that Mr. Biwer was acting pursuant to a business-imposed reporting duty, there was no showing that any of the other declarants were subject to a similar duty.  And, as is discussed in the following sections, there was no other valid basis for overcoming the hearsay problems with those declarants' statements.  The Biwer e-mail is therefore inadmissible as containing multiple hearsay, even if it otherwise qualifies as a business record.

4.    Finally, Rule 803(6) provides that even if a document satisfies the formal requirements of the rule, it may not be admitted if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness."  Certain factors surrounding the preparation of the Biwer e-mail cast further doubt on the trustworthiness of that document as an accurate record of what transpired at the luncheon meeting.  First, Mr. Jacops testified that he and Mr. Sullivan did not discuss Autodata by name, <u>see</u> Trial Tr. (June 11, PM session) 48:13-14 ("[W]e didn't specifically discuss AutoData"); <u>see also</u> Trial Tr. (June 13, AM session) 159:7-12

("Q: Now, at that meeting, you testified earlier names were never mentioned between [you] and .
. . Chuck; is that correct?  . . . A: Yes.").  Yet the e-mail reports Mr. Sullivan as having said that
he "was told that AD has a license to our broader portfolio."  The insertion of Autodata into the
statement constitutes a striking departure from Mr. Jacops's characterization of the Sullivan
meeting in his testimony and gives rise to doubt as to how accurately Mr. Biwer reported the
statements that were passed on to him.  Second, the addition of the "not true" parenthetical
indicates that the e-mail did more than merely recount the conversation with Mr. Sullivan; it also
contained editorial comments of either Mr. Jacops or Mr. Biwer.  Third, as noted, the e-mail
indicated that Mr. Jacops was "going to send out more complete notes later today or tomorrow."
That statement suggests that the account of the lunch in the e-mail was necessarily abridged and
incomplete.  All of those factors indicate that Mr. Biwer's report of the meeting between Mr.
Jacops and Mr. Sullivan may have been essentially a "rough translation" accompanied by
editorial commentary, rather than a faithful account of the facts of the event.

### 2.    Present Sense Impression

Versata seeks to address the problem of the second declarant, Mr. Jacops, by invoking
Fed. R. Evid. 803(1), the exception for statements setting forth the declarant's "present sense
impression."  Rule 803(1) provides an exception to the hearsay rule for "[a] statement describing
or explaining an event or condition, made while or immediately after the declarant perceived it."
Fed. R. Evid. 803(1).   "The justification for this hearsay exception relies on the
contemporaneousness of the event under consideration and the statement describing that event.
Because the two occur almost simultaneously, there is almost no 'likelihood of [a] deliberate or
conscious misrepresentation.'"  Rock, 922 F.2d at 280, quoting Fed. R. Evid. 803(1) advisory
committee's note; see also United States v. Peacock, 654 F.2d 339, 350 (5th Cir. 1981)

(statement that was otherwise hearsay was properly admitted because it was immediately repeated to a third party and "[t]here was no time for [the declarant] to consciously manipulate the truth").

Mr. Jacops testified that he called Mr. Biwer within "a matter of minutes" after the conclusion of the luncheon meeting.  See Trial Tr. (June 13, AM session) 155:15.  That by itself, however, does not establish that Mr. Sullivan's statement, which was made at some point during the luncheon, was reported to Mr. Biwer "while or immediately after the declarant perceived it," as required by the rule.  Mr. Jacops did not say at what point in the course of the lunch Mr. Sullivan made the statement about Autodata's alleged license rights.  But his testimony makes clear that the period of delay between the statement and Mr. Jacops's report to Mr. Biwer was a combination of the time it took to complete the luncheon after the "license rights" comment, plus the "matter of minutes" that Mr. Jacops said went by after the conclusion of the luncheon and before he reported the events of the meeting to Mr. Biwer.  The cases on which Versata relied at trial to establish the contemporaneity of the events and the declarant's present sense impression of those events, United States v. Portsmouth Paving Co., 694 F.2d 312, 323 (4th Cir. 1982), and United States v. Danford, 435 F.3d 682, 687 (7th Cir. 2005), both involved a declarant's reporting of the contents of a telephone conversation immediately upon its conclusion (in Portsmouth, "no more than a few seconds" after the conversation ended; in Danford, "less than a minute after the conversation ended).  The Fifth Circuit, in a case involving Rule 803(1), agreed with the District of Columbia Circuit that a delay of 15 to 45 minutes in reporting an incident does not qualify reporting the incident "immediately" after it occurred.  See United States v. Cain, 587 F.2d 678, 681 (5th Cir. 1979), citing Hilyer v. Howat Concrete Co., 578 F.2d 422, 426 n.7 (D.C. Cir. 1978) ("an out-of-court statement made at least fifteen minutes after the event it

describes is not admissible unless the declarant was still in a state of excitement resulting from the event [which would render the statement admissible under the 'excited utterance' exception to the hearsay rule, Fed. R. Evid. 803(2)]"). The rationale for the requirement of contemporaneity is that the "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Fed. R. Evid. 803(1) advisory committee's note. When a statement is made while the declarant is observing the event being perceived or immediately thereafter, the declarant will have no time for reflection. McCormick emphasizes the requirement that the statement be made "immediately" after the event being reported, noting that "[w]hile principle might seem to call for a limitation to exact contemporaneity, some allowance must be made for the time needed for translating observation into speech. Thus, the appropriate inquiry is whether sufficient time elapsed to have permitted reflective thought." McCormick on Evidence § 271, at 254.

In this case, it seems highly likely that the period of time between when the statement was made during the luncheon meeting and when Mr. Jacops reported the statement to Mr. Biwer after the conclusion of the meeting was sufficient for reflection; it was certainly longer than the period needed "for translating observation into speech." In any event, the burden of showing the elements of admissibility for a statement under the present sense impression exception, like the burden on evidentiary issues generally, is on the proponent of the evidence. See Bemis v. Edwards, 45 F.3d 1369, 1373 (9th Cir. 1995); Miller v. Keating, 754 F.2d 507, 511 (3d Cir. 1985); see also Bourjaily v. United States, 483 U.S. 171, 176 (1987); United States v. Two Shields, 497 F.3d 789, 793 (8th Cir. 2007); Lewis v. CITGO Petroleum Corp., 561 F.3d 698, 705 (7th Cir. 2009). Versata's evidence of contemporaneity, limited to Mr. Jacops's testimony that he called Mr. Biwer within "a matter of minutes" after the conclusion of his

luncheon with Mr. Sullivan, did not satisfy its burden of establishing that Mr. Jacops's statements to Mr. Biwer were made at the time of Mr. Sullivan's comments or "immediately thereafter," as that term is used in Rule 803(1).

While all this may appear to have a hypertechnical flavor to it, the passage of time between event and statement is vitally important to the applicability of the present sense impression exception. "The idea of immediacy lies at the heart of the exception, thus, the time requirement underlying the exception is strict because it is the factor that assures trustworthiness." See United States v. Green, 556 F.3d 151, 155 (3d Cir. 2009) (citations and internal quotations omitted). In that context, the imprecision of Versata's evidence as to the period of delay between Mr. Sullivan's statement during the luncheon and Mr. Jacops's report of that statement in his post-luncheon telephone call to Mr. Biwer is fatal.

To the extent that Versata argues that the present sense impression exception applies to Mr. Biwer's declarations,[2] the evidence indicates that Mr. Biwer's e-mail was not prepared until several hours after his conversation with Mr. Jacops. Mr. Jacops and Mr. Sullivan met for lunch, but Mr. Biwer's e-mail was sent at approximately 6 p.m. that evening, presumably long after the luncheon meeting had ended. That span of time destroys the contemporaneousness that is required to make the statements fall under the exception in Rule 803(1). See Rock, 922 F.2d at 280 (affirming trial court's inadmissibility ruling for accident reports that were "not filed immediately following [the] alleged accident, but only after two days had passed"); Cain, 587 F.2d at 681; cf. First State Bank of Denton v. Md. Cas. Co., 918 F.2d 38, 42 (5th Cir. 1990)

---

[2] "Present sense impression" was the sole hearsay exception that Versata invoked in its pretrial submission in support of the admission of PX 310, although it also argued that the e-mail should be admitted as non-hearsay to show the context of statements reportedly made at the luncheon meeting.

(statements to dispatcher about whether a person was at home satisfied Rule 803(1) when made "virtually on the heels of the discovery that [that person] was not at home"); <u>Canatxx</u>, 2008 WL 1999234, at *14 (e-mail admissible as present sense impression where writer "stated in his affidavit that the email was sent '[a]s soon as I finished my conversation with Blackmon,'" and "[t]he email itself states that Blackmon had 'just called'").

### 3.    State of Mind

Versata faces an even bigger hurdle in attempting to show why Mr. Sullivan's statements are not excludable as hearsay.  Mr. Biwer's e-mail reports that Mr. Sullivan told Mr. Jacops that he (Mr. Sullivan) had been told that Autodata "has a license to [Versata's] broader portfolio." To the extent the statement was offered to show the truth of the matter asserted—i.e., that Mr. Sullivan had been told that Autodata had a broad license to Versata's intellectual property—the statement was plainly hearsay.  Versata made clear at trial that it wished to use the statement for that purpose.  As such, Mr. Sullivan's statement was inadmissible, as none of the hearsay exceptions apply.  The statement was obviously not a business record, it was not a statement of present sense impression by Mr. Sullivan, and it was not a party admission, <u>see</u> Fed. R. Evid. 801(d)(2), because Chrysler (Mr. Sullivan's employer) was not a party to the lawsuit.[3]

To the extent that Versata argues that Mr. Sullivan's statement was admissible under Fed. R. Evid. 803(3) as a statement reflecting Mr. Sullivan's state of mind, the statement clearly fails to satisfy the requirements of that rule.  Rule 803(3) provides an exception to the hearsay rule for a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or

---

[3]   Nor would the statement reported in the e-mail be admissible under Fed. R. Evid. 801(d)(1), even if it were regarded as inconsistent with Mr. Sullivan's deposition testimony that was read at trial.  That is because Mr. Sullivan's prior statement (the one reported in the e-mail) was not "given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition."  Fed. R. Evid. 801(d)(1)(A).

emotional . . . condition (such as mental feeling . . .)."   Before a statement which would otherwise be hearsay may be admitted under Rule 803(3) "to show the declarant's then existing state of mind, the declarant's state of mind must be a relevant issue in the case."  Rock, 922 F.2d at 279, quoting Prather v. Prather, 650 F.2d 88, 90 (5th Cir. 1981).

Even if Mr. Sullivan's purported statement that he had been told that Autodata had a license to Versata's portfolio reflected something about Mr. Sullivan's state of mind, his state of mind was not a relevant issue in the case.  Versata was seeking to use the statement to prove that Autodata had made a claim regarding its rights to use Versata's technology, not to show something about Mr. Sullivan's mental state.  Moreover, even if the statement could be regarded as relevant to Mr. Sullivan's state of mind and even if Mr. Sullivan's state of mind on that matter were somehow material, the e-mail would have to have been admitted subject to a limiting instruction "to insure that assertions as to particular facts contained in the statement will be considered by the jury solely as bearing upon the declarant's state of mind" and not for the truth of the factual matter asserted.  30B Michael H. Graham, Federal Practice & Procedure § 7044, at 438 (2006).  But, as indicated earlier, the Court did not (and does not) regard the limiting instruction as adequate under the circumstances of this case and therefore excluded the evidence under Rule 403.

The hearsay rules bar parties from using the state of mind exception as a means of introducing statements of memory or belief in order to prove the matter remembered or believed.  In fact, the state of mind exception in the Federal Rules of Evidence contains an express limitation designed to guard against the use of that exception as a vehicle for introducing evidence for such purposes.  The rule provides (with one exception not applicable here) that the hearsay exception for statements reflecting the declarant's state of mind does not include "a

statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3).

As the advisory committee notes confirm, that provision was added because it was regarded as

necessary to avoid "the virtual destruction of the hearsay rule which would otherwise result from

allowing state of mind, provable by a hearsay statement, to serve as the basis for an inference of

the happening of the event which produced the state of mind." Fed. R. Evid. 803(3) advisory

committee's note. That proposition has been a mainstay of hearsay law for years and has been

applied faithfully since the enactment of the Federal Rules of Evidence. See Shepard v. United

States, 290 U.S. 96, 105-06 (1933); United States v. Liu, 960 F.2d 449, 452 (5th Cir. 1992);

Prather, 650 F.2d at 90; United States v. Cohen, 631 F.2d 1223, 1225 (5th Cir. 1980); United

States v. Samaniego, 345 F.3d 1280, 1283 (11th Cir. 2003).

Mr. Sullivan's declaration therefore does not fall within any hearsay exception; the

hearsay nature of that declaration is sufficient by itself to render PX 310 inadmissible.

### C.  The Timing of the Court's Ruling

The Court informed the jury of its decision to exclude the e-mail from evidence at the

close of all the evidence in the trial. See Trial Tr. (June 15, AM session) 144:4-145:3. After the

jury left the courtroom, Versata objected to the Court's instruction, arguing that the timing of the

instruction was prejudicial. In part, Versata's objection stemmed from concern that Autodata

might comment on the withdrawal of the e-mail from evidence as reflecting adversely on

Versata. The Court, however, stated that it would not allow Autodata's counsel to comment on

that matter, and Autodata faithfully complied. In part, Versata objected to the timing of the

Court's informing the jury that the exhibit had been excluded, coming as it did at the close of the

evidence at trial and only a few hours before the jury retired for deliberations.

The reason the Court chose that time to inform the jury that PX 310 had been excluded was to <u>avoid</u> possible prejudice to one side or the other.  If the Court had informed the jury during or at the end of the plaintiff's case that the exhibit had been excluded, it is possible that the jury would have inferred that some important element of the plaintiff's case had been struck from the record.  Likewise, if the Court had given its explanation to the jury during or at the end of the defense case, the jury might have inferred that the ruling reflected adversely on the defense.  Advising the jury about the disposition of PX 310 as part of the housekeeping matters that came at the close of the evidence and before the jury's luncheon break on the last day of trial seemed to be the most neutral time.  Following counsel's objection, the Court invited counsel to propose a curative instruction, but counsel declined.  The Court concludes that the manner in which the jury was informed that PX 310 had been withdrawn from evidence was not prejudicial to Versata.

For all of the foregoing reasons, the Court confirms its prior ruling that PX 310 was properly excluded at trial.

SIGNED this 5th day of July, 2012.


_____
WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE