# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

VERSATA SOFTWARE, INC., *f/k/a* §
TRILOGY SOFTWARE, INC.; and §
VERSATA DEVELOPMENT GROUP, INC., §
*f/k/a* TRILOGY DEVELOPMENT GROUP, §
INC. §
§    CIVIL ACTION No. 2:08-cv-313-WCB
        Plaintiffs, §
§
v. §
§
INTERNET BRANDS, INC., *f/k/a* §
CARSDIRECT.COM, INC., §
AUTODATA SOLUTIONS COMPANY, §
and AUTODATA SOLUTIONS, INC. §
§
        Defendants. §

## MEMORANDUM OPINION AND ORDER

Before the Court are five post-trial motions filed by the plaintiffs and one filed by the

defendants: (1) Versata's Motion to Alter or Amend Final Judgment Under Rule 59(e) (Dkt. No.

349); (2) Versata's Motion for Judgment as a Matter of Law on Invalidity and Infringement (Dkt.

No. 350); (3) Versata's Motion for Judgment as a Matter of Law, or in the Alternative, New Trial

on Autodata's Breach of Contract Claim Due to Lack of Injury (Dkt. No. 351); (4) Versata's

Renewed Motion for Judgment as a Matter of Law Under Rule 50 or, in the Alternative, for New

Trial Under Rule 59 or Remittitur on Damages (Dkt. No. 352); (5) Versata's Motion for

Judgment as a Matter of Law on Liability for Trade Secrets and Breach of the Master Services

Agreement (Dkt. No. 353); and (6) Defendants' Motion for Award of Attorney's Fees (Dkt. No.

348).  For the following reasons, the five motions filed by the plaintiffs are all DENIED.  The

motion filed by the defendants is also DENIED.

I.      **Background**

This long-running dispute between the plaintiffs (collectively "Versata") and the defendants (collectively "Autodata") centers around technology that permits persons who are shopping for automobiles to use the Internet to configure and compare different vehicles that are available for purchase.   Both companies sell their software offerings to automobile manufacturers, such as Chrysler Corporation and Toyota Motor Corporation.

Prior to 2008, Versata had a contract with Chrysler to provide configuration and comparison software to be used on Chrysler's website.   In that year, Chrysler terminated its contract with Versata and began using Autodata's software instead.   Versata then filed this action, in which it accused Autodata of infringing U.S. Patent No. 7,130,821 ("the '821 patent") as well as breaching a settlement agreement between the parties (a product of earlier litigation) and tortiously interfering with Versata's business relations with Chrysler.

Autodata responded that the '821 patent was invalid because it was anticipated by and rendered obvious in light of various prior art references, including certain Autodata software. Autodata also filed counterclaims in which it alleged that Versata had misappropriated Autodata's trade secrets and in so doing had breached two contracts that the parties had entered into in the late 1990s during a brief period of collaboration.   Both parties asserted other claims as well, but those claims are not pertinent to the issues addressed here.

The case was tried to a jury in June 2012.   After a week-long trial, the jury returned a verdict in favor of Autodata.   With respect to the patent claims, the jury found that Autodata did not infringe the asserted claims of the '821 patent and that the asserted claims of the '821 patent were invalid on grounds of both anticipation and obviousness.   The jury also found that Autodata did not breach the settlement agreement with Versata and did not tortiously interfere with

Versata's prospective business relationship with Chrysler.  With respect to the counterclaims, the jury found that Autodata had proved that Versata misappropriated Autodata's trade secrets, and it awarded damages in the amount of $2,000,000 on that claim.  The jury also found that Versata had breached its contractual obligations to Autodata.  On that claim, the jury awarded Autodata only nominal damages of $1.  Autodata subsequently sought equitable relief from the Court based on the breach of contract verdict, but the Court denied the motion on the ground that Autodata had not shown any continuing injury that called for an exercise of the Court's equitable powers.

On Autodata's claim of inequitable conduct, which was tried to the Court, the Court ruled in favor of Versata, finding that the '821 patent was not unenforceable for inequitable conduct during prosecution.  The Court then entered final judgment in accordance with the jury's verdict and the Court's inequitable conduct ruling (See Dkt. No. 344)  For purposes of taxing costs under 28 U.S.C. § 1920, the Court concluded that Autodata was the prevailing party on its misappropriation and breach of contract counterclaims as well as the claims of patent infringement and invalidity, whereas Versata was the prevailing party on the defendants' counterclaim of inequitable conduct.  Accordingly, the Court entered an award of costs in favor of Autodata in the amount of two-thirds of its taxable costs.

Versata now seeks relief from the final judgment, moving on multiple grounds for judgment as a matter of law ("JMOL"), a new trial, an order of remittitur, and an amendment of the judgment.  Versata's motions focus generally on four issues: the validity of the '821 patent; Versata's liability for trade secret misappropriation and breach of contract; the propriety of the damages awards on the misappropriation and breach of contract claims; and the Court's

determination, for purposes of its award of costs, that Autodata was the prevailing party on its breach of contract claim.

## II.      Discussion

### A.      Patent Invalidity

In its first JMOL motion (Dkt. No. 350), Versata attacks the jury's finding that the '821 patent was invalid as both anticipated by, and obvious in light of, the prior art.  Versata argues that the testimony of Autodata's expert, Dr. Stuart Stubblebine, was insufficiently detailed to support a finding of invalidity.  In particular, Versata contends that Dr. Stubblebine offered only conclusory statements and failed to walk through the limitations of each of the claims and to explain how each limitation was present in the prior art.  In addition, Versata asserts that Dr. Stubblebine misstated the law with respect to the relationship between independent and dependent claims.

In considering the invalidity issue, it is important to note that the asserted claims of the '821 patent are extremely broad and general in nature.  Independent claim 1 recites a method for comparing products in which one computer sends a request regarding a particular product to a second computer and the second computer sends information back to the first computer that allows the first computer to display a configuration of that product.  The first computer then sends a request to the second computer to generate a configuration of a second product that is comparable to the first product with respect to certain criteria, and the second computer sends back data that allows the first computer to display both products in a manner that allows comparison of the features of the two products.  Neither claim 1 nor any of the other asserted claims is limited to a more specific algorithm; any computerized comparison system that

operates in the broadly recited manner described above would infringe claim 1 of the '821 and, if in the prior art, would invalidate it.

This Court's review of the jury's verdict on anticipation under 35 U.S.C. § 102(a) is governed by the rule that anticipation "is a factual determination that is reviewed for substantial evidence when decided by a jury." Koito Mfg. Co. v. Turn-Key-Tech, LLC, 381 F.3d 1142, 1149 (Fed. Cir. 2004). The Court "must presume that the jury resolved any underlying factual dispute in favor of the verdict winner and leave such presumed finding undisturbed if it is supported by substantial evidence." TGIP, Inc. v. AT&T Corp., 527 F. Supp. 2d 561, 577 (E.D. Tex. 2007), citing Tec Air, Inc. v. Denso Mfg. Mich., Inc., 192 F.3d 1353, 1359 (Fed. Cir. 1999). When a court evaluates factual findings for substantial evidence, the "inquiry is whether a reasonable jury, given the record before it viewed as a whole, could have arrived at the conclusion it did." Dawn Equip. Co. v. Ky. Farms, Inc., 140 F.3d 1009, 1014 (Fed. Cir. 1998).

The Court concludes that Autodata presented sufficient evidence to support the jury's finding of anticipation as to all the claims of the '821 patent. Besides Dr. Stubblebine's testimony, Autodata elicited testimony on anticipation from Autodata employee Chris Wedermann, who demonstrated Autodata's AutoQuote Pro software and the manual for that software. As part of his presentation, Mr. Wedermann explained how the AutoQuote Pro software could be configured, consistent with the directions in the AutoQuote Pro manual, to be installed in a network environment, which would entail the use of multiple computers. Trial Tr. (June 14, AM session) 65-67. He also testified that Autodata implemented its technology in a web environment in a product that was sold to a customer in 1997. Id. at 67-69, 96-97, 105-08; see also Trial Tr. (June 13, PM session) 45-46, 126. Taken together, that evidence was sufficient to meet Autodata's burden to show invalidity by clear and convincing evidence. It is true that

5

Dr. Stubblebine's testimony may have differed in form from that offered by Versata's expert Dr. Scott Nettles, who took the jurors on a lengthy, limitation-by-limitation analysis of each of the asserted claims.   But Dr. Stubblebine's testimony, combined with Mr. Wedermann's demonstration of the AutoQuote Pro software and his discussion of the contents of the AutoQuote Pro manual, was sufficient to support the jury's finding that the prior art software met all the limitations of the claims.  See Trial Tr. (June 14, PM session) 27-40.

First, Dr. Stubblebine explained the nature of the anticipation inquiry and what he did to conduct his anticipation analysis.  Trial Tr. (June 14, PM session) 27-28 ("What you need to do is take a look at each claim limitation, and you take a look at the prior art, and you analyze the prior art to see if it's actually doing the same claim steps, the claim elements."); id. at 28 (explaining that he compared the "claim elements of Claim 1 of the '821 patent . . . to AutoQuote Pro").  Dr. Stubblebine then proceeded to "go through each of these elements of Claim 1" and let the jury know whether or not, in his opinion, "those elements . . . are present in the AutoQuote Pro technology."  Id.  In doing so, he made express references to the software demonstration by Mr. Wedermann that had taken place just hours earlier.  Id.; see also Trial Tr. (June 14, AM session) 50-62 (software demonstration).   Dr. Stubblebine was not required to rehash the demonstration for the jury.  Aside from its characterization of Dr. Stubblebine's testimony as offering "bare conclusions without any explanation whatsoever," Versata does not point to any element of the anticipation analysis for which there was no support in Dr. Stubblebine's testimony or the Wedermann demonstration.

As described above, the patented method at issue in this case was not technical or challenging.  The use of a computer network to compare the features of various vehicles was sufficiently commonplace that the attorneys even referred to it during jury selection.  See Trial

Tr. (June 11, Voir Dire) 34 (Versata's attorney asking prospective jurors, "Has anyone ever gotten on the Internet and looked at one of the dealers or one of the automobile manufacturers' website and tried to compare one car to another; you might compare a Ford to a Chrysler? . . . Has everyone done that? . . . Did that work out fairly well?  You tell us, [prospective juror], how did that work?"); see also id. at 34-40 (other jurors describing their experiences with shopping for vehicles on the Internet).[1]

The Federal Circuit has explained that "[t]here is no invariable requirement that a prior art reference be accompanied by expert testimony."  In re Brimonidine Patent Litig., 643 F.3d 1366, 1376 (Fed. Cir. 2011).  Where the references and the patentee's invention are "easily understandable without the need for expert explanatory testimony," such testimony is not essential.  Centricut, LLC v. Esab Group, Inc., 390 F.3d 1361, 1369 (Fed. Cir. 2004), quoting Union Carbide Corp. v. Am. Can Co., 724 F.2d 1567, 1573 (Fed. Cir. 1984).  In this case, the demonstration by Mr. Wedermann and the other descriptions of the claimed methods were readily accessible to a lay jury.  There was no need for Dr. Stubblebine to explain basic concepts of the digital age (such as "providing data to the first computer system to allow the first computer system to display the first product configuration") to jurors who were perfectly capable of understanding those concepts as illustrated during the demonstration and through the testimony of other witnesses at trial.  Accordingly, the Court concludes that the jurors' finding of anticipation based on the AutoQuote Pro software and manual is supported by substantial

---

[1]   The algorithm for doing the comparison that Versata was found to have misappropriated is somewhat more specific than the method disclosed and claimed in the '821 patent, which is quite general.  Compare Trial Tr. (June 14, AM session) 128-133 (Hans Otten testifying about the specific steps of Autodata's comparison algorithm) with '821 patent, col. 12, ll. 35-65; col. 13, ll. 11-39; and Trial Tr. (June 12, AM session) 38-42 (Court questioning Mr. Van Dyke regarding the patented invention).

evidence and that the verdict was not undermined by any inadequacy in the way Autodata developed the expert testimony it presented to the jury.

The cases on which Versata relies, Schumer v. Laboratory Computer Systems, Inc., 308 F.3d 1304 (Fed. Cir. 2002), and Koito Manufacturing, are inapposite.  In Schumer, the accused infringer was asking the court to find, as a matter of law on summary judgment, that a prior art reference anticipated the patented claim.  The court explained that testimony intended to support a claim of invalidity is "insufficient if it is merely conclusory," and that typically such testimony should "identify each claim element, state the witnesses' interpretation of the claim element, and explain in detail how each claim element is disclosed in the prior art reference."  308 F.3d at 1315-16.  The court added that it "is not our task, nor is it the task of the district court, to attempt to interpret confusing or general testimony to determine whether a case of invalidity has been made out, particularly at the summary judgment stage."  308 F.3d at 1316.

When viewed in the context of the rest of the evidence at trial, the Court is persuaded that Dr. Stubblebine's testimony was sufficiently focused and particular to satisfy the standard set forth in Schumer.  During his testimony, Dr. Stubblebine repeatedly referred back to the demonstration of AutoQuote Pro, which had been described and demonstrated in detail for the jury.  Under these circumstances, his testimony was sufficient to link the features found in the prior art to those broadly recited in the asserted claims.  The task of assessing whether the prior art included the limitations of the asserted claims was not complex, and the evidence presented to the jury, unlike the evidence at issue in Schumer and the other authorities relied on by Versata, made it relatively simple for the jury to compare the limitations of the claims with the features of the prior art, and for the Court to do the same in reviewing the jury's verdict.

8

In Koito Manufacturing, the expert's testimony was markedly less helpful and focused than the testimony given by Dr. Stubblebine. In that case, the accused infringer "did not even mention the [supposedly invalidating] JP '082 reference after introducing it into evidence. Instead, Koito's expert . . . offered a conclusion of invalidity relating to a quintet of prior art patents," which included that reference. 381 F.3d at 1151-52. Koito's expert then broadly referred to all the prior art references as a whole, without specifically discussing the JP '082 reference. Id. at 1152. In this case, by contrast, Dr. Stubblebine focused on the specific piece of prior art at issue and explained how it incorporated all the elements of claim 1, an explanation that was buttressed by the in-court demonstration of the prior art software. Such evidence cannot fairly be equated to the "general and conclusory testimony" that was held insufficient in Schumer, Koito, and like cases.

Versata next asserts that Dr. Stubblebine misstated the law by saying that once the independent claim on which the dependent claims rely is invalidated, so are the dependent claims. Versata is, of course, correct that dependent claims may be valid even if the independent claims from which they depend have been invalidated. 35 U.S.C. § 282 ("dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim"); see Schumer, 308 F.3d at 1316; Sandt Tech. Ltd. v. Resco Metal & Plastics Corp., 264 F.3d 1344, 1356 (Fed. Cir. 2001). However, Versata mischaracterizes Dr. Stubblebine's testimony on the issue. Although Dr. Stubblebine initially stated the incorrect proposition, he quickly retracted his statement and clarified that he did not use the misstated law as part of his analysis. See Trial Tr. (June 14, PM session) 37 (apologizing after misstating the law and asking to "take that back"). In fact, right after correcting his misstatement, Dr. Stubblebine went on to explain that he "also looked at each one of the dependent claims" to make sure that there was "nothing unique that

wasn't being shown" in the independent claims.  Id.  He told the jury that dependent claims can add elements to the independent claims but that each of those additional elements in the dependent claims in this case was present in the AutoQuote Pro software.  Id. at 38-40.  Dr. Stubblebine again referred to the software demonstration, and that demonstration, in conjunction with his testimony, suffices to support the jury's finding of anticipation.  To the extent certain limitations of the dependent claims overlapped with those of the independent claims, it was reasonable for Autodata to rely on Dr. Stubblebine's earlier testimony regarding those limitations rather than having him reiterate his testimony as to those limitations.

Versata next challenges the jury's finding that the asserted claims of the '821 patent would have been obvious to one of ordinary skill in the art at the time the patent application was filed and that the claims were therefore invalid under 35 U.S.C. § 103.  A determination of obviousness is a legal question based on factual determinations.  Bos. Sci. Scimed, Inc. v. Cordis Corp., 554 F.3d 982, 990 (Fed. Cir. 2009).  "In review of a jury verdict on the ground of obviousness, the underlying findings of fact, whether explicit or presumed as necessary to support the verdict, are reviewed for substantial evidentiary support; and the ultimate question of obviousness is reviewed for correctness in law, based on the factual premises."  Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 381 F.3d 1371, 1375 (Fed. Cir. 2004); see also Hewlett-Packard Co. v. Mustek Sys., Inc., 340 F.3d 1314, 1319 (Fed. Cir. 2003).  Therefore, on a motion for JMOL, this Court will not overturn the jury's implicit factual findings underlying the verdict of obviousness if they are supported by substantial evidence.  Fresenius USA, Inc. v. Baxter Int'l, Inc., 582 F.3d 1288, 1301 (Fed. Cir. 2009).

Versata argues that in seeking to prove obviousness, Autodata had to present "more than an expert's ipse dixit that particular differences between the invention and the prior art would

have been obvious to one of skill in the art." Dkt. No. 350 at 6.  But even assuming there is any difference between the claimed invention and the AutoQuote Pro software with respect to the claimed comparison functionality, the difference is insignificant.  The only asserted difference that Versata points to relates to the computer on which one of the comparison steps was performed.  See Trial Tr. (June 14, PM session) 34-35.  The AutoQuote Pro software was typically used so that the comparison step was performed on the same computer system that displayed the information to the user, whereas under the patented method the comparison step was performed on a second computer.  However, Dr. Stubblebine testified that in the late 1990s and early 2000s many software products were being adapted to work on the Internet, and it therefore would have been obvious to put "any of th[e] functionality that already occurs on the network computer, to put any of that functionality on a second computer like a web server."  Id. at 35.  Although Versata's expert gave contrary testimony as to whether creating an Internet-enabled version of the comparison software would have been obvious, see Trial Tr. (June 15, AM session) 124, the jury was entitled to credit Autodata's expert's testimony over Versata's.[2] That is particularly true in light of the evidence at trial that in 1997 or 1998, Autodata prepared a version of its vehicle comparison technology that would work in a web environment, Trial Tr. (June 14, AM session) 107-08, and that as early as 1998 other companies were trying to sell cars on the Internet, id., 58-59.  The Court therefore concludes that there is sufficient evidentiary

---

[2]   The recent decision in ActiveVideo Networks, Inc. v. Verizon Communications, Inc., No. 2011-1538, 2012 WL 3636908 (Fed. Cir. Aug. 24, 2012), which Versata cites, is readily distinguishable.  Unlike in ActiveVideo, there was no need in this case to show a motivation to combine discrete references because the AutoQuote Pro software and manual contained all or nearly all the elements of the claimed invention.  As to the computer network component of Versata's patent, the evidence was sufficient to entitle the jury to conclude either that Autodata had already created a network-based version of AutoQuote Pro or, at minimum, that adapting the AutoQuote Pro software to be usable on a network such as the Internet was a simple step that would have been obvious to a person of ordinary skill in the art.

support for the proposition that the asserted claims of the '821 patent would have been obvious in light of the prior art.

Finally, Versata argues that Autodata did not prove that Versata sold or offered to sell the software containing the patented invention to customers more than one year before the filing of the '821 patent application and that the claims were therefore not invalid under the "on-sale bar" rule of 35 U.S.C. § 102(b).  As noted, however, there was evidence at trial that Autodata had sold a web-based version of its AutoQuote Pro vehicle comparison technology to a customer as early as 1997 or 1998.  That evidence was sufficient to support a verdict of anticipation under section 102(b), on which the jury was instructed.

Although the Court concludes that the evidence was sufficient to support the jury's verdict under either anticipation, the on-sale bar, or obviousness, the evidence need only be sufficient on one of those three theories in order for the judgment of invalidity to be sustained.  See Northpoint Tech., Ltd. v. MDS Am., Inc., 413 F.3d 1301, 1311 (Fed. Cir. 2005) ("A failure of proof with respect to any single item of evidence does not justify a grant of either JMOL or a new trial; even if some of the proposed factual grounds for liability are not legally sufficient to support a verdict, that is not fatal, because the critical question is whether the evidence, taken as a whole, was sufficient to support the jury's verdict."); see also Cordance Corp. v. Amazon.com, Inc., 658 F.3d 1330, 1338-39 (Fed. Cir. 2011).  And because the Court upholds the jury's verdict of invalidity, it likewise necessarily upholds the jury's verdict of noninfringement as to the invalidated claims.  Versata's JMOL motion on validity and infringement is therefore DENIED.

### B.     Proof of Trade Secret Misappropriation and Breach of Contract

In a second JMOL motion (Dkt. No. 353), Versata seeks JMOL with respect to the jury's verdict on the claims of trade secret misappropriation and breach of contract.  Versata contends

that Autodata failed to prove that Versata misappropriated the comparison algorithm that Autodata claimed as a trade secret; Versata also argues that it was authorized to use the allegedly secret component known as the "database schema" under its agreement with Autodata. Because there was no misappropriation of any protected information, Versata argues, there was no breach of the contractual provisions prohibiting the unauthorized use of protected information.

At issue in the misappropriation part of the case are two different asserted trade secrets. One is the "ACE algorithm," a series of steps outlining how to implement the solution to comparing different vehicles with differently named features and options. The other is the "database schema," which describes how the data used in the software is arranged and details the relationships between different data elements. Autodata alleged that it shared both the ACE algorithm and the database schema with Versata while the two companies were working together on a project for Ford Motor Company, and that Versata subsequently misappropriated the two trade secrets and used them in connection with software that Versata sold to Toyota. Versata denied the charge. The jury found that Autodata proved that it had trade secrets and that Versata misappropriated those trade secrets in the applications it provided to Toyota.

Versata first argues that "Autodata failed to prove that Versata misappropriated the ACE algorithm as Autodata defined it" because the algorithm Versata used in its product contained different steps in a different order than Autodata's original ACE algorithm. Dkt. No. 353 at 3. Versata asserts that in order to show similarities between the two algorithms, Dr. Stubblebine was forced to generalize both algorithms to such a degree that it reduced the algorithms to three steps that broadly characterized the process of vehicle comparison. According to Versata, that broad characterization, not a "specific, defined trade secret," was all that was common to the ACE algorithm and the product Versata provided to Toyota.

Texas law defines a trade secret as "any formula, pattern, device, or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." In re Bass, 113 S.W.3d 735, 739 (Tex. 2003) (citation and quotation omitted). That definition is broad, and it encompasses matters as diverse as "a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers." Trilogy Software, Inc. v. Callidus Software, Inc., 143 S.W.3d 452, 463 (Tex. App. 2004), quoting Hyde Corp. v. Huffines, 314 S.W.2d 763, 776 (Tex. 1958); see also Apple, Inc. v. Samsung Elecs. Co., No. 11-cv-1846, 2012 WL 3283478, at *14 (N.D. Cal. Aug. 9, 2012) (description of "the algorithms used by each constituent module" and description that "identifies the functions, input and output variables, and data structures used by each module" are trade secrets); Beacon Wireless Solutions, Inc. v. Garmin Int'l, Inc., 103 U.S.P.Q.2d 1721, 1724 (W.D. Va. 2012) ("technical details of the plaintiffs' fleet management system (e.g., the underlying source code, algorithms, protocols, or formats) qualify as trade secrets").

In its JMOL motion, Versata does not argue that Autodata failed to prove that its ACE algorithm and database schema qualify as trade secrets under Texas law. Instead, Versata argues that Autodata failed to prove that its trade secrets were misappropriated. Unlike the case of copyright infringement, one need not make an exact or nearly exact copy of an algorithm or a compilation of information to be liable for trade secret misappropriation in connection with the misappropriation of the essence of the algorithm. Nor do each of the steps of a process that is protected as a trade secret have to be novel or previously unknown. See Restatement of Torts § 757, cmt. b (1939); see also E.I. DuPont de Nemours & Co. v. Christopher, 431 F.2d 1012, 1014 (5th Cir. 1970). The value of the trade secret comes from the fact that competitors do not

possess the information embodied in the trade secret, which gives the holder a potential business advantage.

Both Dr. Stubblebine and Autodata employee Hans Otten testified that despite certain differences in the combination and ordering of steps of the two algorithms, the Versata algorithm embodied the essence of Autodata's algorithm.  See Trial Tr. (June 14, AM session) 128-33 (Otten testimony); Trial Tr. (June 14, PM session) 67-71 (Stubblebine testimony).  The jury was entitled to credit that testimony in its evaluation of Autodata's misappropriation claim.  In addition, the jury could reasonably have concluded from the evidence at trial regarding the events surrounding the disclosure of Autodata's ACE algorithm to Versata that Versata relied on the ACE algorithm to generate its own vehicle comparison algorithm.  Documentary and testimonial evidence supports Autodata's theory that Versata had not developed dynamic vehicle comparison technology as of 1997 and initiated the collaborative relationship with Autodata at least in part because of Autodata's success in developing that technology.  See Trial Tr. (June 11, PM session) 71-75, 172-73 (referencing a Versata report of the first meeting with Autodata stating: "They've [Autodata] already solved our [Versata's] problem of equivalent vehicle compare," and "They've also developed two in-house applications that provide price and equipment and dynamic competitive compare.").

Versata's second argument is that its non-disclosure agreements with Autodata permitted it to use Autodata's Ford schema internally to develop products for Toyota.  Versata contends that because the evidence did not show that the schema was actually transferred to Toyota, it was acting within the authority granted it under its agreements with Autodata and therefore cannot be held liable, based on the Ford schema, for either trade secret misappropriation or breach of

contract.  Versata has limited this "authorization" argument to the "Ford schema" trade secret and has not argued that it applies to the "ACE algorithm" trade secret.

In arguing that it was authorized to use the Ford schema in connection with its development of products for Toyota, Versata relies on the Master Services Agreement between the two companies, which is dated May 13, 1998, and in particular on Schedule B of the Master Services Agreement, which is dated October 28, 1998.  Schedule A of that agreement, which is dated May 13, 1998, authorized Versata to use Autodata's 1999 model year data for Ford, Lincoln, and Mercury, but only in connection with projects for the Ford Motor Company. Schedule B of the agreement, which has an effective date of October 28, 1998, authorized Versata employees to use non-current model year vehicle information in designing and prototyping "new consumer facing applications for automobile manufacturers."

At the outset, Autodata objects that Versata's argument was not raised in Versata's Fed. R. Civ. P. 50(a) motion for judgment as a matter of law at the close of the evidence and therefore cannot be raised in a post-verdict motion for JMOL under Fed. R. Civ. P. 50(b).  In its Rule 50(a) motion, Versata argued (1) that Autodata had not shown that its alleged trade secrets qualified as protectable trade secrets under Texas law; and (2) that Autodata had not shown that Versata misappropriated its trade secrets, because (a) Autodata did not show that Versata made any profitable use of the alleged trade secrets, and (b) Autodata did not offer any evidence of any injury caused by the use of the trade secrets.  As part of its argument regarding the failure of proof of profitable use of the trade secrets, Versata asserted that Autodata "offered no evidence that Versata ever provided the data schema in question to Toyota or (relatedly) that Toyota ever possessed the accused data schema."  Dkt. No. 283, at 7.  That assertion, however, was made in support of the legal argument that "Autodata cannot prove that Versata made use of any alleged

trade secret," and that Versata was entitled to judgment as a matter of law for that reason. Versata's present—and different—argument is that the misappropriation claim fails because Versata's contracts with Autodata authorized it to make "internal use" of the Ford schema, including use in connection with the products that were ultimately sold by Versata to Toyota independent of any joint enterprise with Autodata. Because Versata did not make that argument in its Rule 50(a) motion, it cannot rely upon that argument in this post-judgment Rule 50(b) motion. See Maryland Cas. Co. v. Acceptance Indemnity Ins. Co., 639 F.3d 701, 707 (5th Cir. 2011); Arsemont v. Spinnaker Exploration Co., 400 F.3d 238, 247 (5th Cir. 2005); Deffenbaugh-Williams v. Wal-Mart Stores, Inc., 188 F.3d 278, 284 n.5 (5th Cir. 1999).

Apart from that procedural issue, there are two substantive problems with Versata's argument. First, as noted, Versata's argument by its own terms is limited to the Ford schema; it does not apply to the ACE algorithm and therefore does not undermine the sufficiency of the evidence with regard to the misappropriation of the ACE algorithm trade secret. Both the initial non-disclosure agreements entered into by the parties at the outset of their relationship in November 1997 and the Master Services Agreement entered into in May 1998 contained broad prohibitions against the unauthorized use and disclosure of confidential information, which the jury could reasonably have found included the ACE algorithm. While Schedules A and B of the Master Services Agreement authorized the use of certain aspects of Autodata's Ford-related data for particular purposes, neither those schedules nor the other two agreements authorized the use of the ACE algorithm to develop products for Toyota.

Second, the effective date of Schedule B of the Master Services Agreement, on which Versata relies, was October 28, 1998. There was evidence at trial that Versata was using the Ford schema in connection with its Toyota project prior to that date, and specifically in August

1998.  Because Schedule B was not in effect before October 28, 1998, any use of the Ford schema in connection with the Toyota project would not have been authorized prior to that time and would have been in breach of the Master Services Agreement.

Versata argues that even though the Master Services Agreement recited that its effective date was May 13, 1998, it did not actually become effective until November 12, 1998, when it was signed.  For that reason, Versata contends, Schedule A of the agreement, which restricted Versata's use of the licensed data to the Ford project, was not in effect in August 1998.  There are two problems with that argument.  First, it is well established that the effective date of an agreement is not dictated by the date on which it is signed if the parties intend otherwise.  See Mid-Continent Cas. Co. v. Global Enercom Mgmt., Inc., 323 S.W.3d 151, 157 (Tex. 2010); Vick v. McPherson, 360 S.W.2d 866, 868 (Tex. Civ. App. 1962).  The Master Services Agreement and Schedule A of that agreement recited that they were to become effective as of May 13, 1998, and there is no reason to doubt that the recited effective date (and not the signature date) was the date that the parties meant for the agreement to become effective.  Second, if Versata is correct that the Master Services Agreement did not become effective until November 1998, then the two predecessor non-disclosure agreements that Versata signed in November 1997 (DX30 and DX37) would have governed the authorized treatment of the parties' confidential materials.  Those agreements prohibited each party from using the other's protected information "for [the party's] own benefit or the benefit of anyone else, or for any purpose other than to engage in discussions regarding a possible business relationship" (DX30), and prohibited the use of that information for any purpose "other than evaluating the software and business" of the other party (DX 37).  In either event, it was reasonable for the jury to conclude that the contract language in

effect in August 1998 prohibited Versata from using the schema in connection with its work for Toyota.

As to whether the evidence was sufficient to show that Versata used Autodata's ACE algorithm and its Ford schema in an unauthorized manner, Dr. Stubblebine testified that based on the internal Versata documents he reviewed, he concluded that Versata used the Autodata schema for the Toyota project.  See Trial Tr. (June 14, PM session) 15 ("Q: Do you have an opinion as to whether or not [Versata] used the AutoData schema from the Ford project in the Toyota project?  A. Yes.  Q. What's your opinion?  A: . . . my opinion is, yes, they used [it]."); Trial Tr. (June 14, AM session) 157-62 (referring to pseudo-algorithm equivalent to ACE algorithm in Versata document "where they're representing to Toyota that they can do vehicle comparison, it discloses the pseudo-algorithm for doing it").  Seth Krauss, a former Versata employee, admitted that Versata was using Autodata's vehicle comparison technology not only in connection with Ford, but "with some eye toward use at Toyota as well."  See Trial Tr. (June 15, AM session) 90; see also id. at 95 (detailing e-mails at Versata about using Autodata models with Toyota).  Additionally, there was documentary evidence, in the form of design and development documents from the Toyota projects, showing that Versata offered to provide vehicle comparison functionality to Toyota, and that Versata's vehicle comparison technology incorporated the algorithm and the database schema that Autodata alleged were its trade secrets. An internal Versata document, DX82, which was introduced at trial, reviews "the status of [Versata] software utilization at Toyota" and describes vehicle comparison functionality, including the detailed steps of the algorithm.  Hans Otten testified at trial about the similarities between the Autodata algorithm and the Versata algorithm described in DX82, see Trial Tr. (June 14, AM session) 127-32; (June 14, PM session) 89-10, and Dr. Stubblebine stated that he

reviewed internal Versata documents that showed that Versata was using the database schema in its project with Toyota. Thus, there was evidence at trial that the alleged trade secrets, including the implementation of the comparison algorithm, were used by Versata in an unauthorized manner to secure a commercial benefit in its dealings with Toyota. That is enough to support the jury's verdict. Accordingly, Versata's motion for JMOL challenging the jury's verdict on trade secret misappropriation and breach of contract is DENIED.

### C.    Trade Secret Damages

In its motion for JMOL, a new trial, or remittitur on damages (Dkt. No. 352), Versata argues that Autodata failed to prove damages for the misappropriation of trade secrets because its damages expert did not properly apportion the amount of Versata's profits that were directly attributable to the misappropriation. Versata also takes issue with that expert's methodology. At the very least, Versata argues, the damages award must be reduced to conform to the jury's verdict.

According to Versata, it was improper for the jury to award Autodata the full amount of Versata's $2,000,000 in profits from the Toyota-related projects because Autodata failed to prove that the profits on Versata's contracts with Toyota were entirely attributable to the misappropriated trade secrets.[3]  Versata argues that Autodata's damages expert, Alan Ratliff,

---

[3]    Versata states that Autodata has relied on the "entire market value" rule from patent law, which provides that when the accused features of a product are the basis for customer demand for the product, the party may recover damages based on the entire value of the accused product. See Rite-Hite Corp. v. Kelly Co., 56 F.3d 1538, 1549 (Fed. Cir. 1995) (en banc). While seeming to object to the use of that approach, Versata does not specifically argue against that rationale, but instead simply states that "assuming arguendo that the entire market value rule applies in trade secret cases, the evidence here is not up to the task Autodata assigns to it." Dkt. No. 352 at 5. In any event, all that is at issue here is whether the evidence supports the jury's finding that Autodata's trade secrets were of sufficient importance to Versata's work on the Toyota project that requiring Versata to disgorge all of its profits on the Toyota contracts is an appropriate remedy on the facts of this case.

never presented any evidence that the basis for Toyota's interest in Versata's software was the Autodata trade secrets and that there was no evidence such as "market surveys, demand curves, . . . historical sales evidence, comparable licenses, or any other form of economic evidence" that would explain the basis for that demand. Dkt. No. 352 at 6.

The jury could reasonably find damages in the amount of $2,000,000 based on Mr. Ratliff's testimony and other evidence in the record.  Mr. Ratliff explained that the database schema, one of Autodata's asserted trade secrets, was incorporated into the vast majority of the software components sold by Versata.  See Trial Tr. (June 14, PM session) 125.  In addition, Mr.. Ratliff testified that the basis for the demand for Versata's product was the "compare" functionality enabled by the misappropriated schema.  See, e.g., id. at 97 (describing looking at documents that "highlight[ed] that there was a need by [Versata] for the comparison functionality"); id. at 99 (Mr. Ratliff's damages estimate was based on his experience and "information from market studies which have shown us how important comparison and configuration were in this late '90s time frame.").  Besides Mr. Ratliff, Dr. Stubblebine testified about how Versata used Autodata's schema in preparing products for Toyota.  See Trial Tr. (June 14, PM session) 16-20, 62-65.

Mr. Ratliff testified that in the course of formulating his opinion he considered various documents relating to Versata's work, including its work on the Toyota projects.  See Trial Tr. (June 14, PM session) 93 (Mr. Ratliff considered financial records, contracts, and business documents produced by the parties, as well as "independent research performed by the parties."). He also drew upon his prior experience working on projects for automobile manufacturers and dealers, including Toyota franchises, as well as working on projects for "automotive eCommerce service providers."  Id. at 93-94.  Mr. Ratliff was not obligated to produce the actual market

studies, comparable licenses, or other information on which he relied, and Versata was free to explore the shortcomings of his approach on cross-examination.  See Fed. R. Evid. 705 ("Unless the court orders otherwise, an expert may state an opinion—and give the reasons for it—without first testifying to the underlying facts or data.  But the expert may be required to disclose those facts or data on cross-examination.").

Versata argues that Mr. Ratliff admitted on cross-examination that only one-half of Versata's profits were attributable to the misappropriated trade secrets and therefore that an award of all of Versata's profits on the Toyota contracts is unsupportable.  That argument is based on a misreading of Mr. Ratliff's testimony.  In the portion of his cross-examination on which Versata relies, Mr. Ratliff was discussing the alternative damages theory that he set forth in his expert report, which incorporated a 50% reduction in the amount of his principal damages calculation of $2,000,000.  Mr. Ratliff made clear that his alternative damages theory was just that—a theory of damages that assumed the fact-finder was not prepared to accept the proposition that all of Versata's Toyota contract profits were attributable to the misappropriated trade secrets.  But Mr. Ratliff made clear that his principal damages theory was that $2,000,000 was the proper amount of damages for the trade secret misappropriation and he explained why he concluded that was so.  Moreover, in his cross-examination, Mr. Ratliff stated that he believed "not less than 50 percent would be attributable" to the profits derived from the compare functionality and the schema.  See Trial Tr. (June 14, PM session) 146.  His reference to a lower limit on the amount attributable to the misappropriation did not preclude the jury from awarding a higher amount if it chose to credit his testimony that the trade secrets were incorporated into multiple components of Versata's software and were the primary driver of demand for the product.  Mr. Ratliff's statements on cross-examination therefore did not negate the probative

force of his testimony that $2,000,000 was the proper amount of damages on the trade secret misappropriation claim.

Versata had ample opportunity on cross-examination to point out any flaws in Mr. Ratliff's damages calculation as well as the putative inconsistencies between his primary and alternative calculations.  Versata also presented its own damages expert, see Trial Tr. (June 13, PM session) 37-99, but Versata's expert did not offer an opinion during trial as to what he thought the damages for the misappropriation claim should be if a misappropriation had occurred.  At the end of the day, the jury apparently chose to believe Mr. Ratliff's testimony, which it was entitled to do.

In objecting to the damages award, Versata relies on the Fifth Circuit's decision in MGE UPS Systems, Inc., v. GE Consumer & Industrial, Inc., 622 F.3d 361 (5th Cir. 2010).  In MGE, after certain damages evidence was struck at the close of the plaintiff's case, the only evidence remaining to support the plaintiff's damages claim was a chart showing the defendant's total revenues earned from all sources of income.  622 F.3d at 369.  The problem in MGE was that the plaintiff had not presented evidence that provided "any means of distinguishing revenue [the defendant] gained from other sources from revenue gained through misappropriation of MGE's trade secrets, let alone a calculation of profits from the relevant portion of revenue."  Id.  That is a far cry from the evidence in this case, where the jury was entitled to conclude that the trade secrets were the basis for the core features of the products offered to Toyota and that Versata's profits on the Toyota contracts were therefore entirely attributable to the trade secrets.  The MGE case therefore does require that the jury's verdict on damages be overturned.

Versata next claims that the damages award was inconsistent with the verdict form and must be reduced to conform to the jury's findings as reflected in the special verdict.  The claimed

inconsistency stems from the fact that the verdict form asked whether "Autodata has proved by a preponderance of the evidence that Versata misappropriated Autodata's alleged trade secret(s) in applications and components provided to Toyota in 1998," whereas the evidence presented by Mr. Ratliff involved three contracts, two from 1998 and one from 2000. Neither party objected to the verdict form in that respect or pointed out that the reference to 1998 did not explicitly include the third contract, which was executed in 2000. Versata now asks that the jury award be reduced by the amount of the profits on the 2000 contract, arguing that the inclusion of that sum in the award is not supported by the verdict form, which referred to 1998.

The 2000 Toyota contract was not an independent contract, but an "assignment order" relating to the initial 1998 agreement between Versata and Toyota. During the trial, both parties repeatedly referred to the three contracts collectively and did not distinguish between the different years in which those contracts were signed. See, e.g., Trial Tr. (June 14, PM session) 140; see also id. at 99-100 (describing "the '98-2000 time frame" for the contracts); id. at 127-28 (lumping the three contracts together). In fact, in his closing argument, Versata's attorney referred to the misappropriation allegations and characterized those allegations as turning on whether Autodata had proved "that the alleged trade secrets . . . were misappropriated by [Versata] in applications and components provided to Toyota in 1998." Trial Tr. (June 15, PM session) 65.

In light of the unitary manner in which the parties treated the three Toyota contracts, it was reasonable for the jury to interpret the question in the special verdict form as referring to the entire group of contracts implicated in the misappropriation claim, not as limited to two out of the three contracts based on the year in which each was executed. At trial, Versata never attempted to differentiate between the contracts that were entered into in 1998 and the one

entered into in 2000.  Not having raised this matter in connection with the verdict form, Versata cannot now complain that the jury apparently interpreted the reference to 1998 in the verdict form as a shorthand way of referring to the three contracts collectively.

In any event, the question on the verdict form relating to damages from the misappropriation asked the jury to determine how much, if any, of Versata's profits "from the Toyota contracts" were attributable to Autodata's trade secrets.  That question was not limited to the 1998 contracts, so the jury's answer of $2,000,000 need not be read as restricted to the 1998 contracts, even if the jury interpreted the question about misappropriation as requiring it to focus on applications and components provided to Toyota pursuant to the 1998 contracts.

Finally, Versata contends that a new trial (or a remittitur) is required because the jury's award of $2,000,000 in damages is excessive and is contrary to the weight of the evidence.  For the reasons stated above, this Court rejects that argument because there was substantial evidence supporting the jury's damages award and because the verdict was not excessive.  The purported gaps in the evidence and expert testimony in support of the damages claim "go to the weight of the evidence, which the jury was free to balance and [Versata] was free to argue."  Wackman v. Rubsamen, 602 F.3d 391, 403 (5th Cir. 2010).  While the jury awarded Autodata the full amount of the damages it sought, the award was supported by evidence, and the Court finds no basis on which to overturn the award, reduce it, or grant a new trial on damages.  See, e.g., SynQor, Inc. v. Artesyn Techs, Inc., No. 2:07-cv-497, 2011 WL 3625036, at *3 (E.D. Tex. Aug. 17, 2011) ("when there is a substantial evidentiary basis for the award, a verdict is not excessive merely because a jury awards every dollar requested by the plaintiff"); see also Shows v. Jamison Bedding, Inc., 671 F.2d 927, 930 (5th Cir. 1982) (A trial judge may not "order a new trial simply because he disagrees with the jury verdict.  He must be convinced that the verdict is against the

great weight of the evidence."). Versata's motion for JMOL, a new trial, or remittitur on damages is therefore DENIED.

### D. Nominal Damages for Breach of Contract

In its motion for JMOL or a new trial on the breach of contract claim due to lack of injury (Dkt. No. 351), Versata argues that Autodata failed to prove that it suffered monetary damages on its breach of contract claim and that the jury's award of $1 in nominal damages was therefore improper. The Court previously addressed the issue of nominal damages in an order issued on June 30, 2012. (See Dkt. No. 341) The Court now supplements that discussion with the following:

Versata first argues that proof of damages is an essential element of an action for breach of contract under Texas law and that because Autodata did not offer evidence that it was entitled to money damages, its cause of action for contract breach failed. Contrary to Versata's statement, however, it is proof of injury that is an essential element of a contract breach under Texas law, not proof of "damages." In contract cases, injury (or "damage") can often be remedied only by an award of "damages," and often only money damages are sought. If that is the case, proof of money damages is, of course, essential to recovery. But monetary relief is not invariably the objective of breach of contract claims. As long as there is injury from the breach, liability attaches under Texas law; the question whether that liability gives rise to the remedy of damages or some other remedy, such as specific performance, is a matter for the law of remedies. See Intercont'l Grp. P'ship v. KB Home Lone Star L.P., 295 S.W.3d 650, 655 n.26 (Tex. 2009) ("[M]oney damages are essential in contract claims seeking money damages (though not for contract claims seeking something else)."). A claim for breach of contract in which

actual damages are not the sole objective therefore does not fail because of the plaintiff's inability to prove monetary loss and entitlement to an award of damages.[4]

Prior to trial, Autodata asserted that Versata's contract breaches were material and had caused harm to Autodata, and that it would seek an injunction against the use of Autodata's confidential and trade secret information, and an award of attorney's fees.  Autodata did not assert that it would seek an award of monetary damages if it were able to prove the alleged breaches.  Consistently with that position, Autodata did not seek actual damages for the breach at trial.  Instead, Autodata sought nominal damages of $1, which the jury awarded.  Autodata then sought equitable relief from the Court, as it had earlier indicated that it intended to do.

Versata argues that because Autodata did not seek, and did not prove, actual monetary damages, Autodata failed to satisfy one of the essential elements of breach of contract under Texas law.  The Court disagrees.  The jury was instructed that in order to rule in favor of Autodata on the breach of contract claim, it had to find that Versata's breach caused injury to Autodata.  Autodata's evidence regarding the misappropriation of its confidential information

---

[4]   The imprecision that has crept into some descriptions of the elements of the contract breach cause of action under Texas law may stem from lack of care in distinguishing between the term "damage"—a term that refers to some form of injury, and "damages"—a term of art that refers to a remedy that entails monetary relief.  See Bryan A. Garner, A Dictionary of Modern Legal Usage 243 (1995) ("Often, however, the words [damage and damages] are misused.").  While the Texas intermediate appellate courts have often used the term "damages" in describing the fourth element of a breach of contract claim, they have also frequently used the term "damage" or "damaged" to describe that element.  See Moreno v. Silva, 316 S.W.3d 815, 819 (Tex. App. 2010) (referring to the fourth element of contract breach as proof "that the plaintiff was damaged"); Henriquez v. Cemex Mgmt., Inc., 177 S.W.3d 241, 248 n.6 (Tex. App. 2005); New York Life Ins. Co. v. Miller, 114 S.W.3d 114 (Tex. App. 2003) (same); Sullivan v. Smith, 110 S.W.3d 545, 546 (Tex. App. 2003) (same).  It appears to this Court that when referring to the elements of the cause of action for breach of contract generally, the Texas courts mean to refer to the concept of "damage" or "injury," not the remedy of "damages."  Indeed, the Texas Supreme Court has drawn precisely that distinction in stating that a required element of a breach of contract action seeking "money damages" is that the plaintiff prove that it "was in fact damaged by the breach."  Intercont'l Grp., 295 S.W.3d at 655 n.27.

was sufficient to support the jury's conclusion that the contract breach injured Autodata.   In particular, the jury could have concluded, based on testimony from Autodata's employees, that Autodata was harmed by Versata's acts of depriving Autodata of the benefits of exclusive control over and use of its trade secrets and using the information to obtain patents that were asserted against Autodata, even though Autodata was not able to quantify its injury so as to establish a right to actual monetary damages.   See Trial Tr. (June 13, PM session) 23-24, 199-207; Trial Tr. (June 14, AM session) 29-33.   Versata's argument that Autodata failed to prove breach of contract therefore fails.

Versata's second, and related, argument is that because Autodata did not prove actual damages, it was not entitled to nominal damages on its breach of contract claim.   Again, the Court disagrees.   As the Texas Supreme Court wrote recently, "nominal damages are available for breach of contract, as this Court has stated at least a dozen times."   MBM Fin. Corp. v. Woodlands Operating Co., 292 S.W.3d 660, 664 (Tex. 2009).   The court in the MBM case explained that nominal damages are available in situations in which a legal injury is suffered yet "there is no substantial loss or injury to be compensated."   292 S.W.3d 660, 665 n.19 (Tex. 2009); see also Trevino v. Sw. Bell Tel. Co., 582 S.W.2d 582, 584 (Tex. Civ. App. 1979) ("Nominal damages are those damages recoverable where a legal right is to be vindicated against an invasion that produced no actual loss, or where, from the very nature of the case, some injury has been done, the amount of which the proof fails to show.").

It is true, as Versata points out, that Texas courts have held that nominal damages are not appropriate "when the harm is entirely economic and subject to proof" but the plaintiff fails to prove the amount of its loss.   MBM Fin., 292 S.W.3d at 665; see also Intercont'l Grp., 295 S.W.3d at 660 ("[A] breach-of-contract plaintiff who seeks nothing beyond economic damages

cannot receive a judgment based on breach alone."); Buttross V., Inc. v. Victoria Square Condominium Homeowners' Ass'n, Inc., No. 03-09-526-CV, 2010 WL 3271957, at *11-12 (Tex. App. 2010).  But the unauthorized disclosure of confidential information is a type of harm that can have consequences that are not readily measurable in the form of monetary loss.  In such cases, non-monetary relief can be appropriate, and Autodata made clear that it was requesting such non-monetary relief for the contract breach in this case.  This is therefore not a case in which the asserted harm was purely economic and the party seeking relief simply failed to prove the amount of its loss.

The parties in this case entered into two principal contracts: the 1997 Confidentiality Agreement (see Versata's Motion for Partial Summary Judgment, Ex. 3, Dkt. No. 151-4) and the 1998 Master Services Agreement (see id. Ex. 6, Dkt. No. 151-7).  Both agreements contain confidentiality provisions.  The former was executed when the parties began discussing the prospect of collaborating; it covered the treatment of confidential information disclosed in the course of those negotiations or work between the parties.  The latter was executed six months later when the parties established their collaborative relationship; it established the terms and conditions under which Autodata would provide certain confidential information to Versata during the term of the agreement.  It required that the information be maintained in confidence and used only as authorized.

Although Versata disputes that it ever disclosed Autodata's trade secrets, it does not appear to dispute that if it disclosed any trade secrets, those disclosures would constitute a breach of the contractual non-disclosure provisions.  Instead, Versata argues that Autodata failed to prove any economic loss from the breach and that for that reason it was not entitled to nominal damages.  But that is the kind of situation in which an award of nominal damages is permitted—

when legal injury is shown but the legal injury has not caused economic harm that would be compensable through a monetary award of actual damages.  See MBM Fin., 292 S.W.3d at 664 (if the plaintiff proves breach of the contract, "the law would give some damage, sufficient to authorize a verdict for the plaintiff, although, in the absence of proof of special loss, the damages would be nominal only") (citation and quotation omitted); Huntington Corp. v. Inwood Const. Co., 472 S.W.2d 804, 808 (Tex. Civ. App. 1971) (the trial court, "having found that the appellant failed to bring forward sufficient evidence to establish its damages, was justified in applying the award of nominal damages").

Moreover, although Versata now contends that any injury Autodata suffered from the contract breaches was entirely economic and could give rise only to a right to monetary relief, which Autodata failed to prove, that was not the position the parties took in the Master Services Agreement that was found to have been breached.  In that agreement, the parties agreed that a breach of the nondisclosure provisions of the contract "would cause serious and irreparable harm to the non-breaching party which could not be adequately compensated for in damages."  It is therefore contrary to the position to which Versata agreed in the Master Services Agreement for it now to be arguing that any injury resulting from the contract breaches is economic only and therefore cannot support an award of nominal damages.[5]

When drafting a jury instruction on damages during the trial, the Court explained that it based the nominal damages instruction on a case cited by Versata, Southwest Airlines Co. v.

---

[5]   Following the verdict in this case, the court denied Autodata's request for an injunction based on its breach of contract claim.  See Dkt. No. 343.  The denial of an injunction, however, was based on the court's conclusion that in light of the passage of time since the breach, Autodata could not point to any continuing injury from the breach, and therefore equitable relief was no longer necessary.  The court did not conclude that the legal injury was the kind that could never give rise to equitable relief because any injury suffered by Autodata was necessarily economic only.

BoardFirst, L.L.C., No. 06-cv-891, 2007 WL 4823761 (N.D. Tex. Sept. 12, 2007).  Versata now attempts to distinguish that case, arguing that in Southwest Airlines "a damages expert opined at length about the injury that Southwest Airlines had suffered as a result" of the breach of contract, including decreased sales and advertising.  Dkt. No. 351 at 6.  Versata argues that in this case, by contrast, no witness offered testimony about any injury resulting from the alleged breach.

Versata's factual distinction of Southwest Airlines misses the point of the Court's reference to that case.  The Court did not rely on Southwest Airlines because of the court's holding in that case, but rather for the court's statement of the governing principle of Texas law regarding the availability of nominal damages in contract breach cases.  Versata has not suggested that Judge Boyle's comprehensive discussion of that point of Texas law in the Southwest Airlines case was erroneous.  Based in part on that authority, the Court instructed the jury that it could determine that a contract breach was shown in this case if it concluded that Versata breached its contractual obligations to Autodata and the breach caused harm to Autodata. The Court further instructed the jury that if it found that actual damages were not shown, it could award nominal damages "in the amount of one dollar if that party has proved that a contract was formed and breached."  The Court is satisfied that the instruction given was consistent with Texas law regarding nominal damages in light of the evidence offered and the relief sought by Autodata.  Because this was not a case in which the injury complained of took the form of a monetary loss that was readily calculable, the jury was entitled to conclude, upon finding a contract breach, that an award of nominal damages was appropriate.  Versata's motion for JMOL or a new trial on Autodata's breach of contract claim due to lack of injury is therefore DENIED.

### E.  "Prevailing Party" for Purposes of the Award of Costs

In its challenge to the award of costs in the Court's final judgment (Dkt. No. 349), Versata argues that Autodata was not the "prevailing party" on its breach of contract claim because it received only nominal damages and did not receive the equitable relief it sought from the Court.   Citing Texas cases, Versata argues that "[a]n award of nominal damages without injunctive relief does not render Autodata the prevailing party under Texas law."  Dkt. No. 349 at 2.

The problem with Versata's position is that the "prevailing party" determination that was made in connection with the award of costs is governed not by Texas law but by federal law. Rule 54(d) of the Federal Rules of Civil Procedure provides that an award of costs "should be allowed to the prevailing party."  Because that determination is a procedural matter governed by the Federal Rules of Civil Procedure, federal law applies, not state law, even if the underlying cause of action arose under state law.  See Hanna v. Plumer, 380 U.S. 460 (1965); Carter v. Gen. Motors Corp., 983 F.2d 40, 43 (5th Cir. 1993) ("federal procedural law ordinarily governs the award of costs in diversity cases"); Cates v. Sears, Roebuck & Co., 928 F.2d 679, 689 (5th Cir. 1991) ("no violence is done to the twin aims of the Erie doctrine by the application of federal procedural provisions to the taxing of costs"); 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2669, at 251 (1998) ("The award of costs is governed by federal law.").  Accordingly, in connection with deciding the issue of costs in this case, and in particular in determining whether Autodata was a "prevailing party" with respect to the contract breach claim for purposes of determining whether to award costs, federal law applies, and Versata's extensive citations to Texas law cases not involving the award of costs are beside the point.

Under federal law, a party who obtains a judgment is the "prevailing party" for purposes of an award of costs even if the relief obtained by the party is limited to nominal damages.  The Fifth Circuit has said exactly that in a diversity case involving a breach of contract claim arising under state law.  Three-Seventy Leasing Corp. v. Ampex Corp., 528 F.2d 993, 998 (5th Cir. 1976) ("In our view, the award of nominal damages marks the plaintiff, . . .  as the 'prevailing party' within the meaning of Rule 54(d)."); see also Friends for All Children, Inc. v. Lockheed Aircraft Corp., 725 F.2d 1392, 1398 (D.C. Cir. 1984) ("a party obtaining at least nominal damages may be considered as having prevailed and be eligible for a cost award under Rule 54(d)"); 10 Federal Practice & Procedure § 2667, at 220.  The jury in this case awarded Autodata nominal damages on its contract breach claim, and the court entered judgment on that claim.  Under governing Fifth Circuit law, Autodata must be regarded as the "prevailing party" for purposes of the award of costs, regardless of whether the receipt of nominal damages would be sufficient to render a party the "prevailing party" under state law for an award of costs or for other purposes.  Accordingly, Versata's motion to alter or amend the final judgment is DENIED.

### F. Attorney's Fees for Autodata's Breach of Contract Claims

In its Motion for Award of Attorney's Fees (Dkt. No. 348), Autodata seeks attorney's fees for work performed and expenses incurred in connection with its breach of contract claim against Versata.  Autodata contends that it is contractually entitled to an award of attorney's fees because it was the prevailing party on that claim.  As part of its motion, Autodata argues that the fee award should include most of its fees and expenses for the entire litigation because the work done in connection with the breach of contract claim was related to work done in connection with other claims and defenses in the case.  Autodata also seeks to recoup those portions of its court costs that were not covered by the parties' Agreed Motion for Taxation of Section 1920

Costs (Dkt. No. 347) as well as anticipated appellate fees if Versata should choose to appeal the judgment.  The total amount of the award Autodata seeks is $4,669,793.39 in fees and expenses.

Versata opposes any award of fees.  It argues that the jury's award of nominal damages does not make Autodata a "prevailing party" on the breach of contract claim and that a fee award must be denied for that reason.  In opposing the fee request, Versata also relies on the arguments it made in its Motion to Alter or Amend Final Judgment Under Rule 59(e) (Dkt. No. 349), and in its Motion for Judgment as a Matter of Law, or in the Alternative, New Trial on Autodata's Breach of Contract Claim Due to Lack of Injury (Dkt. No. 351), which were addressed earlier in this order.  Versata also contends that Autodata has failed to submit sufficiently detailed and comprehensive records to justify its claim for fees, and that it has improperly sought fees for claims and defenses unrelated to the breach of contract claims.  Accordingly, Versata argues that Autodata's fee claim should be denied in its entirety.

Ordinarily, an award of attorney's fees for a claim arising under Texas law presents a jury question.  Bocquet v. Herring, 972 S.W.2d 19, 21 (Tex. 1998).  In this case, however, the parties agreed to leave the issue of the attorney's fee award to the Court.  The Court will therefore proceed to address the attorney's fee issue based on the materials provided to it by the parties.

### 1.   The Effect of the Nominal Damages Verdict on the Attorney's Fee Request

Texas has long followed the "American Rule" that parties are ordinarily required to bear their own attorney's fees.  MBM Fin. Corp. v. Woodlands Operating Co., 292 S.W.3d 660, 669 (Tex. 2009); Intercont'l Grp. P'ship v. KB Home Lone Star L.P., 295 S.W.3d 650, 653 (Tex. 2009); Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 310-11 (Tex. 2006).  By statute, however, Texas provides for attorney's fee awards in cases in which a party brings a successful claim for breach of contract.  Tex. Code Ann. Civ. Prac. & Rem. § 38.001(8).  In cases such as

this one, in which the parties have addressed the attorney's fee issue in their contracts, the statute does not control, as the parties "'are free to contract for a fee-recovery standard either looser or stricter' than the fee-recovery standards provided by statute, and courts are bound by the parties' choice." <u>Mohican Oil & Gas, LLC v. Scorpion Exploration & Prod., Inc.</u>, 337 S.W.3d 310, 321 (Tex. App. 2011), quoting <u>Intercont'l Grp.</u>, 295 S.W.3d at 653.

The 1997 Confidentiality Agreement provides that in the event of litigation over a claimed breach of the agreement, the "prevailing party . . . shall be paid reasonable attorney's fees and court costs." Similarly, the 1998 Master Services Agreement calls for the breaching party to "indemnify . . . the non-breaching party . . . against any and all damages, costs, or expenses incurred or suffered by the non-breaching party as a result of [a] breach, including all attorney's fees and court costs associated with the breach." Although the 1997 agreement refers to fees being awarded to the "prevailing party," the 1998 agreement does not use that term. Nonetheless, Autodata treats both agreements as if they contained a "prevailing party" requirement. See Dkt. No. 348 at 3 ("[U]nder the parties' agreements, the 'prevailing party' in the action shall be entitled to recover 'from the party in breach' its attorney's fees and other legal expenses related to claims arising from the breach of contract."). In light of Autodata's position on that issue, to which Versata does not object, the Court will treat both agreements as requiring the fee applicant to show that it is the "prevailing party" in order to be eligible for a fee award.

Although the Master Services Agreement provides that it is to be governed by and construed in accordance with Michigan law, neither party has relied on that provision of the Agreement; instead, both parties have treated the contractual provisions on attorney's fees as governed by Texas law. The Court treats the parties' exclusive reliance on Texas law in connection with the contractual claim for attorney's fees as acquiescence in the applicability of

Texas law and a waiver of any rights either party might have asserted under Michigan law.  See

Southwest Airlines Co. v. BoardFirst, L.L.C., No. 06-cv-891, 2007 WL 4823761, at *4 (N.D.

Tex. Sept. 12, 2007) ("Having cited Texas cases through its briefing, BoardFirst appears to have

acquiesced in the application of Texas law.").  The Court will therefore address the merits of

Autodata's contractual claim for attorney's fees under Texas law.[6]

Versata contends that Autodata was not the "prevailing party" on its breach of contract

claim because Autodata obtained only nominal damages on that claim.  Although Autodata

sought equitable relief in connection with the breach of contract claim, this Court denied that

request, so the only remedy Autodata received on that claim was the one dollar in nominal

damages awarded by the jury.

In its 2009 decision in MBM Fin. Corp. v. Woodlands Operating Co., 292 S.W.3d 660,

666 (Tex. 2009), the Texas Supreme Court noted that it had "never said whether nominal

damages are enough" to support an award of attorney's fees.  The court did not resolve that

question, as it held that the party seeking fees could not even recover nominal damages.  In

Intercontinental Group Partnership v. KB Home Lone Star L.P., 295 S.W.3d 650, 657 (Tex.

2009), decided the same day as MBM Financial, the Texas Supreme Court again sidestepped the

question whether nominal damages can support an award of attorney's fees.  In that case, the jury

found that Intercontinental had breached a written contract with KB Home, but it awarded zero

---

[6]   Unlike its treatment of the issue of costs, see Carter v. Gen. Motors Corp., 983 F.2d 40, 43
(5th Cir. 1993), the Fifth Circuit treats issues involving entitlement to attorney's fees in
connection with state law causes of action as governed by state law, not federal law.  See Shelak
v. White Motor Co., 636 F.2d 1069, 1072 (5th Cir.1981) ("Our cases have made it clear that in
an ordinary diversity case, state rather than federal law governs the issue of the awarding of
attorney's fees.").  That rule extends to both eligibility for and the reasonableness of fees.  See
Mathis v. Exxon Corp., 302 F.3d 448, 461 (5th Cir. 2002) ("State law controls both the award of
and the reasonableness of fees awarded where state law supplies the rule of decision.").  This
Court accordingly applies state law in assessing Autodata's contract-based request for attorney's
fees.

dollars in damages.  Id. at 652.  The court held that the award of attorney's fees in that case was improper because KB Home "got nothing except a jury finding that Intercontinental violated the contract.  It recovered no damages; it secured no declaratory or injunctive relief; it obtained no consent decree or settlement in its favor."  Id. at 655.[7]

Consistent with Intercontinental Group, numerous Texas cases have held that a plaintiff in a contract breach case who obtains a verdict finding a breach but who is awarded no damages or other relief is not a "prevailing party" for purposes of an attorney's fee award.  See Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997); State Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 437 (Tex. 1995); Mustang Pipeline Co. v. Driver Pipeline Co., 134 S.W.3d 195, 201 (Tex. 2004); Chambers v. First United Bank & Trust Co., 02-11-47-CV, 2012 WL 1556091, at *9 (Tex. App. May 3, 2012); Garza v. Villarreal, 345 S.W.3d 473, 484-85 (Tex. App. 2011); Medistar Corp. v. Schmidt, 267 S.W.3d 150, 165 (Tex. App. 2008); Cytogenix, Inc. v. Waldroff, 213 S.W.3d 479, 489 (Tex. App. 2006); G.R.A.V.I.T.Y. Enters., Inc. v. Reece Supply Co., 177 S.W.3d 537, 547-51 (Tex. App. 2005) (comprehensively reviewing Texas authorities); see also Ryan Energy Techs. V. CDG-MWD GP, L.L.C., No. Civ.A. H-04-3135, 2006 WL 213916, at *7 (S.D. Tex. Jan 27, 2006); Alcatel USA, Inc. v. Cisco Sys., Inc., 239 F. Supp. 2d 660, 674-76

---

[7]   Autodata argues that the $2,000,000 award it received on its trade secret misappropriation claim distinguishes this case from Intercontinental Group, presumably because Autodata received meaningful monetary relief on a related claim.  The $2,000,000 verdict on the misappropriation claim, however, was based on a theory of disgorgement of profits.  Texas courts have held that disgorgement is not an available remedy for breach of contract under Texas law, which may explain why Autodata did not seek any remedy other than injunctive relief and nominal damages on its breach of contract claim.  See Henry v. Masson, 333 S.W.3d 825, 849 (Tex. App. 2010); Bancservices Grp., Inc. v. Strunk & Assocs., L.P., No. 14-03-797-CV, 2005 WL 2674985, at *6 (Tex. App. 2005).  The $2,000,000 award on Autodata's misappropriation claim therefore cannot be treated as a de facto form of monetary relief on Autodata's breach of contract claim.

(E.D. Tex. 2002).[8]  The Court therefore has no difficulty in concluding that under Texas law, a plaintiff in a contract breach case must recover damages or obtain some other affirmative relief in order to be considered a "prevailing party" for purposes of an attorney's fee award.  The question the Court must answer in this case is whether a verdict of $1 in nominal damages mandates a fee award when a verdict awarding no damages does not.

Although the answer to that question is not free from doubt, the Court concludes that Texas courts would treat an award of nominal damages as equivalent to an award of no damages in determining whether a party who asserts a claim of breach of contract is a "prevailing party" for purposes of an attorney's fee award.

The Texas Supreme Court's decision in the Intercontinental Group case is enlightening on this point.  Although the court did not conclusively resolve the issue, the court's analysis strongly supports Versata's position that an attorney's fee award is not appropriate where the only relief obtained by the party seeking fees is nominal damages.  The court in that case rejected the plaintiff's argument that it should recover attorney's fees because it had "sued to 'declare rights' under the contract and prevailed by obtaining a jury verdict that Intercontinental breached the contract."  295 S.W.3d at 656.  The court concluded that although the jury's finding that Intercontinental breached its contractual obligation to the plaintiff may have been "satisfying as a

---

[8]    There is contrary authority from some intermediate appellate courts in Texas, see Johns v. Ram-Forwarding, Inc., 29 S.W.3d 635, 638 (Tex. App. 2000); Atl. Richfield Co. v. Long Trusts, 860 S.W.2d 439, 450 (Tex. App. 1993), but it appears that those decisions are no longer good law (if they ever were) in light of the Texas Supreme Court's decision in Intercontinental Group. See Glattly v. Air Starter Components, Inc., 332 S.W.3d 620, 641-42 (Tex. App. 2010).  In addition, some Texas courts have held that a defendant who defeats a plaintiff's breach of contract claim can recover contract-based attorney's fees even without recovering monetary damages, see, e.g., Robbins v. Capozzi, 100 S.W.3d 18, 27 (Tex. App. 2003), but that situation is obviously quite different from that of a plaintiff who seeks affirmative relief for a contract breach.

matter of principle," the "purely technical or de minimis" success obtained by the plaintiff "affords no actual relief on the merits that would materially alter [the plaintiff's] relationship with Intercontinental." Id. at 656-57 (citation and quotation omitted).  The court explained that while the plaintiff was "perhaps a 'nominal winner' in convincing the jury that it was 'wronged,' [it] cannot be deemed a 'prevailing party' in any non-Pyrrhic sense." Id. at 657 (internal citation omitted).

That analysis applies equally to an award of nominal damages as to an award of no damages at all.  The judgment on Autodata's breach of contract claim in the amount of one dollar in damages and no equitable relief is just such a de minimis victory; it rendered Autodata a "nominal winner" in this case in the same way that the declaration of breach and award of no damages did in Intercontinental Group.  In both instances, the verdict can best be characterized as an acknowledgement that although the complainant established that the opposing party breached the contract, the breach did not result in any monetary harm for which the plaintiff was entitled to be compensated or give rise to a right to equitable relief of any sort.  See Intercont'l Grp., 295 S.W.3d at 655 ("A stand-alone finding on breach confers no benefit whatsoever").  As such, the jury's verdict in this case, combined with the Court's denial of Autodata's request for equitable relief, is not materially different from the naked declaration of breach in Intercontinental Group, which that court concluded could not support an attorney's fees award. See 295 S.W.3d at 656-57; see also MBM Fin., 292 S.W.3d at 670 (rejecting the argument that a party should be entitled to fees because, although it recovered no damages on its breach of contract claim, it secured a declaratory judgment of breach).

The court in the Intercontinental Group case discussed the United States Supreme Court's decision in Farrar v. Hobby, 506 U.S. 103 (1992).  In Farrar, the Supreme Court held that a

plaintiff who obtained an award of nominal damages was a "prevailing party" under the federal civil rights attorney's fee statute, 42 U.S.C. § 1988, but that the plaintiff nevertheless was not entitled to attorney's fees on the ground that a "plaintiff who seeks compensatory damages but receives no more than nominal damages is often [the type of] prevailing party" who should receive no attorney's fees at all.  506 U.S. at 112, 115.  That was because "the awarding of nominal damages also highlights the plaintiff's failure to prove actual, compensable injury."  Id. at 115.  In its discussion of Farrar, the Texas Supreme Court in Intercontinental Group emphasized the importance to the denial of attorney's fees in Farrar that the plaintiff had not obtained any "genuine success" or meaningful relief on its contract claim, as the outcome of the case had not "materially altered the legal relationship" between the parties.  295 S.W.3d at 655 ("Whether a party prevails turns on whether the party prevails upon the court to award it something, either monetary or equitable.").

Although the Intercontinental Group case involved an award of no damages rather than an award of nominal damages, an earlier decision suggests that the Texas Supreme Court would not distinguish between those situations for purposes of authorizing an award of attorney's fees. In that case, Southwestern Bell Mobile Systems, Inc. v. Franco, 971 S.W.2d 52 (Tex. 1998), the court addressed attorney's fee claims by two plaintiffs, Franco and Mendez.  Because Franco had obtained equitable relief on her claim, the court that she was entitled to attorney's fees.  Mendez, however, obtained no relief on her claim, and the court held that she was not entitled to a fee award.  In discussing Mendez's fee claim, the court noted that she had not obtained "meaningful relief."  The Franco court noted that in Farrar the U.S. Supreme Court had held that fees should not be awarded to a plaintiff "who seeks compensatory damages but receives no more than nominal damages," and it characterized Mendez as "such a plaintiff, [who] therefore should not

recover attorney's fees."   <u>Franco</u>, 971 S.W.2d at 56, quoting <u>Farrar</u>, 506 U.S. at 107.   The

decision in <u>Franco</u> is not a square holding against Autodata, because Mendez was awarded no

damages rather than nominal damages.   Nonetheless, the <u>Franco</u> court's discussion of the issue,

which treats an award of "no more than nominal damages" as equivalent to no monetary award at

all, strongly suggests that the Texas Supreme Court would be skeptical of an attorney's fee claim

based on an award of nothing more than nominal damages.

Although the Texas Supreme Court has not squarely decided this issue, intermediate

appellate courts in Texas have addressed it and have uniformly held that an award of nominal

damages is not sufficient to render a plaintiff a "prevailing party" in a contract breach case.  <u>See</u>

<u>Ameritech Servs., Inc. v. SCA Promotions, Inc.</u>, No. 05-03-247-CV, 2004 WL 237760, at *4

(Tex. App. Feb. 10, 2004) (a verdict of $1 in nominal damages "cannot support an award of

attorney's fees"); <u>Ford Motor Co. v. Metro Ford Truck Sales, Inc.</u>, No. 05-99-31-CV, 1999 WL

1126280, at *6 (Tex. App. Dec. 9, 1999) (same); <u>ITT Commercial Fin. Corp. v. Riehn</u>, 796

S.W.2d 248, 256-57 (Tex. App. 1990) (same); <u>see also</u> <u>County of Dallas v. Wiland</u>, 216 S.W.3d

344, 358 (Tex. 2007) (stating, in a civil rights action under 42 U.S.C. § 1983, that "nominal

damages ordinarily will not support attorney fees"); <u>Gulf States Utils. Co. v. Low</u>, 79 S.W.3d

561, 567 (Tex. 2002) (stating in dictum that "plaintiff who receives nominal or zero damages is

not entitled to attorney's fees").   Combined with the reasoning and pointed dictum in the Texas

Supreme Court cases, those decisions of the Texas intermediate appellate courts are sufficient to

persuade this Court that under Texas law, an award of nominal damages, in a breach of contract

case in which no other affirmative relief is granted on the contract claim, will not support a claim

for an award of attorney's fees.

For these reasons, the Court concludes that the nominal damages award of $1, which was the only relief Autodata obtained on its breach of contract claim, does not render it a "prevailing party" for purposes of its request of $4,669,793.39 in attorney's fees and expenses.  Autodata's fee request therefore must be denied on that ground.

### 2.  The Amount of the Fee Request

Apart from Autodata's failure to satisfy the requirement that it be a "prevailing party" on its breach of contract claim, the amount of Autodata's fee request is not supported by the documentation Autodata has supplied to the Court.  Versata objects to the amount of the fee request on two grounds: first, that Autodata has included within its request for fees and expenses that are not directed to Autodata's breach of contract claim but relate to other issues in the case; and second, that the records Autodata has submitted are so general in nature as to make it impossible to determine what work relates directly to its breach of contract claim.  The Court concludes that there is merit to both points.  Although the Court's ruling on Autodata's attorney's fee request does not turn on these issues, the Court concludes that it may nonetheless be useful to address them at least briefly.

Under Texas law, a party seeking an award of attorney's fees is generally entitled to recover only for work on the particular claim for which the party has a statutory or contractual right to fees.  Gulf States Utils. Co., 79 S.W.3d at 567.  As a result, fee claimants have been required to segregate fees between claims for which fees are recoverable and claims for which they are not.  Tony Gullo Motors, 212 S.W.3d at 311.  Texas courts have recognized an exception to that rule for work on other claims that arise out of the same transaction and are "so interrelated that their 'prosecution or defense entails proof or denial of essentially the same facts.'"  Id. (quoting earlier cases).  In 2006, the Texas Supreme Court noted that the exception

has "threatened to swallow the rule," and it therefore set forth a narrow test for applying that exception: "it is only when discrete legal services advance both a recoverable and unrecoverable claim that they are so intertwined that they need not be segregated." Id. at 313-14.   In a subsequent case, the Texas Supreme Court made clear that "attorney's fees are recoverable only if necessary to recover on a contract or statutory claim allowing them," and that fees incurred on separate but "arguably intertwined claims" are not recoverable.  Varner v. Cardenas, 218 S.W.3d 68, 69 (Tex. 2007).

Autodata contends that more than 70 percent of all the legal services performed and expenses incurred in this case are sufficiently related to its breach of contract claim that they are recoverable under the attorney's fee provisions in the 1997 and 1998 contracts.  That claim is questionable on its face and is supported only by the assertions of Autodata's counsel.  For example, it is difficult to perceive how the relationship between the breach of contract claim and the patent claims is sufficient to satisfy the standard set forth in Tony Gullo and Varner.  The same would appear to be true of the state law claims involving the Chrysler contracts.  The misappropriation and breach of contract claims relate to events that occurred between 1997 and 2000.  The patent claims and the state law claims involving Chrysler relate principally to events that occurred years later.  It is difficult to envisage any discrete legal services specifically directed at the patent claims that could fairly be said to be necessary to Autodata's effort to prevail on its breach of contract claim.  If there is any theory under which that could be so, Autodata has failed to identify it except through unhelpful generalizations.

While Autodata recognizes that Texas law requires it to segregate work done on fee-eligible claims from work done on claims that are not fee-eligible, there is nothing in the materials submitted to the Court that explains how Autodata segregated the fees and expenses;

there is not even any statement as to which claims Autodata regards as sufficiently related to the breach of contract claim to support its fee request or how the work on other claims related to the breach of contract claim.   The principal affidavit in support of the fee request, filed on Autodata's behalf by attorney Michael Adams, acknowledges Autodata's obligation to segregate the fees that are attributable to the breach of contract claim from other fees incurred in the case, but it offers no explanation of how Mr. Adams reached the conclusion that more than 70 percent of Autodata's attorney's fees and expenses were attributable to the breach of contract claim. Regarding the segregation issue, his affidavit has only this to say:

> A significant portion of the time involved in this matter has been spent doing, or causing to be done, the actions necessary to defend and prevail on claims arising from or substantially connected with Versata's breach of its contractual obligations. . . .   I removed all fees that were not attributable or substantially connected to Autodata's breach of contract claim. . . .   My segregation of fees identified $3,037,554.34 in recoverable fees that are attributed to or are substantially connected with Autodata's breach of contract claims.   My segregation analysis and review ultimately removed $1,255,348.16 in fees related to claims for which it could not recover attorney's fees.

Those assertions are essentially unreviewable.   The Court has no guidance from Mr. Adams's affidavit as to which claims Mr. Adams regards as "substantially connected with Autodata's breach of contract claims" and which he regards as too remote to be included.   Given that Mr. Adams concluded that more than 70 percent of the fees and expenses incurred in this case were for the breach of contract claim or claims "substantially connected with" that claim, the Court is left with a strong suspicion that in characterizing particular claims as "substantially connected with" the breach of contract claim, Mr. Adams has taken a broad view of the "necessary to recover" standard adopted by the Texas Supreme Court.   In any event, there is no guidance from the affidavit, and very little guidance from Autodata's motion, as to what claims

were included within the fee request and how those claims satisfied the "necessary to recover" test.

The other affidavits submitted with the motion are insufficient for the same reason.  Mr. Fraioli's affidavit and Ms. Giberti's affidavit largely track Mr. Adams's affidavit with respect to the issue of segregation.  Mr. Gillam's affidavit contains no discussion of segregation at all.  The short of the matter is that if the Court's order denying Autodata's request for attorney's fees should be overturned on appeal, the segregation issue will be a critical one on which the parties are likely to disagree sharply.  If the Court is to have any means of resolving the parties' dispute as to the work for which Autodata is entitled to recover fees and expenses, it will need considerably more than the unelaborated assertions of Autodata's counsel that the requested fees and expenses were all incurred on the breach of contract claim or claims that are "substantially connected with" the breach of contract claim.[9]

A second, and related, problem with Autodata's fee application is that it does not contain the level of detail necessary for the Court to conduct a meaningful review of the actual services performed and expenses incurred so as to determine which services and expenses are recoverable and which are not.  The affidavits are general in nature, they are not supported by billing records, and they do not set forth what specific work was done with respect to which claims in the case.  While the attorneys' affidavits break down their fees by categories of work,

---

[9]   The Court does not regard the inadequacy of Autodata's evidence of segregation of its fees to be an alternative ground for ruling that Autodata is entitled to no fee award.  The Texas Supreme Court has held a party's failure to segregate attorney's fees does not mean that the party may not recover any fees at all, but that the proper course in such a case is to order a remand.  See Tony Gullo Motors, 212 S.W.3d at 314; Stewart Title Guaranty Co. v. Sterling, 822 S.W.2d 1, 11-12 (Tex. 1991).  Accordingly, in the event that the fee issue were to arise again in the course of this litigation, the Court would likely follow that course and allow Autodata to file an amended request applying the proper standards for segregating its fees and providing adequate detail to assure the Court that it had done so.

such as "case assessment," "review of document production," and "preparation of discovery motion," that is as far as the affidavits go by way of providing detail as to the services rendered. Under Texas law, as applied to an attorney's fee application such as the one in this case, that evidence is insufficient enable the Court to "discern from the evidence how many hours each of the tasks required and whether that time was reasonable."  El-Apple I, Ltd. v. Olivas, 370 S.W.3d 757, 763 (Tex. 2012).

Autodata's Motion for Award of Attorney's Fees is DENIED.

It is so ORDERED.

SIGNED this 9th day of October, 2012.


WILLIAM C. BRYSON
UNITED STATES CIRCUIT JUDGE